**Richard BARNETT, et al., Plaintiffs,**

**v.**

**CITY OF CHICAGO, et al., Defendants,**

**and**

**Carole Bialczak, et al., Defendant–Intervenors.**

**Mary BONILLA, et al., Plaintiffs,**

**v.**

**CITY OF CHICAGO, et al., Defendants,**

**and**

**Carole Bialczak, et al., Defendant–Intervenors.**

**Nos. 92 C 1683, 92 C 2104 and 92 C 2666.**

United States District Court,
N.D. Illinois,
Eastern Division.

June 9, 1997.

---

Judson H. Miner, Miner Barnhill & Galland, Chicago, IL, Nathaniel R. Howse, Jr., Howse, Howse, Neville & Gray, Chicago, IL, Jacqueline A. Berrien, New York City, for Richard Barnett, Eddie Reed.

James Michael Scanlon, Rieff & Scanlon, Chicago, IL, for Bd. of Election Com'rs of Chicago.

Paul L. Strauss, Jeffrey Irvine Cummings, Mark Steven Kende, Judson H. Miner, Miner Barnhill & Galland, Chicago, IL, for Ed H.

Smith, Allan Streeter, Helen Shiller, John O. Steele, Dorothy Tillman, Lawrence S. Bloom, Robert Shaw, Jesse J. Evans, Bobby L. Rush, Percy Giles, William M. Beavers, Toni Preckwinkle, Rickey Hendon, Joe Moore, Arenda Troutman, Shirley A. Coleman, Virgil E. Jones, Jesse Miller, Sam Burrell, Political Action Conference of Illinois.

Kelly Raymond Welsh, Andrew S. Mine, City of Chicago, Law Dept. Corp. Counsel, Chicago, IL, Susan R. Lichtenstein, Ameritech Corp., Chicago, IL, for Richard M. Daley.

Kelly Raymond Welsh, Andrew S. Mine, City of Chicago, Law Dept. Corp. Counsel, Chicago, IL, Michael Levinson, Bd. of Election Com'r, Chicago, IL, Susan R. Lichtenstein, Ameritech Corp., Chicago, IL, for City of Chicago, City Council.

Ricardo Meza, Maria Valdez, Anthony E. Chavez, Patricia Mendoza, Mexican American Legal Defense & Educ. Fund, Chicago, IL, for Mary Bonilla, Rafael Boria, Neomi Hernandez, Ignacio Alvarez, Antonio Miranda, Peter Mendoz, Francisco Duprey.

James Michael Scanlon, Rieff & Scanlon, Chicago, IL, for Michael J. Hamblet.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

### INTRODUCTION

#### A. *The Trial Proceedings*

1. The trial of this case lasted for 48 trial days commencing on February 28, 1996 and concluding on August 1, 1996.[1] There was a lengthy hiatus in the trial between April 4, 1996 and June 25, 1996 necessitated by a serious injury suffered by the lead trial counsel for the *Barnett* plaintiffs. The transcript of this trial spanned 8731 pages. The record of this trial also included several hundred exhibits and approximately one thousand pages of deposition designations and counter-designations offered by the parties.[2]

2. The monumental length of this bench trial was necessitated by the complex and tightly fought nature of this case. This case raised numerous difficult and knotty legal and factual issues, the complexity of which was compounded by the issuance of several Supreme Court decisions during the course of trial, which defendants argued altered significantly the scope of § 2 of the Voting Rights Act (the "VRA"). The complexity of this trial was further compounded by this Court's obligation to consider the "totality of the circumstances" in connection with plaintiffs' claim that they have been afforded "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *See* 42 U.S.C. § 1973. This Court endeavored, to the extent that time permitted, to give the parties extensive leeway in their examinations of witnesses and the admission of evidence in an effort to permit a thorough analysis of the totality of the circumstances.[3]

3. Together the plaintiffs presented 20 witnesses. Plaintiffs' witnesses included six expert witnesses: 1) Prof. Paul Kleppner who testified on behalf of the *Bonilla* plaintiffs concerning the historical background of the redistricting process; 2) Dr. James

---

1. This Court feels compelled to express its appreciation to the counsel in this case for their outstanding representation of their clients. Rarely in its twenty-one years as a judge has this Court had the pleasure of presiding over a trial in which the attorneys displayed such zealous and skillful advocacy. The people of this City were truly well served by the adroit manner in which the counsel presented the issues in this important case to this Court.

   This Court also wishes to express its gratitude to Magistrate Judge Joan Lefkow of the Northern District of Illinois for her judicious shepherding of this case through its hard fought and lengthy discovery process.

2. Throughout this Opinion citations to the trial transcript are "Tr. ____"; stipulated exhibits are "SX ____"; joint plaintiffs' exhibits are "PJX ____"; *Barnett* plaintiffs' exhibits are "BAPX __"; *Bonilla* plaintiffs' exhibits are "BOPX __"; defendants' exhibits are "DX ____"; deposition designations are "____ Dep. Des. ___."

3. This Court recognizes that this is the longest opinion it has ever issued. This event was unavoidable, however, given the complexity of the issues before this Court and this Court's obligation to conduct a searching review of all the relevant facts.

Lewis who testified on behalf of the *Barnett* plaintiffs concerning racial cleavages in City Council voting and the access of minority candidates to campaign funds; 3) Dr. D. Garth Taylor who testified on behalf of the *Barnett* plaintiffs concerning the diverse communities of interest in the white and African–American communities; 4) Dr. Leobardo Estrada who testified on behalf of the *Bonilla* plaintiffs concerning the illustrative alternative ward maps prepared in connection with the *Bonilla* case, the socio-economic characteristics of Chicago's Latino population, the "fragmentation" of the Latino community by Chicago's ward map, and the Latino citizenship rates in Chicago; 5) Professor Alan Lichtman who testified on behalf of the *Bonilla* plaintiffs concerning racial bloc voting and the cohesiveness of Latino voters, Professor Lichtman also investigated Latino voter turnout and voter registration patterns; 6) Professor Richard Engstrom who testified on behalf of the *Barnett* plaintiffs concerning racial bloc voting, voter cohesiveness and polarization as they affect African–American voters, the fracturing and packing of African–American communities in the present ward map, and the *Barnett* illustrative alternative ward maps. In addition to this extensive expert testimony, plaintiffs also presented testimony from many, with some key exceptions, of the persons who played pivotal roles in the remap process.[4] The plaintiffs also submitted by designation the deposition testimony of ten witnesses including Aldermen Virginia Rugai, John Buchanan, Burton Natarus, Lorraine Dixon, Michael Wojick, former aldermen Medrano, Fary, Mazzola and Bialczak and Joseph Pindell, an employee of EDS who was responsible for maintaining the computers used by the City in connection with the ward remap process.[5]

**4.** Judge Lisa Ruble Murphy, who was the City Council Finance Committee Staff member largely responsible for drawing the present ward map; Alderman Edward M. Burke; Alderman Patrick Huels; Alderman Thomas Murphy; former–Alderman Edwin Eisendrath; Alderman Richard Mell; Kimball Brace, the president of Election Data Services ("EDS") the consulting service hired by the City in connection with the remapping process; and Dr. Lisa Handley, the chief demographic researcher employed by EDS, were all called by plaintiffs as adverse witnesses. In addition, the *Barnett* plaintiffs called plaintiff-aldermen Toni Preckwinkle, Arenda Troutman, and John Steele as witnesses. In addition during their rebuttal case, the *Barnett* plaintiffs called State Senator, and former alderman, Ricky Hendon. The *Bonilla* plaintiffs also called Congressman Luis Gutierrez and State Senator Juan Garcia, both of whom were alderman during the 1991–1992 ward redistricting process. Defendants attempt to make much of the fact that some of the pivotal members of the African–American aldermanic plaintiff-class, who played leadership roles during the redistricting process, as well as some members of the Latino community's leadership during the redistricting, were not called to testify by plaintiffs arguing that their failure to testify justifies the drawing of a negative inference as to their role in the remapping process. Plaintiffs' conduct, however, is not at issue in this case—even if the aldermanic plaintiffs had been completely obstructionist and unaccommodating or had adopted a completely unreasonable position during the remap process, such conduct would not excuse a final ward map that diluted minority voting strength. Defendants also argue that plaintiffs have failed to establish that minority voters suffer any actual dilution of their voting strength under the present ward map because no non-aldermanic, non-expert voters in the City of Chicago were called to testify concerning their experience of vote dilution. It is difficult to imagine the possible probative value of lay testimony concerning the experience of vote dilution, absent some practice or policy which operates as a bar to minority participation at the ballot box. It is highly doubtful that a lay witness, no matter how sophisticated, would be able to provide any probative testimony concerning the abstruse social science analysis necessary to identify racial bloc voting, minority voting cohesion, and the identity of the minority candidate of choice all of which are relevant to this Court's VRA § 2 analysis. Similarly, it would be of minimal, if any, relevance for one, or several, lay minority voters to testify of his or her personal experience of being fractured or packed as a voter in the City of Chicago. Given the standard set forth in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the most relevant evidence of minority vote dilution will of necessity be elicited from expert, rather than lay, testimony. The ability to give credible opinions concerning voting patterns, however, is not limited to experts in statistical analysis. Candidates, or others significantly engaged in politics, who must necessarily develop an ability to analyze voters' preferences, can also provide helpful testimony concerning voting patterns. *See e.g. Vecinos De Barrio Uno v. City of Holyoke*, 960 F.Supp. 515, 523–24 (D.Mass.1997) (*UNO*).

**5.** If only part of a deposition has been offered into evidence Fed. R. Civ. P. 32(a)(4) permits the counter-designation of any other part of the deposition which ought in fairness be considered

4. The defendants presented the testimony of sixteen witnesses. The defendants called two expert witnesses: 1) Professor Norfleet Rives who testified concerning demographic patterns in the City of Chicago, "race-neutral" benchmark maps, fracturing under the current ward map and plaintiffs' illustrative alternative maps, and an estimate of citizenship rates and their effect on minority voting strength; and 2) Professor Ronald E. Weber who testified concerning minority participation in the political process, minority voting cohesion, and whether bloc voting by majority voters usually results in the inability of minority voters to elect their candidates of choice. The defendants called Aldermen Burke, Murphy, Rugai, Mary Ann Smith, and Banks; former Finance Committee staffmembers Judge Ruble–Murphy and Kathy Tuite; David Ortiz, a former aldermanic candidate in the 10th Ward; George Atkins, the campaign manager for Alderwoman Helen Schiller of the 46th Ward; Robert Bartell, the President of the Independent Voters of Illinois–Independent Precinct Organization; Joseph Pindell, a computer technician then employed by EDS; Dr. Solomon Chu, the President of the Chinatown Chamber of Commerce; Michael Norkewicz, the chief demographer of the Latino Institute a not-for-profit organization which was involved in developing proposed ward maps for Latino majority wards during the redistricting process. The defendants also called Whitman Soule, a computer technician who assisted the African–American aldermen during the remap process and who assisted in preparing the *Barnett* illustrative alternative ward maps, and whose testimony was of little or no relevance, as an adverse witness.

5. The defendants also submitted deposition designations for 23 *Barnett* plaintiffs or former plaintiffs including the present and former aldermanic plaintiffs and the lay plaintiffs. The defendants also submitted deposition designations for the 4 lay *Bonilla* plaintiffs and for Juan Andrade, the President of the Midwest/Northeast Voter Registration and Education Project.

### B. The Parties [6] and their Claims

6. This litigation was initially brought by three separate classes of plaintiffs: the *Barnett* class consisting of several African–American residents and voters in the City of Chicago (92 C 1683); the *Smith* class consisting of 16 African–American alderman for the City of Chicago (92 C 2104); and the *Bonilla* class consisting of several Latino residents and voters in the City of Chicago (92 C 2666) (the "*Bonilla*" plaintiffs). The *Barnett* and *Smith* classes have been consolidated and will be referred to collectively as the *Barnett* class. The *Barnett* and *Bonilla* classes have been consolidated for the purposes of discovery, trial, and the possible consideration of a remedial ward map.

7. Both the *Barnett* and *Bonilla* plaintiffs are challenging the boundaries of Chicago's aldermanic districts which were approved by a majority of the voters in the City of Chicago by referendum on March 17, 1992. Both sets of plaintiffs have challenged Chicago's present ward boundaries under § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 *et seq.*, (the "VRA") and the Fourteenth and Fifteenth Amendments of the United States Constitution. In capsule summary, both classes of plaintiffs allege that the present ward boundaries were purposefully drawn to, and/or result in, the dilution of African–American and Latino voting strength.

8. Both the *Barnett* and *Bonilla* classes have been certified to include those African–Americans and Latinos "who have been, will be, and/or continue to experience a dilution of their right to vote due to the discriminatory actions, policies, and practices of the defendants as alleged in the plaintiffs' third amended complaint."

9. The defendants in both consolidated cases are the City of Chicago and the Board

---

with the part introduced. In the spirit of this broad rule and this Court's liberal admission of all relevant evidence at trial, this Court, based upon its review of the deposition designations and counter-designations, can discern no obstacle to their admissibility.

6. Throughout this Opinion, this Court will use the terms "Latino" and "African–American" to denote members of the relevant ethnic and racial minorities. This Court was advised by counsel that these are the preferred terms among members of the respective communities.

of Election Commissioners of Chicago. Additionally, 30 current or former alderman for the City of Chicago have intervened as defendants in both consolidated cases. The majority of the intervening alderman were among the co-sponsors of the current ward map when it went before the voters of the City of Chicago at referendum. The defendants and intervening defendants will hereinafter be referred to collectively as "the defendants."

10. Having considered the testimony and exhibits presented during the course of the trial, the pleadings, the designated discovery materials, and the parties' written submissions following trial, this Court concludes that plaintiffs have failed to demonstrate either a violation of the VRA, or of their constitutional rights.

## I. FINDINGS OF FACT[7]

### A. The 1990 Census and the Chicago City Council

11. The Chicago City Council is composed of 50 alderman each of whom is elected from one of 50 single-member districts. Chicago's aldermen are elected in non-partisan elections every four years. If no aldermanic candidate receives a majority of the votes in the initial round of voting, then a runoff election is held between the top two vote-getters. 65 ILCS 20/21–36.

12. The most recent aldermanic elections, using the present ward map, were held in February, 1995, with runoff elections held in April, 1995. As a result of these elections, there are presently 24 white, 19 African–American, and 7 Latino aldermen in the City of Chicago.

13. Pursuant to Illinois law, ward boundaries for Chicago's City Council must be redrawn every ten years, on the basis of the national census within the year after the decennial census. The Illinois Statute requires that the ward remap performed subsequent to the 1990 census be completed on or before December 1st of the year following the decennial census. 65 ILCS 20/21–38.

14. The statute of the State of Illinois also requires that each ward must be contiguous and compact and the population in each ward must be "as nearly equal as practicable." 65 ILCS 20/21–36. Given the total population of Chicago, as tabulated by the 1990 Census, the target ward population, if each ward is equally populated, is 55,675 persons.

15. Census data for the City of Chicago was released on February 11, 1991. The data released on that date constitutes the official tabulation of the population of the State of Illinois and the City of Chicago pursuant to Public Law 94–171. The P.L. 94–171 data constituted the files used in the redistricting process and are produced by the Census Bureau pursuant to its statutory obligations. The P.L. 94–171 files contain data at the block level recorded by race and Latino origin for total and voting-age population. The initial release by the Census Bureau does not contain citizenship data. The Census Bureau's estimates of citizen population were not released until early 1992, after the ward remapping process was complete.

16. According to the 1990 census, Chicago's population changed significantly between 1980 and 1990. The total population of Chicago fell by 221,286 from 3,005,072 in 1980 to 2,783,726 in 1990. (SX 1, 3). The makeup of Chicago's population underwent significant changes as well. The breakdown of Chicago's white, African–American and Latino populations[8] were:

---

7. To the extent that a finding of fact constitutes a conclusion of law, it is adopted as such, and to the extent that a conclusion of law constitutes a finding of fact, it is likewise adopted as such.

8. The balance of Chicago's total population, some 107,355 persons, includes Asian–Americans, Native–Americans, and others. The Asian–American population of Chicago, while sizeable, is spread throughout the City with its principal concentrations on the near south side in the 25th ward, the northwest side in the 33rd and 39th wards, and the north side in the 46th and 48th wards. The Asian–American community in Chicago is not so compact so as to be able to form a majority in a single ward.

|  | Whites | African–Americans | Latinos |
|---|---|---|---|
| Total Population (TP) in 1990 | 1,056,048 | 1,074,471 | 545,852 |
| Increase or (Decrease)in TP from 1980 | (243,509) | (122,529) | 123,789 |
| % of TP in 1990 | 37.9 | 38.6 | 19.6 |
| Change in % of TP from 1980 | – 5.3 | – .8 | 5.6 |
| Voting Age Population (VAP) in 1990 | 897,405 | 736,560 | 345,307 |
| VAP in 1980 | 901,574 | 764,260 | 252,077 |
| % of VAP in 1990 | 43.5 | 35.7 | 16.8 |
| % of VAP in 1980 | 49.8 | 35.5 | 11.7 |

17. The 1990 census figures also revealed additional information concerning the population patterns in the City of Chicago which information was highly important to the redistricting process. The 1990 census showed that Chicago's then-existing wards were not evenly populated—wards ranged from as much as 13,100 above the target ward population to 13,400 below the target ward population of 55,675. (SX 2). All the wards in which African–Americans were a majority were underpopulated—wards 2, 3, 4, and 20, all of which are on the South Side of Chicago, were each more than 10,000 people below the ideal ward population and wards 5, 7, 8, 16, and 17 all of which are also on the city's South Side were at least 3,500 people short of the target population. The five African–American majority wards on the west side of the city had collectively lost over 73,000 people. Meanwhile, most of the wards with white or Latino majorities or pluralities were populated in excess of the target ward population—wards 12, 13, 14, 22, 23, 25, 30, 31, 32, 33, 35, 36, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, and 50 were all overpopulated. Since Chicago's wards were not evenly populated, the City was required to redraw the ward boundaries.

18. The census data also revealed that the City of Chicago remains highly segregated. 90% of the City's African–American population lived in census blocks that were at least 50% African–American, chiefly on the City's south and west sides, while 83% of the City's white population lived in census blocks that were at least 50% white, chiefly on the City's north and northwest sides. While the City remained highly segregated, the census data revealed that there was some migration of African–Americans from traditional African–American neighborhoods to white majority and plurality areas. (*Compare* SX 1, SX 3). The white majority areas of the City, correspondingly, were less densely white populated than in the past. The Latino community was not quite as densely concentrated, nonetheless approximately 61% of the Latino community lived in majority Latino census blocks, chiefly on the near-northwest, near-southwest and southeast sides of the city.

19. Subsequent to the release of the P.L. 94–171 data, and subsequent to the drawing of the ward maps which were submitted to referendum, the Census Bureau released its estimates of the citizen voting age population ("CVAP") of the City of Chicago. The CVAP estimate is not arrived at by means of a canvas of every household in the City, rather it is derived from sample census forms which are mailed to one in every eight households. Based upon the sample data, CVAP estimates are derived at the census block group, rather than the smaller census block level. Based upon the census bureau's estimates, Chicago's CVAP is approximately 45% white, 40% African–American, and 11% Latino. (DX 509).

20. Plaintiffs ask this Court to adjust the census figures for the alleged undercount of

minority members, chiefly African–Americans. This Court, however, has already ruled and this Circuit has already rejected claims seeking to force an adjustment of the census data to reflect the minority undercount. *Tucker v. United States Dept. of Commerce*, 958 F.2d 1411 (7th Cir.), *cert. denied*, 506 U.S. 953, 113 S.Ct. 407, 121 L.Ed.2d 332 (1992). Even accepting the likelihood that there was an undercount of minorities, the official census count nonetheless constituted the statutory basis for drawing the Chicago ward map. Furthermore, this Court has been presented with no basis for a statistical adjustment for the undercount which would necessarily improve the accuracy of the census count. This Court, therefore, will not adjust the official census count. This Court recognizes, however, that within the constraints of Illinois' statutory requirements that ward populations be "as nearly equal as practicable" the drawers of the ward map can adjust for a perceived undercount by "underpopulating" areas where an undercount occurred and "overpopulating" other areas[9] or by a skillful drawing of boundary lines so as to include majority populations in majority-minority wards.

## B. The Ketchum Litigation

■ 21. Defendants ask this Court to make detailed findings and conclusions relating to the litigation and eventual settlement arrived at as a result of the 1981 ward redistricting. *See Ketchum v. Byrne*, 740 F.2d 1398 (7th Cir.1984); *on remand, Ketchum v. City Council*, 630 F.Supp. 551 (N.D.Ill.1985). This Court rejects defendants' invitation to find that the current ward map is presumptively legal because of what happened during the course of the *Ketchum* litigation. First

and foremost, *Ketchum* was decided on the basis of the 1980 census and the manner in which the population of the City was distributed at that time—the population of Chicago is simply not distributed in the same manner as it was in 1980 and this Court must make its findings based upon the factual situation in Chicago as it existed in 1990, following the legal standards as set forth in the relevant authority including *Ketchum*.[10]

22. Furthermore, several of the findings made in *Ketchum* which might well bear revisiting based upon the facts presented before this Court. First, while the District Court approved the map of the 18th ward as agreed upon in the *Ketchum* settlement, the boundaries of the 18th ward must be reviewed by this Court in the light of the population shifts in that area and the record of election results and minority access to the political process presented at trial. The 18th ward did not have to be reconfigured in order to correct retrogression. *Ketchum*, 630 F.Supp. at 562. Second, the *Ketchum* era 18th ward was drawn as a "horse race" ward and this Court must review the record to determine whether the race has proved to be unequal. *Id.* Third, whether minority voters are packed or fractured is an extremely fact specific analysis dependent upon the present population patterns and minority access to the political process, not upon the factual record of the prior litigation. Fourth, *Ketchum* posited a 65% rule of thumb as the population percentage necessary to constitute an effective minority ward, an estimate which was necessitated by the unreliability of the data then available. *Ketchum*, 740 F.2d at 1416. Additionally, the map approved in the final District Court order in *Ketchum* was a compromise map—it was not necessar-

---

**9.** Within the local context, a population deviation below 10% is presumptively constitutional. *Voinovich v. Quilter*, 507 U.S. 146, 160–62, 113 S.Ct. 1149, 1159, 122 L.Ed.2d 500 (1993).

**10.** *Ketchum* provides one of the leading studies of the principle of retrogression. *Ketchum* defined retrogression as a decrease in a new districting plan or other voting scheme from the previous plan or scheme in the absolute number of representatives a minority group has a fair chance to elect. *Ketchum*, 740 F.2d at 1402, n. 2. For retrogression to occur there must be a shortfall in minority representation below what

would have been anticipated based on changes in overall population proportions. The application of the nonretrogression rule was particularly apt in *Ketchum* where the population of Chicago was declining but the number of wards remained constant. *Id.* The nonretrogression rule, however, is of little applicability to this Court's analysis. In the instant case, both African–American and white population decreased. African–American representation in the City Council remained constant, however, while white representation decreased by 3 seats, and Latino representation rose by 3 seats.

ily a complete vindication of plaintiffs' rights. It is, of course, beyond dispute that the final *Ketchum* map is relevant insofar as it was the map that was in place, and thus acted as a template, when the redistricting process began in 1991.

23. Under the *Ketchum* ward boundaries, based upon the 1990 census total-population figures, there were 16 wards with white majorities, 20 with African–American majorities, 6 wards with Latino majorities, and 8 wards with no racial or ethnic group constituting a majority. Using voting-age population as a measure, there were 20 white majority wards, 20 African–American majority wards, 4 Latino majority wards, and 6 wards with no racial or ethnic group constituting a majority. (SX 3). In the elections taking place in February and April 1991, which utilized the *Ketchum* ward map, 28 white, 18 African–American, and 4 Latino alderman were elected to the City Council. The alderman elected in the 1991 elections bore the statutory duty to redistrict Chicago's ward boundaries.

### C. The 1991 Redistricting Process

#### 1. General Overview

■ 24. This Court heard extensive testimony concerning the process of redrawing Chicago's ward map in 1991, including testimony concerning the negotiations, political alliances, and cleavages, which affected the remap process. This testimony, which frequently touched upon purely political questions concerning the leadership style and personality of various leaders of the Chicago City Council, invited this Court to inspect processes which courts are properly loathe to consider. It would be improper for this Court, or any other, to attempt to take politics out of legislative redistricting, even if it is the most common politics of rewarding one's allies and punishing one's adversaries. The redistricting process is intrinsically political and it is impossible to separate the considerations motivating the parties involved in the process from partisan political concerns. While keeping in mind the political nature of the redistricting process, this Court must not lose sight of the purpose of VRA § 2 to ensure that minority members have an equal opportunity to participate in the political pro-

cess and to elect representatives of their choice.

25. Despite its reluctance to venture into the political thicket, this Court has considered the history of the 1991 remap process insofar as it is relevant to plaintiffs' intent claims. Additionally, while the process by which the present ward map was drawn is largely irrelevant to the *Gingles* analysis of plaintiffs' VRA § 2 claims, the process is relevant to this Court's consideration of the totality of the circumstances. The testimony concerning the redistricting process shed much light on the practical concerns motivating the City Council leadership, and the Latino and African–American communities. These practical considerations, such as the low citizenship and registration rates in some segments of the Latino community, guided some of the City's redistricting decisions. In order to have an accurate view of the full extent to which the present ward map might limit minority participation in the political process it is necessary to take into account the prudential, political compromises which were a part of the map-drawing process.

#### 2. Initial Preparations for the Redistricting

■ 26. The 1990 census figures were released in February of 1991. At about the same time, Alderman Edward Burke, representing the 14th Ward on the City's southwest side, and chairman of the City Council's Finance Committee, instructed his staff to begin preparing for the redistricting of Chicago's ward map.

27. Alderman Burke has long been one of the acknowledged leaders of the Chicago City Council and much of this power derives from the traditional importance of his position as Chairman of the Finance Committee. The Finance Committee has the largest budget and professional staff of any committee of the City Council and has jurisdiction over the City's budget. As such, by virtue of his position as chairman of the Finance Committee, Alderman Burke is among the leaders, if not the single most influential figure, in the City Council.

28. One area where the Finance Committee does not formally exercise jurisdiction is

over the decennial redrawing of the Chicago ward map. Redistricting is formally under the jurisdiction of the Rules Committee of the Chicago City Council. The Rules Committee was, and remains, chaired by Alderman Richard Mell of the 33rd Ward.

29. That the Finance Committee assumed the rule of leading the initial stages of preparation for the remap of the ward map is not indicative of any discriminatory intent. At the time of the redistricting, the Rules Committee had only several people on its full-time staff while the Finance Committee had the largest staff of any City Council committee. The Finance Committee staff also had extensive experience conducting legal research and administering and coordinating sizable citywide projects. The Finance Committee also had the largest budget of any City Council committee, permitting the committee to retain outside consultants and obtain computer equipment using council funds. More than any other agency, the staff members of the Finance Committee were experienced in coordinating and obtaining consultants' and other services. It was not unusual for Finance Committee staffers to assist other committees on projects outside the formal jurisdiction of the Committee. Given these circumstances, it is not surprising that Finance Committee staff members assumed the leading staff responsibilities for the 1991 redistricting. The use of Finance Committee staff members in connection with the redistricting was simply a practical expedient insofar as the staff members of the Finance Committee had the expertise, manpower and budget necessary to coordinate a project as time-consuming and complex as redistricting the Chicago ward map.

30. Among the Finance Committee staff people assigned to the redistricting was Lisa Ruble–Murphy, now a Cook County Circuit Court Judge, who was a long-time employee of the Committee. Judge Ruble–Murphy was given the lead role in connection with the work related to redistricting. Judge Ruble–Murphy quickly assumed the role of the principal map-drawer. In fact, the final ward map was largely Judge Ruble–Murphy's handiwork. She was the only city employee trained to operate the computers used to assist in the map drawing process as well as the only city employee with complete access to the redistricting computer. She was given the task of canvassing and coordinating the desires of the 50 alderman and the relevant community interest groups. Having observed Judge Ruble–Murphy on the witness stand for over four days of testimony, this Court found her to be an honest and credible witness who performed the difficult task of coordinating the various competing aldermanic and community interests to the best of her ability while sincerely attempting to draw a ward map that would comply with law and would account for community concerns as fully as possible. Not surprisingly, many parties, including plaintiffs and some of the defendants, were dissatisfied with the map that was finally produced. Also not surprisingly, several alderman testified that they were dissatisfied with their access to the redistricting computer or with Judge Ruble–Murphy's attentiveness to their desires. (Tr. 5153–Preckwinkle; Tr. 5205–Steele; Tillman 9/20/95 Dep. Des. 80). These complaints concerning access to the computers in City Hall were indicative of neither intentional discrimination nor a § 2 violation but were a function of the heavy demands for computer time.

31. Given the prior history of efforts to draw ward maps for the City and the serious and intensely felt interests at issue in the ward remap process, Alderman Burke and Judge Ruble–Murphy expected at an early date that the map which was eventually approved would likely be the subject of litigation. Accordingly, among Judge Ruble–Murphy's stated objectives as she undertook her responsibilities of coordinating the redistricting was to draw a map that could withstand legal challenge. (Tr. 191–92–Burke). In furtherance of this objective, Judge Ruble–Murphy and her staff conducted an extensive review of the City's previous redistricting efforts and of the relevant legal standards. In the summer of 1991, Judge Ruble–Murphy enlisted several student interns to prepare a number of memoranda summarizing Chicago's demographic and electoral situation, including the changes in the racial and ethnic makeup of Chicago, the minority undercount, and racial differences in voting turnout, participation, and registration.

(PJX 24–30). That a redistricter would request reports summarizing these conditions is neither surprising nor indicative of racially-based intent but is simply indicative of the fact that Judge Ruble–Murphy attempted to familiarize herself with the many issues and factors which were relevant to this redistricting process.

32. One of the first tasks performed by Judge Ruble–Murphy and her staff was to locate and recommend a redistricting consultant to assist the City Council. (Tr. 198, 391–Ruble–Murphy). It was anticipated that the consulting firm would provide computers, software to assist with the redistricting, and consulting services. Eventually, two leading consulting firms, were identified, Logistic Systems, Inc. ("LogisSys") and Election Data Services ("EDS"). LogisSys and EDS both submitted bids to provide redistricting support to the City Council.

33. After comparing the competing bids, Judge Ruble Murphy recommended EDS. (Tr. 407, PJX 6). The reason for this recommendation is a subject of some dispute and plaintiffs have asked this Court to infer that EDS's selection is indicative of defendants' discriminatory intent. This Court declines that invitation. That EDS had previously been involved as a consultant to the City in the 1980 redistricting that culminated in the *Ketchum* litigation and had also served as a consultant in the state redistricting that culminated in the *Rybicki* litigation, does not necessarily lead to the conclusion that EDS would prepare a discriminatory ward map. Nor is there anything on the record to suggest that EDS did anything discriminatory during the process or ever acted in a manner other than as a neutral redistricting consultant assisting the City with the application of sophisticated computer technology. Given the City's own history of redistricting litigation and the likelihood that the final ward map would wind up being the subject of litigation, it was reasonable to hire a firm that was experienced and was familiar with Chicago. The record unambiguously establishes that EDS is one of the most prominent and experienced firms presently providing redistricting consulting. While the firms competing with EDS were also extremely

well-qualified and included the services of preeminent experts, there is no basis for concluding that EDS was somehow less qualified or independent than any of the competing consulting firms.

34. Nor can any discriminatory intent be inferred from comparing EDS's bid with competing bids, it is not this Court's role to determine whether EDS was, in fact, the most cost-effective bidder. In any event, Judge Ruble–Murphy's testimony indicates that EDS's more comprehensive bid was ultimately cost-competitive with the ostensibly lower, but less-inclusive, bid submitted by LogisSys. (Tr. 6887–88). Although the initial decision to hire EDS was made in March 1991, a formal contract was not entered into until May, 1991. In any event, the circumstances surrounding EDS retention are of only minimal relevance to plaintiffs' intent claims, since the testimony establishes that EDS provided chiefly technical support to the City during the redistricting process and played no other role in drawing the map eventually approved at referendum.

35. Defendants attempt to explain their initial preparation for redistricting by referring to the preparation for redistricting and the retention of consultants by various groups of minority alderman and citizen groups. That communities with significant interests at stake during redistricting began preparing for the redistricting process is indicative of nothing save the good sense to recognize that the final contours of the ward map would have significant consequences for the next decade and beyond.

36. For the purposes of the 1991 redistricting, the Rules Committee of the Chicago City Council was reorganized as a committee-of-the-whole shortly after the April 1991 run-off elections which in essence placed the powers of the entire Council in the Committee. Alderman Richard Mell, of the 33rd Ward, remained chairman of the reconstituted Rules Committee. Aldermen Burke, Lemuel Austin of the 34th Ward, and Luis Gutierrez of the 26th ward were named vice-chairmen of the Committee. Aldermen Mell and Burke are white, Alderman Austin (who is now deceased) was African–American, and Alderman (now Congressman) Gutierrez is

Latino. Both Aldermen Austin and Gutierrez were considered to be members of the voting bloc that was viewed as being "allied" with the mayoral administration and the City Council leadership.

### 3. Summer and Early Autumn of 1991

37. The redistricting process began in earnest in the summer of 1991. The events taking place during the summer of 1991 which the parties all contend were relevant include: 1) Alderman Burke's trip to visit EDS's offices in Washington in July; 2) the approval of guidelines governing the redistricting process by the City Council; 3) initial meetings between Aldermen Burke and Patrick Huels, of the 11th Ward, generally considered to be Mayor Daley's spokesman in the City Council, and the other aldermen; 4) meetings among the freshman alderman; 5) the formation of the "Latino Committee for Fair Redistricting" (the "Latino Committee"); 6) the formation of the "Fair Map" coalition; 7) issues surrounding aldermanic access to the redistricting computers; 8) the initial maps prepared by Judge Ruble–Murphy; and 9) the extent to which Judge Ruble–Murphy relied upon the initial public hearings. This Court will discuss, in turn, each of these topics, which the parties claim are relevant.

38. On July 25, 1991, Alderman Burke visited EDS's offices in Washington, D.C. Defendants assert that the purpose of this trip was for Alderman Burke to meet with Kimball Brace, the president of EDS, in order to familiarize himself with the computer equipment and software which EDS was to install in the City in order to assist with the redistricting process. In order to display the features of the redistricting computer, Brace focused on an area with which Alderman Burke was intimately familiar, namely Burke's own 14th ward. (Tr. 224, 226–Burke). Nor is it surprising that when Alderman Burke and Brace looked at citywide population figures, they concentrated on Latino population concentrations since even at this early stage of the process, Alderman Burke was aware, given the growth of the Latino community and the declines in the African–American and white populations, that the Latino community was underrepre-

sented and additional Latino-majority wards would have to be drawn. (Tr. 225). At the earliest stages of the process it was evident that additional Latino-majority wards would have to be drawn which, given the limited total pool of 50 wards and the racial calculus intrinsic to the redistricting process in a large city, meant that some other ethnic or racial groups would have to surrender control of several wards. The testimony does not indicate that Burke's visit to the EDS offices was an attempt to mastermind the redistricting process. The maps drawn by Alderman Burke at EDS's office are simply an expression of Alderman Burke's general concerns as of late–July 1991.

39. Also in July, 1991, three Latino Alderman (Gutierrez, Garcia and Suarez) proposed an ordinance for "fair and open redistricting." (PJX 34). The ordinance, as originally introduced, set forth a procedure for conducting the redistricting and contained criteria for re-drawing the ward boundaries. The criteria listed in the proposed ordinance included: 1) population deviations of no more than 10%; 2) compliance with the Voting Rights Act; 3) drawing ward lines so as not to interfere with neighborhoods or communities of common interest except where the community was not significantly large enough to form a voting majority and the boundaries otherwise complied with the Voting Rights Act; 4) drawing the wards as compactly as possible except where it was necessary to draw wards to comply with the Voting Rights Act; 5) prohibiting the drawing of wards intended to separate or pack racial or ethnic groups; 6) drawing the wards in a manner minimizing the sum of the length of the boundaries of all the wards in the City (a rough synonym for compactness); and 7) drawing the wards so that they were contiguous. (PJX 34).

40. The redistricting ordinance that was eventually adopted did not contain the above-listed criteria. Judge Ruble–Murphy testified that she concurred with the creation of the appearance of an open, unbiased process, and that she supported holding public hearings and making redistricting computer terminals open to the public. (Tr. 471). Judge Ruble–Murphy, however, also advised Alder-

man Burke against the inclusion of specific criteria for drawing the ward boundaries. Judge Ruble–Murphy was concerned that the appropriate criteria could differ from ward to ward and that the inclusion of specific redistricting criteria would limit the City's flexibility. Judge Ruble–Murphy was also concerned that incorporating specific VRA § 2 requirements in the redistricting ordinance could pose legal redistricting problems for the city in the future. (PJX 32, 38).

41. Judge Ruble–Murphy drafted an alternative redistricting ordinance which was eventually adopted by the City Council. The substitute ordinance provided for public access computer terminals and public hearings. At least one public hearing was to be held after the Rules Committee publicly released its final ward map. The revised redistricting ordinance also contained a more general statement of the appropriate map drawing criteria than the original proposed ordinance, providing that the final ward map "ensure fair and effective representation" of the persons protected by the Voting Rights Act and that "as nearly practicable, each ward shall be of equal population, compact, and contiguous." (PJX 40). The substitute ordinance also provided that should no map be approved by the City Council, thus necessitating that the proposed maps be submitted to a referendum, any ten aldermen could submit a map to referendum. The ordinance drafted by Judge Ruble–Murphy was enacted, with a vote of 43 yeas and 2 nays, by the City Council. (PJX 40).

42. The criteria set forth in the redistricting ordinance as finally approved, while not as specific as those contained in the original proposed ordinance, do not evidence any discriminatory intent nor do they facilitate the preparation of a ward map that would violate the Voting Rights Act. Rather, the requirements of the Voting Rights Act, along with a brief recapitulation of traditional districting criteria, are adequately encapsulated in the redistricting ordinance in a manner that also prudently permits the City flexibility in drawing the final ward map.

43. Eventually there were 15 public hearings held at locations throughout the City. There were, however, no public hearings held after the preparation of the maps submitted to referendum since there was no ward map ever approved by the entire Council.

44. Beginning in August, 1991, each alderman was given the opportunity to meet with the chairman and/or vice-chairmen of the Rules Committee to discuss his or her ward, their expectations for their ward, and the possibility that changes would be made in the ward boundaries. Alderman Huels, who according to testimony, is widely viewed as Mayor Daley's spokesman in the City Council, and Judge Ruble–Murphy also occasionally sat in on these meetings. One of the purposes of these meetings was to build consensus on the contours of a map, because ten dissenting alderman could force a public referendum. (Tr. 240–41, 6854–56–Burke; Tr. 686–Huels). As several of the more junior aldermen testified, the meetings amounted to being told that they should expect significant changes in their wards and that since the outcome of how the wards would finally be drawn was beyond their control, they should simply go along. (Tr. 3432–Murphy; Tr. 5200–02–Steele; Wojcik Dep. Des. 86–89; Bialczak Dep. Des. 83).

45. That some of the white junior aldermen such as Bialczak, Wojcik and Murphy were told at an early stage of the process that their wards would likely be drawn in a manner making their reelection impossible does not indicate that the contours of the final ward map had already been decided nor does it indicate that the leaders of the City Council harbored any discriminatory intent. Even at a very early stage of the remap process, it was reasonably clear that junior members of the City Council would be most likely to have their wards changed significantly in order to respond to the changes in Chicago's demographic patterns. Nor should it be surprising that at an early stage of the process the senior leaders of the City Council would begin exerting pressure on some of the more junior members of the Council to go along with the leadership plan.

46. In these early meetings, the leadership of the City Council also began gathering information from the aldermen concerning their wards, including the location of ward offices, aldermanic preferences for ward

boundaries, aldermanic views as to the core neighborhoods in the wards, important or integral portions of the community such as schools, businesses, community groups, and parish boundaries.

47. At this stage of the process, when the City Council leadership met with African-American aldermen, Aldermen Burke and Judge Ruble–Murphy took the position that it would likely not be possible to draw additional African–American majority wards. During these initial meetings, Alderman Burke indicated, however, that the Council leadership intended to maintain the same number of African–American majority wards as then existed. (Tr. 6892). While some of Judge Ruble–Murphy's initial attempts at drawing wards with the redistricting computers included additional African–American majority wards, all of these maps contained significant population deviations and were only partial and incomplete maps.

48. Alderman Burke and the other members of the Council leadership also met with the Latino aldermen. In these meetings, the initial contours of the final plan which included seven Latino supermajority wards and an "influence" district on the southeast side began to take shape.

49. This Court heard extensive testimony concerning an August 13, 1991 meeting between Alderman Burke and then–Alderman, now State–Senator, Garcia and a memorandum prepared by Senator Garcia in connection with that meeting. (DX 112). Whether this memorandum was Sen. Garcia's agenda for the meeting or the summary of the substance of the meeting or a combination of both is of little relevance. Even if the negotiating position of a prominent member of the Latino community, at a very early stage of the process, was to seek only seven supermajority wards, that would not be of any particular relevance to this Court's VRA § 2 analysis if it finds that the present ward map limits the ability of the Latino community to participate in the political process and elect candidates of their choice. Whether an agenda or a report, the memorandum merely states what would reasonably be the most likely topic of conversation at such a meeting between Aldermen Burke and Garcia at this

stage of the process: 1) the likely shape of the 22nd ward, Senator Garcia's ward, under the final ward map; 2) the number of additional Latino wards that would be drawn; 3) how the sizeable Latino community on the southeast side (the southeast side Latino community was not large enough to constitute an effective majority in a single ward, but as of 1991 it was splintered into several wards further diminishing its electoral influence) would be treated; 4) the proper method for passing redistricting legislation; and 5) the possible impact of the redistricting on the African–American community. Even at this nascent stage of the negotiations it was entirely clear that Latino aldermanic representation would increase. Given the finite number of aldermanic seats in the council, Latino representation could be increased only at the expense of white or African–American majority districts.

50. Even if this memorandum represents Alderman Burke's comments as recorded by Senator Garcia, this memorandum shows that the council leadership at this early date was aware of Latino community concerns and recognized that Latino representation would increase by three supermajority districts at the expense of white majority wards, that the sizeable Latino community on the southeast side of the City should be brought into a single ward, and that African–American representation would remain constant.

51. In response to the pressure he felt as a first-term Alderman, Alderman Murphy, of the 18th Ward, attempted to organize a coalition of the 10 freshman Alderman crossing racial lines to protect the common interests. After only several meetings, however, the group stopped meeting as coalitions began forming along racial and ethnic lines. (Tr. 3436).

52. Attempts at forming aldermanic coalitions continued throughout the early phases of the redistricting process. Eventually, the Aldermen coalesced into three chief coalitions formed more or less along racial and ethnic lines.

53. Recognizing the marked growth of the Latino community in Chicago, the community's concomitant desire for additional

representation to reflect that growth, and the value of actively advocating the community's interests in increased representation in the Council and state and federal legislatures, a coalition of Latino public service and community organizations formed the Illinois Latino Committee for Fair Redistricting. ("Latino Committee"). The Latino Committee was composed of broad coalition of educational, legal, and neighborhood organizations including the Mexican–American Legal Defense and Educational Fund ("MALDEF"), the Latino Institute, and the Midwest/Northeast Voter Registration and Education Project. The Latino Committee was formed in order to advocate the interests of the Latino community in connection with the redistrictings of the City Council, the state legislature, and the Illinois congressional delegation.

54. For the purposes of the ward redistricting, the Latino Committee and the four Latino alderman agreed to work together to negotiate the number of wards in which Latino voters would be able to elect their candidates of choice. The Latino negotiating strategy was to push for a number of Latino-majority wards which could realistically be achieved through negotiations and would be secure as Latino seats. The Latino Committee also sought the unification of the southeast side Latino community into a single ward.

55. The Latino aldermen agreed to relinquish their individual views in order to represent and advocate the agreed upon positions of the Latino Committee. (Tr. 1223–Gutierrez; Tr. 1622–Garcia). This Court was impressed by the sincerity and truthfulness of the former aldermen, Congressman Gutierrez and State Senator Garcia, who testified at trial. Although three of the four Latino aldermen were generally considered to be members of the leadership of the City Council, Senator Garcia was not generally considered to be allied with the leadership, the testimony suggests that they, particularly Congressman Gutierrez, worked very hard to put aside their allegiances to their Council allies in order to represent the independent interests of the Latino community. This Court can find no occasion where the allegiance of the Latino aldermen to their major-ity political allies caused them to disregard the interests of the Latino community. Even though Congressman Gutierrez was then actively seeking higher political office, his ambitions and his search for support in the political establishment did not cause him to contradict the agenda of the Latino Committee.

56. While the testimony is undisputed that the Latino Committee was extremely energetic and vocal in its representation of the Latino community, and pooled the resources of the various community organizations, the Latino Committee, nonetheless lacked the resources available to the Council leadership. In fact, the Latino Committee was able to make free use of the mapping capabilities of EDS's computers when preparing their proposals for Latino majority wards.

57. Although defendants attempt to make an issue of the manner in which Latino organizations coalesced around the redistricting drive, this is largely irrelevant to this case. Plaintiffs should not be penalized for their efforts to have a role in the redistricting process. The relevant issue is whether the present ward map limits Latino opportunities to participate in the political process. That the Latino Committee actively pursued the interests of the community is not at issue except to the extent that it is somewhat indicative of the ability of Latino voters to participate in the political process. Of relevance to this Court's consideration of the totality of the circumstances, however, are the practical considerations taken into account during the negotiating process such as the balancing of the desire to maximize Latino wards against the desire to craft wards which would be secure enough to cement Latino political victories.

58. While the Latino Committee played an influential role in the negotiation process and was courted by the other groups seeking to put together the 41 votes necessary to pass a new ward map in the City Council, the Latino aldermen never constituted a "swing" vote during the redistricting process. Congressman Gutierrez testified that the Latino aldermen exerted a pivotal role in the negotiation process but that they never became a

swing vote (Tr. 1977). The simple arithmetic of the City Council made it impossible to characterize the Latino aldermen as a "swing" vote—41 votes were needed to avoid submitting a proposed ward map to a referendum, adding the 4 Latino aldermanic votes to any of the other coalitions that had coalesced around the redistricting process would not add up to the 41 votes necessary to ensure victory. Thus, while the 4 Latino aldermen would have been necessary to the formation of a successful coalition and would have played a pivotal role in the redistricting process, they were not, of themselves, sufficient to form a 41 vote coalition with any single identifiable group.

59. This Court rejects defendants' suggestion that it draw a negative inference based upon plaintiffs' decision not to call additional witnesses who were members of the Latino Committee. Additional testimony would simply have been redundant with that presented before this Court. This Court is satisfied that the members of the Latino Committee who were called to testify, including Congressman Gutierrez and Senator Garcia, were entirely forthright.

60. As was the case of the formation of the Latino Committee, that most of the African–American aldermen, along with several independent white aldermen, formed a coalition advocating their own interests for the redrawing of Chicago's ward map, is only tangentially relevant to the defense of this case. That the African–American community began its initial preparations for the ward remap process in March or April of 1991 simply indicates that the community was, given the history of past ward remaps, concerned about its role in the process and was eager to defend its rights. That all the plaintiff aldermen were diligent in protecting the rights of their communities under the Voting Rights Act and the equal protection clause in no way excuses any violation of the Voting Rights Act or any intentional discrim-

ination which might have been committed by defendants.

61. One of the keystones to defendants' contention that the 1991 redistricting process was the most open one in the history of Chicago is the computer system installed by EDS which was accessible to the public and the City's aldermen.[11]

62. As part of the City's redistricting guidelines two redistricting computers were made available at City Hall. The computers were provided by EDS. One of the computers was placed in the "map room," Room 3M at City Hall in August, 1991. This computer was intended for the use of aldermen and their staffs. The second computer, which was placed in an easily accessible hallway in the second floor of City Hall was intended to be available to the public (and, of course, the press) and was installed in late September, 1991. The two computers contained identical data and software. EDS provided a full-time technical adviser, Joseph Pindell, who according to testimony, was nearly always available to provide assistance no matter what the hour and, according to all accounts, was extremely courteous and helpful. The computer's database included the City's total and voting-age population data as taken from the census data as well as election results. The database also contained electronic versions of the geography of the City, complete with street names, that permitted users to assign a census block or a group of blocks to a ward. The computer could then immediately calculate demographic statistics based on the assignment of geography. This information could be displayed on the computer's display screen as a user was assigning geography.

63. Beginning in late August until September, 1991, Mr. Pindell began holding computer orientation sessions for the aldermen and their staffs. These meetings were attended only by Mr. Pindell, the alderman, and his/her staff and were not attended by any other aldermen or by Judge Ruble Mur-

---

11. Prior to trial, this Court, in order to better understand the data base, visited the redistricting computers in City Hall and was given an opportunity to sample their capabilities. While presenting a block-by-block overview of the selected area of the City, the computer also provided the racial and ethnic composition of the selected blocks, by TP and VAP. As blocks were placed in hypothetical wards, the racial and ethnic composition of those wards were provided on the computer. Counsel for all the parties was present.

phy. According to Mr. Pindell's testimony, these sessions began by comparing the alderman's then ward boundary with the 1990 census information. (Tr. 7327–Pindell). Nearly all the aldermen, or their staffs, attended these orientation meetings. (DX 24A).

64. Aldermen were permitted unlimited access, depending on availability, to the aldermanic computer. Initially, aldermen were asked to make appointments to use the computer but that process eventually broke down and aldermen began using the computers without appointments. As time went on, use of the computer became subject to availability. (Tr. 7315–16–Pindell). Not surprisingly, there were some aldermanic complaints about access to the computers and some aldermen testified that they were unable to use the computers when they wanted. (9/20/95 Tillman Dep. Des. 80). This Court, however, credits the testimony of Mr. Pindell and Judge Ruble–Murphy that accessibility to the computer was based entirely upon availability and was not the result of an effort to deny access to the computers to minority aldermen.

65. Nor were limits placed on the aldermanic use of the computers. (Tr. 6899–Ruble–Murphy; Tr. 7316–Pindell). Aldermen were given free access to the computers and could attempt to draw maps for any part of the City they wished. Aldermen were not, however, allowed to view draft ward maps prepared by any of their compatriots, nor were they given free access to the draft ward maps prepared by Judge Ruble–Murphy. Draft maps stored on the computer were treated as the work-product of the persons who prepared them.

66. Judge Ruble–Murphy attempted to listen to and incorporate the comments of the aldermen, but discussion and negotiations could not continue indefinitely. In the end, it was necessary to bring the process to a close and Judge Ruble–Murphy attempted to draw a ward map incorporating as much of the aldermanic input as possible. As with any project in which multiple participants are involved, many aldermen were unhappy with the contours of their wards under the various draft maps and felt that their desires had been ignored.

67. There is, however, no basis on the record for plaintiffs' contention that defendants permitted access to the redistricting computers in order to analyze the proposals prepared by plaintiffs which were stored on the redistricting computer.

68. Plaintiffs attempt to make an issue of Judge Ruble–Murphy's unlimited access to the redistricting computer and the many maps prepared by her during the early phases of redistricting. (SX 24–27, 30, 31, 53). In August 1991, Judge Ruble–Murphy prepared numerous draft maps, which is neither surprising nor troubling, since she was the person charged with coordinating the redistricting efforts and attempting to synthesize the proposals offered by the aldermen and the public into a ward map for the entire City.

69. Many of Judge Ruble–Murphy's earliest maps focused on areas with heavy concentrations of Latino population, namely the near northwest, the southwest, and the southeast sides of the City. During this early period in August, 1991, Kimball Brace also prepared studies and maps identifying Latino population concentrations in the City. It was natural that Judge Ruble–Murphy was, at an early stage, concentrating on these areas since from the outset, it was clear that the new ward map would need to account for the significant growth in the Latino population in the City. The most extensive changes in the pre-existing ward map would need to take place in areas with significant Latino population growth and would of necessity result in moving or combining the wards represented by incumbent aldermen. Even at the earliest stages of the redistricting process, it was clear that additional Latino-majority wards would have to be drawn, so it is not surprising that as she was becoming proficient on the computers Judge Ruble–Murphy would concentrate on the areas that were likely to pose particularly thorny problems during the remap process.

70. These early draft ward maps are of limited relevance, since none of them were intended to be final ward maps for the City but were at most very incomplete, prelimi-

nary studies of areas that were going to prove to be important in the redistricting process. (Tr. 6904–07–Ruble–Murphy). In some cases, Judge Ruble–Murphy's early maps have extremely large population deviations leading this Court to conclude that these early maps are indicative of little more than Judge Ruble–Murphy's attempts to familiarize herself with the workings of the redistricting computer. (SX. 24, 26–27, 30–31).

71. As part of the effort to make the 1991 redistricting process the most open one in Chicago's history, the City held several rounds of public hearings. The first round of public hearings was held in October 28, 1991, shortly before the leadership released its first draft map for review by the City Council. The second round of hearings was held shortly after the Rules committee met on October 28, 1991 in order to give the public an opportunity to comment on the proposed maps.

72. The public hearings were held at a variety of locations throughout the City including: at Roberto Clemente High School on the near northwest side on September 11, 1991; at Julian High School on the south side on September 11, 1991; at Pressman's Hall on the southwest side on September 11, 1991; at Garfield Park on the west side on September 24, 1991; at IIT on the south side on September 26, 1991; at Kennedy–King College on the south side on September 30, 1991; at John Spry Elementary School on the near southwest side October 1, 1991; at the United Steel Workers Union Hall on the south side on October 2, 1991; at the Greater Canaan Missionary Baptist Church on the south side on October 3, 1991; at Ebinger School on the northwest side on October 7, 1991; at the Scottsdale Park Fieldhouse on the southwest side on October 8, 1991; at North Central Park on the west side on November 12, 1991; at the north Park Village on the north side on November 12, 1991; at Kennedy–King College on the south side on November 13, 1991; at 2150 South Laflin on the southwest side on November 14, 1991. The public hearings were generally attended by the aldermen from the relevant communities and either Alderman Mell, the chairman of the Rules Committee or one of the committee's co-chairs. The public hearings were also recorded by a court reporter and were available to the public. (SX 5–19).

73. The public hearings were also attended by members of the finance committee staff. Because of the birth of her child, Judge Ruble–Murphy was unable to attend all the hearings, but a staff member attended in her place and Ruble–Murphy reviewed the hearing transcripts.

74. As with any open public hearing, in which any interested member of the community was given an opportunity to state his or her mind, the speakers at the public hearings expressed a wide diversity of opinions. It is not possible in many instances to identify the speakers or the particular expertise or perspectives they may have brought to the hearings. The first round of hearings was particularly unfocused and resulted in diverse testimony since at the time of the hearings, no proposed maps had yet been released to the public. In general, there were two chief opinions stated at the hearings: minority witnesses expressed their desire to see more minority wards, and witnesses frequently stated their desire to retain their current aldermen.

75. Given the importance of the redistricting process, some of the aldermen bussed in constituents who stated that they did not want their ward boundaries redrawn. (Tr. 6055–Tuite). Alderman Murphy, in particular, took advantage of the public hearings at Scottsdale Park to mobilize community support. Conduct of this nature is instructive since it an indication of a competently and efficiently run ward organization which is able to mobilize community support and is led by a responsive and energetic alderman. Alderman Murphy of the 18th ward should not be condemned because he was successfully able to galvanize his constituents behind him.

76. When assessing the importance of the public hearings it is necessary to take into account the context in which the hearings were held. The first round of hearings were held at an early stage of the redistricting process when there had been no complete maps released to the public. The hearings

were more important for the purpose of encouraging an opportunity for community involvement and input and thereby raising the attention of the community to the redistricting process, than for eliciting concrete plans for proposed ward maps. The hearings, therefore, were more relevant as a gauge of general community concerns for the relevant policymakers than as an platform for proposing actual redistricting policies.

77. This Court is satisfied that Judge Ruble–Murphy reviewed the transcripts of the public hearings and attempted to take the portions she felt were relevant into heed as she prepared ward maps. This Court, however, gives little substantive weight to the public hearings as an indicator that the City either did or did not heed community concerns with respect to the redistricting. The public hearings are relevant to this Court's consideration only insofar as they are indicative of the fact that the 1991 redistricting process was relatively more open and allowed more community expressions of interest than any past redistricting in the history of the City.

78. It would be impossible for the redistricting process to transcend the realm of politically bargained and brokered deals negotiated by the relevant legislative bodies, but at the very least there was an effort during this process to elicit public opinion.

**4. October 1991—the Preparation of Draft Maps and the Rules Committee Meeting of October 28th, 1991**

79. According to the redistricting ordinance, a proposed map was to be submitted to and voted on by the Rules Committee by October 28, 1991. (PJX 40). While there was extensive testimony concerning the maps that were prepared in anticipation of the October 28th, 1991 Rules Committee meetings, the fact of the matter is that the maps that were submitted to the Rules Committee in October 1991 were only proposed maps which were neither approved by the City Council nor submitted to referendum. The process leading to this first round of proposed citywide draft maps is relevant only to the extent that it might be indicative of some discriminatory intent or is indicative of the totality of the circumstances surrounding minority participation in the process by which the final ward map was finally produced.

80. Beginning in September and continuing through October, Judge Ruble–Murphy, assisted and advised by Kimball Brace, began working on a citywide map. During September and October, 1991 Brace was very active in providing guidance to Judge Ruble–Murphy, billing approximately 140 hours to the Chicago remap process including "drawing plan ideas." (PJX 17, 19). Throughout September and October, Judge Ruble Murphy met with every alderman at least once and with most twice. In these meetings, Judge Ruble–Murphy discussed the contours of their wards with the individual aldermen.

81. Judge Ruble–Murphy's staff also sent questionnaires to each alderman's staff asking them to identify the core areas of the ward, the areas of the community that the alderman most wanted to retain, the neighborhoods contained in the ward, and the important community institutions contained within the ward. Judge Ruble–Murphy attempted to utilize the information contained in these questionnaires as she was preparing the draft ward maps.

82. Some of the aldermen expressed frustration with Judge Ruble–Murphy in these meetings because the meetings generally concerned only the boundaries of the alderman's individual wards. (Tr. 5153–Preckwinkle, Tr. 5204–Steele). Based upon the testimony presented at trial, however, this Court is convinced that Judge Ruble–Murphy was entirely professional and courteous in her conduct towards the aldermen throughout the redistricting process. As was clear from her testimony, and that of others, Judge Ruble–Murphy made every effort to be accommodating to every alderman during the process and made an effort to comply with every reasonable request. (Tr. 5167–Preckwinkle; Tr. 5284–85–Steele; Tr. 1914–Gutierrez).

83. This Court is satisfied that Judge Ruble–Murphy was willing to show a citywide map to any alderman who asked. Given the difficulties of coordinating 50 aldermen with very different interests and agendas it would have been entirely understandable if Judge

Ruble–Murphy had attempted to limit the discussions to the aldermen's own wards as opposed to encouraging discussions that went too far afield. If every individual alderman had been permitted to propound citywide redistricting strategies to Judge Ruble–Murphy, at this stage, the remap process could well have never come to an end.

84. In October, 1991, after returning from a very brief maternity leave, Judge Ruble–Murphy began meeting with groups of aldermen in order to discuss the boundaries of adjoining wards in an effort to discuss and resolve any disputes concerning boundary areas between wards.

85. During October, 1991 Judge Ruble–Murphy met with the Latino aldermen and members of the Latino Committee as well as, in some instances, Aldermen Burke and Mell. At the meetings with representatives of the Latino Committee in October, 1991, the participants discussed drawing seven Latino supermajority wards and a ward with a substantial Latino minority in the southeast side of the City. During this phase of the redistricting process the representatives of the Latino community advocated drawing wards with as sizeable a majority as possible. Although they had been active in discussions with Judge Ruble–Murphy, the Latino aldermen did not see the final shape of the wards proposed in the map on October 28, 1991 until the map was finally released. (Tr. 1221–Gutierrez; Tr. 1668–Garcia).

86. Plaintiffs place much importance on the existence of some incomplete draft maps which included additional African–American wards. (SX 46, 58). These maps, however, all had unassigned populations, wards with unacceptably large population deviations, and wards that were extremely elongated, or irregularly shaped.

87. Similarly, this Court credits Judge Ruble–Murphy's testimony that during September and October she did not believe that additional African–American wards could be drawn in a manner consistent with the legal requirements. (Tr. 6893–94). The draft maps prepared by Judge Ruble–Murphy and Brace do not disprove Judge Ruble–Murphy's stated opinion given the incompleteness and other flaws of those maps. Nor does

Alderman Ed Smith's statement to Judge Ruble–Murphy that he had seen drafts with additional African–American wards prepared by the African–American aldermen's counsel (Tr. 6894) indicate that Judge Ruble–Murphy had any discriminatory intent or knew that additional minority wards could be drawn but chose not to do so. It is hardly surprising that, at an early stage of the process, different participants in the process held widely divergent opinions as to the acceptability of various proposed maps. The redistricting process is, of course, a highly politicized one in which there is much give and take and therefore it is not surprising that as of October, 1991 there were wide differences of opinion between the relevant players concerning the most equitable manner of providing for Chicago's demographic shifts between 1980 and 1990.

■ 88. Based upon the factual record, it is clear that the only way in which it was possible, due to the population patterns in the City of Chicago, to draw additional African–American majority wards was consistently to underpopulate African–American wards and to overpopulate white majority wards. Judge Ruble–Murphy's reluctance to deviate from equal population is not necessarily indicative of discriminatory intent given the equal population mandates of the Illinois statute and the Chicago remap ordinance. Judge Ruble–Murphy's reluctance to deviate from an equal population standard is not necessarily indicative of a discriminatory intent.

■ 89. Nor is the fact that some of the early draft maps prepared by Judge Ruble–Murphy contained an 18th Ward with significantly altered boundaries indicative of discriminatory intent on the part of Council leadership. The redistricting process is long and arduous and it would be patently unrealistic to suppose that early draft maps and proposals are binding upon the map drawers. Plaintiffs' suggestion that the changes in the contours of the 18th ward during the map drawing process lead to an inference of discriminatory intent does not account for the skillful manner in which Alderman Murphy of the 18th Ward protected his ward bound-

aries and energized his constituency despite the early indications that his ward would be drawn out of existence.

90. In mid–October a group of 16 African–American and three independent white alderman (Schiller, Moore and Bloom) stopped working with Judge Ruble–Murphy and formed the "Fair Map" coalition working exclusively with their counsel. (Tr. 6913–14– Ruble–Murphy). While this fact does not alter the simple fact that plaintiffs' draft maps are not at issue, it does highlight the extent to which the redistricting process was highly politicized and perhaps suggest that the parties were also anticipating of the inevitability of litigation. Additionally, the lack of cooperation is of some relevance insofar as it sheds light on the circumstances under which Judge Ruble–Murphy was laboring as she endeavored to prepare the new Chicago ward map.

91. In drawing the African–American majority wards for the map that was required to be completed by October 28, 1991, Judge Ruble–Murphy testified that she relied upon her meetings with those African–American alderman who had continued to work with her, namely Aldermen Dixon and Austin, who were generally considered to be aligned with the administration and who had not joined the Fair coalition, and Aldermen Beavers and Hendon. (Tr. 6914). Judge Ruble– Murphy also testified that she relied upon her understanding from her previous conversations that the African–American aldermen would accept a map with no fewer than 21 African–American majority wards and that so long as the map contained 21 African– American majority wards the individual aldermen would be willing to sacrifice their individual ward boundaries. (Tr. 6935, 7016). This Court is satisfied that Judge Ruble– Murphy reasonably understood that 21 African–American majority wards was the prime objective of the African–American political community.

92. The manner in which the 18th and 19th wards were drawn is of particular importance to the *Barnett* plaintiffs' case, since these wards are pivotal to the vote dilution claim of the African–American plaintiffs. The 18th and 19th Wards are both located on the far Southwest side of Chicago. Both wards were very close to the ideal total population; the 18th Ward had only 534 residents more than its ideal total population, while the 19th ward had only 1,336 residents more than 55,675 target. The boundaries of the 18th ward had been arrived at as part of the settlement of the *Ketchum* litigation, and had been crafted as a ward which would hopefully result in a "horse race" between white and African–American candidates.

93. As of the 1990 census, the 18th Ward had a total population that was 41.34% white and 55.63% African–American, however white candidates had prevailed in all the previous aldermanic elections with the then-current ward boundaries. As of the 1990 census, the 19th Ward had a total population that was 77.03% white and 20.57% black. (SX 2). Both wards had a somewhat similar population pattern, in which the eastern ends of the wards contained census blocks that had predominantly African–American population majorities, while the western ends of the wards contained census blocks that were predominantly white.

94. In the map that was produced on the 28th of October, the boundaries of these wards were changed only insignificantly, so that the racial makeup of the wards was virtually identical to what it had been previously: the 18th Ward as it was redrawn had a total population that was 41.34% white and was 55.63% African–American while the 19th ward has a total population that was 78.03% white and was 19.27% African–American. (PJX 49a).

95. While this Court is unconvinced that the *Ketchum* settlement map provided an adequate justification at this time for retaining the boundaries of the 18th and 19th Wards, this Court finds that there were other legitimate reasons justifying the map drawn by Judge Ruble–Murphy. It is worth noting, however, that the 18th and 19th wards constituted two of only nine wards that were considered "white" wards yet also possessed as much as 20% African–American total population (the 1st, 42nd, 10th, 14th, 46th, 48th and 49th Wards were the only other wards there were as much as a 20% African–American population coexisting with

a white population of at least 20%). (SX 2). As corner wards, wards whose shape was determined on at least two sides by the perimeter of the City, with nearly ideal populations, the 18th and 19th wards could easily retain their pre-existing boundaries. While other wards with nearly ideal boundaries were often significantly redrawn, that was often a function of the wards' location because it was necessary to transfer populations in order to respond to other redistricting concerns such as the drawing of additional Latino-majority wards. Because of their locations in a corner of the City, the shape of the 18th and 19th wards could be readily retained with little spillover effect. Also of no small consequence in the retention of the basic contours of the 18th Ward was Alderman Murphy's effective lobbying on his own behalf both to the political leadership and through his mobilization of his constituency at the public hearings. (Tr. 6918–Ruble–Murphy; Tr. 3494–Murphy).

96. Similarly, the shape of the 7th and 10th wards, on the City's far southeast sides was the result of a difficult political compromise. In the 7th and 10th wards, the interests of the African–American, the Latino, and the white communities were very different. As of 1991, the 7th and 10th wards combined contained a total of 29,088 Latino residents—not enough to create an effective Latino majority ward but approximately 27% of the total population of the two wards. The 7th Ward which had a majority African–American population of 68.62% was significantly underpopulated (8.63%), while the 10th Ward, which had a white plurality of 42.31% (and an African–American total population of 28.29%) was slightly underpopulated (1.11%). (SX 1).

97. The Latino Committee sought to consolidate as much of the Latino community on the Southeast Side into a single ward as possible in order to create an "influence district." On October 28, 1991, the Latino Committee produced a partial map (for its proposed 10th Ward only) proposing a 10th Ward with a total Latino population of 51.3%. (BOPX 5). The Latino Committee map, however, made no effort to replace the population taken from the 7th ward in order to

consolidate the Latino community into the 10th Ward. (Tr. 626, 725–27—Ruble–Murphy). Alderman Beavers of the 7th Ward, on the other hand, sought to keep much of the Latino population in the 7th Ward. (Beavers Dep. Des. 20–21). Alderman Buchanan of the 10th Ward, meanwhile, sought to retain the "core" areas of his ward— namely Hegewisch and East Side, which were predominantly white, within a single ward. (Buchanan Dep. Des. 235–36). The three requests could not all be accommodated.

98. In an effort at compromise which likely satisfied no one, Judge Ruble–Murphy consolidated significant portions of the Latino community into the 10th Ward and took a major portion of the African–American population out of the 10th Ward and placed it into the 7th Ward, the effect of these population transfers was to create a 10th Ward with a total population that was 45.33% Latino, 11.28% African–American, and 42.39% white and a 7th Ward that had a total population that was approximately 8.1% Latino, 86.27% African–American and 5.16% white. (PJX 49a). A consequence of these transfers was to roughly equalize the population deviations of these two wards so that the 7th ward now had a population that was only 2.61% below the ideal and the 10th ward was up to 2.10% below the ideal. The affect of these changes was to draw 7th and 10th wards which met no one's desires.

99. This map was the result of a hurried effort to reach a compromise map and was not completed until the morning of the October 28, 1991 Rules Committee meeting. (Tr. 6931–Ruble–Murphy).

100. Given this tangled history of discussions, on October 28, 1991 at a meeting of the Rules Committee of the City Council, Alderman Mell, as chairman of the Rules Committee, unveiled what came to be called the "Equity" Map (the group of aldermen who supported the Equity map will be referred to hereinafter as either the Equity Coalition or the leadership group). Alderman Mell, of the 33rd Ward—a ward that as of the 1990 census had a total population that was 52.49% Latino, announced that the Equity Map created 21 African–American wards and

7 Latino wards, resulting in the potential to increase the representation of both minority groups in the City Council.

101. Ostensibly, the Equity Map created an additional African–American ward on the west side and three additional Latino wards with two on the north side and one on the south side.

102. There were significant differences of opinion as to the character of the Equity Map—while Judge Ruble Murphy characterized the Map as a starting point for discussion (Tr. 6933), some African–American aldermen characterized the map as a "cruel joke" (Tr. 6931–Ruble–Murphy). Even as a point of departure for negotiations the Equity Map left much to be desired. Included in the list of 21 putatively African–American wards was the 18th Ward which, while it had a majority total and voting-age African–American population, had never elected an African–American alderman. In addition, three of the west-side African–American majority wards came to be known as "smokestack" or "chimney" wards because of their bizarre, narrow shapes which extended from approximately Roosevelt Road, or 1000 South, on the south side to approximately Irving Park Road, or 3800 North. The west side "smokestack" wards bore almost no resemblance to the African–American wards that had previously existed on the west side. The Equity Map also contained wards with extremely contorted, irregular wards on the north and west sides.

103. Upon its completion, the Equity Map was sent to EDS for review. Dr. Lisa Handley, an employee of EDS and a respected expert in the redistricting field, conducted a cursory, pen and pencil, analysis of the "effectiveness" of the wards—that is an analysis of the likelihood that minority candidates would prevail in wards that were putatively minority-majority wards. According to Dr. Handley, a ward would be effective if minority candidates won more than half the elections in the ward. This analysis took account of voter registration and turnout in an effort to determine the minority population necessary to create a ward where minority candidates were likely to elect a minority candidate. Under Dr. Handley's analysis, the

18th Ward was not an effective African–American ward. (Tr. 1123, 1320–25).

104. At the Rules Committee meeting of October 28, 1991, the Equity Map received 26 votes—those of 24 of the 28 white alderman and two African–American aldermen, Dixon and Austin. The leadership of the City Council determined that the Equity map would not be able to garner the 41 votes necessary for approval by the City Council. (Tr. 2569–Mell; Tr. 298–Burke).

105. Several additional maps were also introduced at the October 28, 1991 City Council meeting. The Latino aldermen submitted a partial map, focusing only on areas with heavy concentrations of Latino population, providing for 7 Latino supermajority (total population) wards and 2 Latino majority wards. (DX 152). The Fair Map coalition introduced two complete ward maps—both maps provided for 21 African–American wards, with one map providing for 7 Latino majority wards and the second map providing for 8 Latino majority wards. (SX 96, 99).

106. Once again, this Court notes that the process by which the Fair Map group developed its maps is of no relevance. As was made clear from the trial testimony, the negotiations during the redistricting process were intense and heated and the participants were at times intractable, but the simple fact of the matter is that the Fair Map is not the issue of this trial, nor are the passions and temperaments of the participants in the process at issue. Even if the minority aldermen had adopted a completely unrealistic bargaining position and had negotiated in bad faith throughout the process, which was not the case, that would not have excused a retaliatory adoption of a ward map which had the effect of diluting minority voting strength by limiting the opportunity for minority voters to elect candidates of their choice. The negotiation process, however, is of some relevance in this Court's comprehensive consideration of facts bearing upon the ability of minority voters to participate in the political process.

107. Both of the Fair Maps introduced on October 28th, contained 21 African–American supermajority wards, without resorting to

the "chimneys" of the Equity Map. (*Compare* PJX 49, SX 96, 99) Like the Equity Map, however, the Fair Maps contained several irregularly shaped wards. Both of the Fair Maps contained population that was not assigned to any ward. Both Fair Maps also split the Latino population on the southeast side between several wards rather than bringing it within a single ward. The Fair Maps also consistently overpopulated white majority wards and underpopulated African–American wards.

108. The Latino Committee also released several proposed maps, all of which were only partial, or incomplete, ward maps. The first partial map was released at a press conference on October 21, 1991. It contained eight wards with a Latino total population majority of at least 65%, and a southeast side ward with a Latino total population of 50.08%. The map was released as a preliminary map (DX 135). The October 21st map contained Latino population majorities that were lower than those being pursued in negotiations. In the testimony of its drafter, the October 21st map did not take account of any political considerations, such as incumbency (Tr. 7228–Norkewicz), a consideration which is unavoidable and necessary during the redistricting process. This Court concludes that the October 21st Latino Committee map was indeed drawn as a preliminary map subject to extensive redrawing during the negotiation process. This conclusion follows from the fact that the map was only a partial map focusing solely on Latino communities and was drawn without any attention to neighboring incumbencies or drawing existing incumbents into the same wards, all of which are legitimate concerns during the redistricting process. That is not to say that this map was released solely as a public relations tool, or that the Latino Committee had already conceded that drawing 7 Latino supermajority wards would *per se* satisfy the Voting Rights Act. At this stage of the process, evidently there were differences of opinion within the Latino Committee and between the Latino Committee and the administration as to the number of Latino supermajority wards that could be drawn and the exact fashion in which these wards could be drawn.

109. On October 28, 1991, the Latino Committee released a second partial map which was introduced by the four Latino aldermen at the Rules Committee meeting. (DX 152). This partial map contained 7 wards with a Latino total population majority of at least 68%, and one ward with a Latino total population majority of 61.9% and a southeast side ward with a Latino total population majority of 51.3%. The press release accompanying this proposed map called for the creation of no less than seven Latino supermajority wards. Once again, this was only a partial map, which did not account for the impact of the proposed wards on surrounding populations.

110. Both the October 21st and 28th maps created four Latino supermajority wards on the northwest side. Both maps also drew the Ukrainian Village neighborhood out of the surrounding Latino supermajority wards. Both of these characteristics are features of the present ward map.

111. Following the October 28th Committee hearing, 4 additional public hearings were held. The testimony at the four public hearings was nearly universally in opposition to the proposed Equity map. The Equity Map was, therefore, unpopular with every segment of the population.

### 5. November 1991—Attempts to Compromise

112. After the October 28 Rules Committee meeting, Alderman Huels and Judge Ruble–Murphy spearheaded an effort to develop a compromise map with the Latino and African–American aldermen which would be acceptable to 41 aldermen.

113. After October 28, Brace and Alderman Burke became less involved in the process. At this time, Brace was also heavily involved in the Illinois state legislative and congressional redistrictings. Alderman Burke testified that he did not have the patience to deal with some of the interested parties, and their advisors and withdrew from the process because he did not desire to risk frustrating the negotiations due to personality clashes. (Tr. 6856). At this point of the process Aldermen Huels of the 11th Ward led the attempt to reach a compromise

map, and became viewed as the broker for any potential agreement. Alderman Huels assumed this role because of his reputation as an effective floor leader and conciliator in the Council, and because he was frequently viewed as the mayor's spokesman in the City Council.

114. Of particular importance to this Court's consideration, is the aborted agreement reached between the City and the Latino Committee concerning the number and general shape of the Latino majority wards.

115. Congressman Gutierrez played the lead role in negotiating Latino representation on behalf of the Latino Committee at this juncture. Congressman Gutierrez was selected as the chief negotiator, in part because of his working relationship with the administration. Despite plaintiffs' occasional attempts to portray Congressmen Gutierrez as a less than zealous member of the Latino Committee, who was willing to sacrifice Latino community interests in his effort to seek support from the administration for his eventual campaign for Congress, this Court finds Congressmen Gutierrez to have been an entirely, credible witness who was sincere in his efforts to increase Latino political representation and who would not have knowingly acceded to any proposal which did not significantly improve Latino opportunities for political participation.

116. A major complaint in the Latino community with the Equity Map had been that the Latino population percentages were too low in the Latino majority wards. Therefore, the enhancement of Latino majorities in the Latino majority wards was one of the chief topics of negotiations. (Tr. 1920–Gutierrez; 6936–Ruble–Murphy).

117. Throughout late October and early November, Judge Ruble–Murphy worked extensively with members of the Latino Committee in an effort to draft a ward map including seven Latino majority wards with high percentages which were generally in the range of 65% Latino total population majorities in the northwest Side, 70% in the near west and north side, and 70 to 75% Latino total population majorities in the south and southwest side wards. The parties sought to draw Latino majority wards with high Latino supermajorities for several reasons which included the young age of the Latino population (approximately 3 out of 8 Latinos were under the age of 18) and the relatively low registration and turnout rates in the Latino community. There was also some awareness of the recent residential trends in the City, such as the declining Latino population in some portions of the near northwest side due to gentrification, which, therefore, necessitated that the Latino majority wards be drawn with higher supermajorities in these areas. Additionally, there was an attempt to account for some of the areas of Latino population growth on the northwest side by including these areas in Latino majority wards. By the same token, however, a significant area of Latino population growth on the southwest side in the Back of the Yard and Gage Park and Marquette Park neighborhoods was eventually split between several wards as will be discussed at length below. (*See* ¶¶ 182–184, 226, 227, xxx).

118. Latino concerns about citizenship rates were also a consideration for the drive for Latino wards with very high supermajorities. At the time of the redistricting, the Census Bureau had not yet released its estimated citizenship data, which are based upon block group data, so that Judge Ruble–Murphy, the members of the Latino Committee and the other parties involved in the redistricting process were forced to rely upon rough estimates of the citizenship rates among Latinos in Chicago. The conventional wisdom as of November 1991, dictated that the Latino community in the north side was more heavily Puerto Rican, and thus had more members who were born citizens, and that the Latino communities on the near north and west sides and the south and southwest sides were composed primarily of persons of Mexican origin, and thus were thought to have lower citizenship rates. Because of these circumstances, the Latino Committee, adopted high estimates of the Latino population necessary to constitute an effective ward ranging from 65 to 70% depending on the area of the City in its negotiations.

119. The *Bonilla* plaintiffs now seek to separate themselves from the estimates

which were used by the Latino Committee in 1991 of the population necessary to constitute an effective Latino ward. The *Bonilla* plaintiffs argue that they should not be held to the "mistaken" views of the Latino Committee in 1991, when subsequently released data established that lower Latino total population majorities would have sufficed to create effective Latino wards. The *Bonilla* plaintiffs' experts now estimate that, based upon census data released in 1992, on the north side wards with as little as 60–61% total Latino population can be effective, while on the south and southwest side an effective Latino ward could be created with as little as a 57.33% total population majority (51.16% VAP Latino majority). (BOPX 21, 74).

120. This Court is seriously troubled by this sort of double guessing and litigation based on hindsight. All the evidence suggests that given the best data and estimates then available, the parties involved in the negotiations reasonably believed that very high Latino population majorities were necessary in order to craft effective Latino wards. Second guessing the redistricting decisions based upon estimates which were not available when Judge Ruble–Murphy and the Latino Committee were attempting to hammer out the contours of the Latino majority districts would subject any large city to endless litigation should the parties' good-faith estimates of the population necessary to forge an effective ward, later prove to be less than entirely accurate.

121. It was a prudent bargaining strategy to push for a rough proportionality of representation, accepting perhaps one less ward than is absolutely possible, in order to ensure victory in a number of wards which is roughly proportional to the Latino community's share of the population of the City of Chicago. This is particularly the case when the community is relatively younger, is experiencing marked population growth, is nearly doubling its share of representation in the City Council and therefore has to establish new ward organizations, and is seeking to cement its share of representation in the community. It would have been a pyrrhic victory to negotiate for the highest possible number of Latino majority wards only to discover that some of those wards were ineffective. Discretion, it has been said, is often, particularly in political negotiations, the better part of valor. Litigation should not be a continuation of the political negotiation process.

122. As a necessary component of any coalition composed of the 41 out of 50 aldermen necessary to approve a ward map, the 4 Latino aldermen were heavily courted by the competing coalitions seeking to draft a successful map and exercised an influence beyond their quantifiable share of the City Council. It would be inaccurate, however, to characterize the Latino aldermen as a "swing" vote since their addition to either of the recognized competing coalitions would not add up to the 41 votes necessary to pass a ward map out of the City Council.

123. During early November, 1991, the Latino Committee met repeatedly with the representatives of both the Equity and Fair Map coalitions.

124. The Latino Committee's discussions with the Fair Map coalition proved fruitless because the groups were unable to reach a compromise on the contours of the wards on the southeast side—the Latino committee advocated the consolidation of the Latino community into single ward while the Fair coalition advocated the creation of an additional African–American ward. These two objectives proved to be mutually contradictory and, accordingly, the groups were unable to reach an agreement.

125. The negotiations between the Latino Committee and the Equity Coalition progressed much further and culminated in an agreement reached on November 13, 1991 after a marathon meeting attended by, among others, Alderman Huels and Judge Ruble–Murphy and members of the Latino Committee. Although the parties disagree about the precise terms of the agreement and whether the agreement was soon broken by one or both of the parties, it is undisputed that late in the evening of November 13th, there was, at least for a fleeting moment, what appeared to be an agreement between the Equity Coalition and the Latino Committee concerning the boundaries of the Latino majority wards in the City of Chicago.

126. The November 13, 1991 meeting involved Alderman Huels as the chief negotiator on behalf of the Equity coalition. Judge Ruble–Murphy also was active in the negotiations. Aldermen Mell and Burke were also present for part of the meeting. All four Latino aldermen attended the meeting as did other members of the Latino Committee, including representatives of MALDEF who also acted as negotiators on behalf of the Latino Committee.

127. This Court heard extensive testimony concerning the November 13th meeting. While the existence of an agreement between the Latino Committee and the administration would never excuse the creation of a map that violated Latino voting rights, the negotiations and the content of those negotiations are relevant to this Court's consideration of the totality of the circumstances particularly insofar as the negotiations highlighted the Latino Committee's position that it was important to ensure Latino access to the political process by crafting wards with high Latino population majorities rather than risk an absence of political representation by creating wards in which Latino electoral success would not be as likely. The negotiations of November 13, 1991 highlight the extent to which the give and take of the redistricting process resulted in numerous compromises which nonetheless resulted in significantly expanded opportunities for Latino participation in the political process as well as in roughly proportional representation of the Latino population.

128. The participants at the November 13th meeting discussed and agreed upon the importance of creating wards with high Latino population concentrations because of, among other factors, citizenship rates in some Latino areas. One of the methods the parties agreed upon in order to increase the effectiveness of Latino wards, was to split some Latino communities between several wards, all of which would have Latino majorities. For this reason, the Humboldt Park community, with a large Puerto Rican population was split between the 26th ward, where it had previously been concentrated and the new 1st ward which had a sizeable Mexican community. (Tr. 1949–50–Gutier-

rez). Similarly portions of the 22nd ward were included in the new 12th ward. The new 12th ward was given an extremely high Latino majority population because it had an incumbent white alderman and committeeman. (Tr. 1939–Gutierrez). In order to be drawn with adequate population, the 12th Ward was drawn in a rather elongated, snake-like, and irregular manner bringing together portions of the Back of the Yards community as well as portions of South Lawndale and cutting through what had historically been portions of the 11th Ward (which included Bridgeport and was represented by Alderman Huels) and the 14th Ward (which was represented by Alderman Burke).

129. At the time, there was extensive discussion of how to draw the ward map in relation to the Back of the Yards neighborhood which had a sizeable concentration of Latino population but which was somewhat isolated from the traditional south side Latino population centers in the 22nd and 25th Wards in Pilsen, Little Village and South Lawndale. The Latino Committee and the Equity Coalition were also aware that as of 1991 there was a burgeoning, but not yet very dense, concentration of Latino population in the Gage Park and Marquette Park neighborhoods to the southwest of the Back of the Yards—these neighborhoods were predominantly in the 14th and 15th wards. The Gage Park and Marquette Park neighborhoods are considered to be middle-class areas, with a housing stock composed largely of brick bungalows and two-flats. The Back of the Yards neighborhood is significantly less advantaged with a much older and somewhat deteriorated housing stock.

130. During the November, 1991 negotiations, the parties were reasonably concerned that it would not be feasible to draw an effective Latino ward on the Southwest side encompassing all of the Back of the Yards and the Gage Park and Marquette Park areas. Given the then current thinking, that a very high Latino population concentration was necessary to create an effective ward, it was not realistically possible to create a new southwest side Latino ward without borrowing population from the 22nd or 25th Wards

to the North. Additionally, while crafting a new southwest side Latino majority population ward, the parties were no doubt aware of the fact that much of the Back of the Yards and the southwest side growth area was in the 14th ward, a ward with a long-serving, for more than two decades, Alderman who had run unopposed and had prevailed in the ward in the 1991 elections even though the ward then had a plurality Latino population. Given these considerations it was a prudent compromise, even if it was not the first choice of the Latino Committee, to forego drawing what then appeared would likely be an ineffective Latino ward comprised of the Back of the Yards and Gage Park and Marquette Park in order to include a portion of the Back of the Yards neighborhood into the new 12th Ward which would also include portions of the old 22nd and 25th wards and the Latino areas of the old 12th Ward.

131. Another concern that contributed to the splitting of a portion of the Back of the Yards neighborhood into several wards was the severe underpopulation of the neighboring 16th and 3rd wards (the 3rd ward had a total population 21.54% below the ideal population while the 16th ward had a total population 14% below the ideal).

132. This is not to say that the Latino Committee did not collectively view the inclusion of the Back of the Yards community into a single ward as important; but rather that within the context of accounting for: 1) political realities, 2) the likely effectiveness of any such ward, and 3) the process of reaching political compromises, this particular priority was sacrificed in order to effect other interests of the Latino community. Making difficult choices and compromises is what leadership in politics is all about.

133. The precise particulars of the November 13th agreement were in dispute between the parties. Certain details of the November 13th agreement, however, are not in dispute: 1) there would be four wards with Latino supermajority populations of at least 65% on the northwest side; 2) there would be three wards with Latino supermajorities of at least 72% on the southwest side; 3) there would be a Latino "influence" district

on the southeast side that was approximately 45% Latino which would unite most, but not all, of the predominantly Latino neighborhoods in the area into the 10th Ward. Within the contours of the agreement, significant portions of the Latino population in the Back of the Yards were placed in the 3rd, 11th, 14th and 16th Wards. (DX 167). The agreement covered ward population percentages as opposed to specific boundary lines. (Tr. 7044–Ruble–Murphy). There were also discussions, although the testimony does not indicate that any ward boundaries were ever discussed, that the number of African–American wards might be increased by one. (Tr. 1232–33–Gutierrez).

134. The *Bonilla* plaintiffs contend that the November 13th agreement also included a commitment to hold special elections in the "new" Latino wards. Defendants contend that special elections were not a part of the agreement. It is undisputed that the parties at least discussed special elections during their negotiations.

135. Senator Garcia's testimony concerning special elections was somewhat equivocal and indicates that, at the end of the November 13th meeting, there was not a conclusive agreement to hold special elections but that the participants felt that there was a likelihood that an agreement to hold some sort of special elections might eventually be achieved. (Tr. 1673–74, 1700, 1779). Senator Garcia's testimony is incomplete as to whether there was ever an actual deal in place to hold special elections, and if so whether those elections were to be held City-wide or in the "new" wards. On the other hand, the testimony of Alderman Huels and Congressman Gutierrez is more complete, is credible, and can be reconciled readily with Sen. Garcia's testimony. Both testified that the question of special elections was raised at the meeting, that no definitive agreement was reached, but that there was still an agreement in place as to the seven Latino supermajority wards and the one influence district. (Tr. 1936–Gutierrez; Tr. 925–28–Huels). Alderman Huels testified that he was asked whether the City would object to special elections in the "new" Latino wards and that he made a counter-offer of elections

in all the wards. (Tr. 926). The meeting ended with the participants deciding that they needed to confer amongst themselves and the groups they represented before they could come to some agreement as to special elections. Nonetheless, as Congressman Gutierrez testified, the outcome of the discussions concerning special elections did not hinder the general agreement as to ward boundaries. (Tr. 1937–38).

136. That the discussions concerning special elections played out in this manner makes sense. It would have been problematic from a representational perspective to hold special elections only in those wards which were "new" insofar as residents who were transferred into preexisting wards in order to make way for the new wards would have wound up being, in essence, unrepresented. It would have been a logistical nightmare to determine precisely which wards were new and which were old—for example significant changes were made in the 14th, the 22nd and the 11th wards in order to make way for the "new" 12th ward; the 27th, the 42nd, 32nd and 26th wards were all transformed to make a space for the "new" 1st ward. It is not surprising that the offer to hold elections throughout the City quickly died on the vine given the significant expense and logistical difficulty of holding City-wide elections in the middle of an election year cycle. The fact there was no definitive agreement reached as to special elections comports with Sen. Garcia's inconclusive testimony which could lead one to conclude that his lukewarm support for the compromise map was dependent upon eventually agreeing to special elections.

137. Given these circumstances, this Court concludes that an agreement between the Equity Coalition and the Latino Committee was indeed reached calling for seven Latino supermajority wards and an influence district, incorporating most but not all of the Latino community on the southeast side. The question of special elections remained to be worked out between the parties.

138. The November 13th agreement, however, did not survive. Congressman Gutierrez testified that the agreement did not last. (Tr. 1674, 1879).

139. In the final ward map, however, the Latino majority wards had lower Latino population majorities than the Equity Coalition and the Latino Committee had originally agreed upon on November 13th. The population percentages for the Latino majority wards in the final ward map prepared by Judge Ruble–Murphy, while slightly different from those originally agreed upon were still within the general range of the agreement—the north side Latino majority wards all had Latino total population majorities of at least 65%, and the 1st ward had a Latino total population majority of 68.89%, the southwest side wards had Latino majorities of at least 72%, and the 10th ward had a Latino total population plurality of 43.13%. Thus, while there were changes in the makeup of the seven Latino wards, the reason for which was never explained, those changes did not significantly vary from the population figures agreed upon on November 13th. Even if the agreement had been for specific ward boundaries, the boundaries of the final ward map are in the same general location as those that had been agreed upon on November 13th. (Tr. 7282).

140. During November, 1991, the Equity Coalition was also conducting negotiations with the Fair Coalition in an effort to craft a ward map acceptable to 41 aldermen in order to avoid a referendum. Unfortunately, the negotiations proved to be fruitless.

141. Not surprisingly, the parties have presented radically different interpretations of the history of these negotiations. While this Court finds the factual account presented by the defendants more compelling, this Court notes its disagreement with the conclusions drawn from those facts by the defendants. It is neither surprising, nor relevant, that the members of the Fair Map group: 1) sought a map that would have been most advantageous to their interests; 2) insisted upon maximizing the number of African–American wards; 3) were opposed to drawing a Latino influence ward on the southeast side because it would have made it impossible to create an additional African–American ward in this area of the City; 4) and proposed maps that would have jeopardized the African–American aldermen who were allied

with the Equity Coalition. That the members of the Fair Map coalition pursued a compromise that would have been very advantageous to their interests and that they were intransigent in their negotiations, would not excuse a map limiting minority opportunities to participate in the political process, nor would it provide an excuse for intentionally drawing a discriminatory map in retaliation for the perceived intransigence of the members of the Fair Map coalition.

142. The negotiations with the Fair Map group began promisingly enough with an initial offer by Alderman Huels and Judge Ruble–Murphy to prepare a map that would provide for 21 effective African–American wards with the caveat that the 34th ward represented by Alderman Austin and the 8th ward represented by Alderman Dixon would not be adversely affected. (Tr. 5207–08–Steele). Given their previous agreement with the Latino Committee the representatives of the Equity coalition also demanded that the Fair Map group and the Latino Committee work out an agreement with respect to the proposed southeast side Latino influence ward. Initially, the Fair Map coalition, demanded that at least 22 wards be effective African–American majority wards. (Tr. 5207–08–Steele), but it eventually agreed to 21 wards. (Tr. 5207–Steele, Smith Dep. Des. 250).

143. While several draft compromise maps were prepared between Judge Ruble–Murphy and the Fair Map coalition and its representatives, none of them proved to be mutually satisfactory. (SX 106, 107; Tr. 761–63–Ruble–Murphy). In order to craft 21 effective African–American wards, the draft compromise maps made extensive use of population deviations, consistently underpopulating African–American majority wards and overpopulating wards on the north side of the City. (SX 106, 107). The draft compromise maps also contained ward boundaries that were consistently more irregular than those found in the ward map that was eventually approved at referendum.

144. There were numerous reasons why the attempt at compromise failed, among the reasons were; 1) the rather heated personal animus between some of the leaders of the relevant coalitions which probably precluded an effective compromise; 2) the difficulty of reaching an agreement with respect to the 8th and 34th wards; 3) the difficulty of reaching an agreement with respect to the 18th ward; 4) the inability of agreeing upon ward lines that would satisfy the 41 aldermen necessary to avoid a referendum.

### 6. December 1991—Preparation of the Referendum Maps

145. After it became clear that negotiations between the competing aldermanic coalitions would not result in a consensus map, each group privately began drafting its own proposed map for submission to a referendum.

146. Judge Ruble–Murphy assumed the duty of drawing a map for referendum on behalf of the council leadership (referred to hereinafter as the "Referendum Map" or the "present ward map"). The template for the Referendum Map was the preexisting ward map taken in the light of the 1990 census figures. (Tr. 569, 6965, 7054–Ruble–Murphy). From this template, the first wards drawn were the Latino majority wards, including the wards that were essentially new configurations wards such as the 12th and 1st wards. (Tr. 865, 6970–Ruble–Murphy). The most significant changes and largest population allocations from the pre-existing wards were made in order to reflect the substantial growth of the Latino community. It logically follows that the first wards to be drawn would be those that required the most significant changes in the existing ward maps. The creation of the new Latino wards in the near southwest side and the near northwest side set off a domino-like effect in the surrounding wards requiring that those wards be drawn so as to fill in any remaining space. The surrounding wards were drawn filling up the areas that were carved out from the remaining areas—for example, portions of the old 22nd, 25th, 11th, 12th and 14th wards were taken to create the new Latino super-majority 12th ward. As a result, since the new 12th ward assumed the northeast portion of the 14th ward, the 14th ward had to pick up additional population which it did by absorbing the portions of the old 12th ward that were not included in the new 12th ward.

147. Given the unfortunate breakdown in discussions between the competing council factions and their attorneys, the Fair and Equity groups drafted their respective ward maps without consulting their counterparts. Thus, both the Fair and Equity groups drafted their respective maps for the referendum without any additional input as to the wishes of the opposing aldermanic group or the public. When the parties ceased communicating the die was cast.

148. As a general overview, the Referendum Map, contains 19 wards which are majority white wards, 19 effective African–American wards, and 7 effective Latino supermajority wards. The Referendum Map also contains several wards which can not be so readily characterized namely the 18th, 10th, 46th, 48th and 49th wards. No racial or ethnic group possesses clearcut, unchecked electoral control in these wards.

149. The 18th ward has an African–American total population majority of 55.382% and an African–American voting age population majority of 53.632%. This ward, however, has never elected an African–American alderman. In the 1995 aldermanic election, however, the white candidate for alderman received a plurality of the African–American votes, as estimated by extreme case analysis, indicating that he may have been the African–American candidate of choice. (DX 506, BAPX 13).

150. The 10th ward has a slim white plurality. According to the 1990 figures the current 10th ward has a total population that is 43.148% white, 43.133% Latino, and 13.216% African–American, and a voting age population that is 50.344% white, 37.522% Latino, and 11.628% African–American. (SX 1). The current 10th ward contains most, but not all of the Latino population concentrated in the Southeast side. The Bonilla plaintiffs contend that the ward should have included the balance of the Latino population presently in the 7th ward while the Barnett plaintiffs contend that an additional African–American ward could have been drawn in the area.

151. The 46th, 48th and 49th wards, all have white pluralities with sizeable Latino, African–American and Asian populations. (SX 1). In all three wards, the minority candidate of choice in aldermanic elections has frequently been a white candidate reflecting the extent it is necessary to build multi-ethnic and racial coalitions in order to succeed. In these wards, minority members are able to wield considerable influence in the political process by virtue of the fact that without their support electoral victory would not be possible.

152. Judge Ruble–Murphy testified that she was guided by five chief criteria when drawing the ward maps. These criteria were:

1) Guided by *Ketchum*, the City was not to engage in any "retrogression" when drawing the 1991 ward map;

2) Also guided by *Ketchum*, any minority districts would be "effective." Judge Ruble–Murphy did not use a particular benchmark for effectiveness but relied upon the estimates of the aldermen and community groups to recommend a level of minority population that would be effective. Judge Ruble–Murphy was aware, however, of *Ketchum*'s estimate of 65% total minority population or 60% voting age population as a rough rule of thumb for effectiveness;

3) Wards should be as nearly equal in population as possible;

4) Wards should be as compact as possible;

5) New ward boundaries should adhere as closely as possible to existing ward boundaries.

(Tr. 568ff).

153. There was no testimony suggesting that the present ward map was retrogressive, the number of Latino and African–American majority wards did not decrease under the present ward map.

154. Judge Ruble–Murphy testified that she attempted to draw the wards for the referendum map with populations as equal as possible. (Tr. 572, 581–82). In the final map, the largest population deviation was 59 persons, or a deviation from the ideal ward population of 55,675 of approximately .01%. Judge Ruble–Murphy testified credibly that

she based her fidelity to a zero population deviation standard on her understanding of one person one vote principles. (Tr. 6971). Judge Ruble–Murphy also relied upon the requests of the north-side aldermen, who were predominantly white, in attempting to achieve minimal population deviations. The Latino Committee also generally favored minimal population deviations.

155. This Court notes that in her early partial draft maps, Judge Ruble–Murphy utilized population deviations and that she also used population deviations with a total swing of approximately 7% in the Equity Map. The practical effect of the switch to a zero population deviation strategy was to make it nearly impossible to create an additional African–American majority ward on the west side of the City. Adopting a zero deviation strategy did not, however, result in the creation of an additional white majority or plurality ward. Nor did the adoption of a zero population deviation strategy necessarily result in the diminution of the number of minority wards. White population from the overpopulated north side wards was used both to re-populate the west side African–American majority wards and as filler in the new Latino majority wards. White and African–American population from the old 42nd and 1st wards was used to re-populate the 27th and 2nd wards. Additionally, white population from the 36th and 30th wards was used to repopulate the 29th ward. Excess white population was also inserted into the 31st and 26th wards in order to equalize population in those wards and to permit the creation of the additional Latino majority 35th and 1st wards. The concrete effect of these population transfers was to triple the number of whites living in African–American or Latino majority wards on the west or near northwest sides. (*Compare* SX 1, 3). Either utilizing population deviations or including excess white population in minority-majority wards tends to have the same effect—namely permitting the preservation or the drawing of additional minority-majority wards. That Judge Ruble–Murphy utilized one permissible map drawing method rather than another is not necessarily discriminatory nor does it necessarily result in a dilution of minority voting strength.

156. During the redistricting process, Judge Ruble–Murphy did not strictly apply the 65% total population/60% voting age population rule of thumb from *Ketchum*. Nor did Judge Ruble–Murphy ever perform an independent analysis of the effectiveness of the wards. Rather, Judge Ruble–Murphy attempted to accommodate requests by minority aldermen and community representatives as to what they "needed" for their respective wards (Tr. 649–Ruble–Murphy). The Latino Committee advocated that Latino majority wards be drawn with minimum majorities of 70% Latino total population on the Southwest side, 65% total population on the North side, and 70% total population in the 1st ward. (Tr. 649–Ruble–Murphy). The Fair Map coalition and its representatives similarly advocated that the African–American majority wards be drawn with high total age population majorities of approximately 70% or voting-age population majorities of 65%. (Tr. 649–50). In general, Judge Ruble–Murphy attempted to adhere to these requests whenever possible.

157. Judge Ruble–Murphy's awareness of the *Ketchum* 65% rule of thumb for effectiveness, however, belies the contention that there are indeed 20 effective African–American maps contained in the Referendum Map, since the 18th Ward does not meet this benchmark. The 18th ward contained in the referendum map has an African–American total population majority of 55.382% and a voting-age population majority of 53.632%. This Court will address the proffered reasons for drawing the 18th Ward as it was included in the Referendum Map at ¶¶ 185–194.

158. Judge Ruble–Murphy also testified, and this Court credits that testimony, that she attempted to draw the wards as compactly as possible. (Tr. 574). Compactness is a statutory requirement in Illinois. 65 ILCS 20/21–36. Compactness was also important to many of the alderman in order to allow them to service their wards effectively. (Tr. 6848–49–Burke). In general, except for some of the relatively irregular wards in the north and southwest sides necessitated by the drawing of 7 Latino supermajority wards, and the subsequent irregularities in the sur-

rounding wards, the ward boundaries in the Referendum Map are generally more compact than those contained in either the Fair or Equity Maps.

159. Judge Ruble–Murphy also testified that she attempted to adhere as closely as possible to existing ward boundaries. In order to facilitate this process in September, 1991 each alderman was asked to answer a questionnaire in which he/she was asked to identify the "core" neighborhoods of his/her ward, important community and/or religious institutions in the wards, and important business centers of the wards. Judge Ruble–Murphy attempted to accommodate these interests. (Tr. 575–76–Ruble–Murphy).

160. It was not always possible to adhere to the "least-change" strategy when preparing the new ward boundaries. Several considerations made it impossible to adhere strictly to a "least change" policy. The entirely new Latino wards, particularly the 1st and 12th wards, bore almost no resemblance to any traditional ward boundaries. Only small fractions of the old 12th and 1st wards are contained in the new 12th and 1st wards. The significant changes in these two wards set off a chain reaction of new boundaries and necessitated allocations of large portions of population in the surrounding wards. Second, it was necessary to account for the population shifts in the City which, as of 1990, had left the north side wards largely overpopulated and the south side wards, generally with African–American majorities, largely underpopulated. (Tr. 719–20–Ruble–Murphy). This phenomenon occurred even though the overall white population decreased by approximately 240,000 between 1980 and 1990 and the African–American population decreased by approximately 120,-000 between 1980 and 1990. On the north side the decreased white population was offset, relatively speaking, by increased Latino, Asian, and African–American population in these portions of the City, which left the north and northwest side with white majorities which were slightly less dense than had previously been the case. For example, almost 23,000 African–Americans moved into the north side lakefront wards, the 46th, 48th and 49th wards, between 1980 and 1990—this

area, however, remained plurality white. Meanwhile in the African–American majority wards on the south side there was no offsetting influx of population to ameliorate the outflow of African–American population.

161. Given Judge Ruble–Murphy's efforts to hold population deviations to a minimum, it was necessary to alter ward boundaries in order to account for these changes in the City's population patterns. These two considerations—the new wards and population equalization—combined to result in significant changes in traditional ward boundaries. For example, the 2nd ward, which was traditionally a near south side ward became a ward that stretches from its traditional near south side heartland to the Printer's Row neighborhood in Downtown and then extends west in a narrow band between Roosevelt Road and 16th Street to Western Avenue until it juts north to pick up some African–American majority census blocks on the west side. The significant changes in the 2nd ward were necessitated by the serious underpopulation of the ward, as of the 1990 census the ward was more than 18% beneath the ideal population, and the eradication of the traditional Downtown 1st ward. In essence, the 2nd ward gained the necessary population by acquiring the southern territory of the old 1st ward. Thus, where the least change strategy was not utilized, and it was not used in many instances, the reason for its abandonment was generally due to the overriding strategies of creating the new Latino majority wards or the southeast side influence ward (this accounts for the large population transfers in the 10th, 14th, 26th and 32nd wards), or to equalize population, or due to a combination of the two factors (which accounts for the transfers of population in the 15th and 42nd wards).

162. Judge Ruble–Murphy received substantial input from the members of the Latino Committee when drawing the Latino majority wards for the referendum map. (Tr. 6965). She, of course, had the target population figures and approximate ward maps that had been worked out on November 13th. She also consulted with several of the incumbent Latino alderman and other Latino public officials concerning the Latino wards

contained in the Referendum map. The percentages of total population in the northwest side wards all remained over 65% Latino, and the Ukrainian Village community, which is majority white remained carved out of the 1st and 26th wards.

163. This Court also heard suggestions that the boundaries of the 25th, 22nd and 12th wards were changed extensively from those proposed in the November 13th compromise. This Court is satisfied that a chief reason for this change was that then–Alderman Medrano of the 25th Ward, and an ally of the council leadership, actively sought the inclusion of the Chinatown community, which was traditionally part of the old 1st ward, into the Latino majority 25th ward. (Tr. 6968–Ruble–Murphy; Tr. 821–Huels). The inclusion, for whatever reason, of Chinatown into the 25th ward set off a chain reaction forcing the 25th ward's boundary with the 12th ward to shift to the east, which also resulted in changes to the 22nd ward's boundaries. In spite of these changes in the boundaries of the 25th, 12th and 22nd wards, the level of Latino population in these wards remained over the target of 70% that had been set in earlier negotiations. While the configurations of the wards changed, the configurations were similar to those agreed upon in November (Tr. 1234–Gutierrez) and despite these changes, the effectiveness of these wards was not impaired.

164. The Latino percentage in the 10th Ward, however, decreased by approximately 2.5% between the November 13th compromise map and the Referendum Map from 45.691% to 43.133% of the total population. It would be inaccurate, however, to conclude that this change was affected in order to increase the white incumbent's chances of success because the white population percentage also decreased slightly between the two maps from 43.859% in the November compromise map to 43.148% in the Referendum Map. (Compare DX 167, SX 1). The reason for these changes was the addition of African–American population to the 10th ward, the African–American population percentage increased from 10.014% in the Equity Map to 13.216% in the Referendum Map. Thus, rather than increasing the white incumbent's chances for success, the Referendum Map actually added minority population to the 10th ward and decreased the white plurality in the ward.

165. The balance of the wards, the African–American majority wards and the far north side lakefront wards, were for the most part prepared by Judge Ruble–Murphy without any contemporaneous advice from the aldermen. The exceptions to this rule were the aldermen of the 8th and 34th wards, who were members of the Equity Coalition, who had substantial input into the shape of their wards for the Referendum Map. The remaining effective African–American majority wards, as well as the 46th and 49th wards, which were represented by members of the Fair Coalition, were drawn by Judge Ruble–Murphy without any input, with neither a request nor an offer from anyone for further discussion, other than her records of the November compromise discussions and her previous informational meetings with the aldermen in the late summer and fall. It was an unfortunate consequence of the breakdown in negotiations and the acrimonious tone surrounding the redistricting process that Judge Ruble–Murphy, on behalf of the Equity Coalition, and Mr. Miner, on behalf of the Fair Coalition, were left to prepare maps for the referendum without substantial input from all the members of the City Council. It is an unavoidable fact of a redistricting process that very few legislators are entirely happy with the results, and that was particularly the case in the 1991 ward remap when the City Council broke down into opposing factions that by the end of the process had stopped talking to each other.

166. The Fair Map was likewise prepared for referendum in a vacuum without any input from members of the competing Equity Coalition. The Fair Map contained 22 effective African–American wards. The Fair Map also contained 7 Latino supermajority wards but did not consolidate most of the Latino population on the southeast side into a single ward.

### 7. The Referendum

167. On February 4, 1992, the Equity Coalition filed its map with the City Clerk for submission to referendum on the March 17,

1992 ballot. On that same day, the Fair Coalition filed its map to the City Clerk for inclusion in the referendum. Inexplicably, the referendum did not include a picture of the respective maps, nor did it identify the maps by name. The referendum simply listed the names of the aldermen who signed the respective filing petitions. (PJX 117).

168. Since no map was ever approved by the necessary supermajority of the Rules Committee, the final hearing envisioned by the redistricting ordinance was never held.

169. At the referendum, three of the four incumbent Latino aldermen were cosponsors of the Referendum Map. Senator Garcia, then alderman of the 22nd ward, did not endorse either map.

170. Additionally, the demographer of the Latino Institute, Michael Norkewicz, who also acted in the same role for the Latino Committee prepared an analysis of the two ward maps which suggested that the Latino Institute endorse the Referendum Map. (DX 203, 206). This memorandum is relevant only insofar as it reiterates the prudential concerns motivating the original November 13th compromise. Norkewicz concluded that on the southwest side no more than 4 effective Latino majority wards could be drawn, and that the Referendum Map generally conformed to the November 13th agreement. Norkewicz's memorandum reiterated the Latino Committee's position that Latino majority wards had to be drawn with very high percentage majorities because of concerns about low citizenship and registration rates. Norkewicz was also critical of the Fair Map's failure to include a southeast side Latino influence ward. While members of the Latino Institute and the Latino Committee were aware of this suggestion, these organizations did not endorse either map.

171. The referendum process allowed the aldermanic coalitions to take their cases directly to the voters, an eventuality that had frequently been threatened during the course of negotiations over a compromise map. In connection with the referendum campaign the Council leadership raised approximately $250,000 and the Fair Map coalition raised approximately $25,000. (BAPX 10, 11). This disparity permitted the Referendum Map coalition to campaign much more aggressively in support of their map, the Fair Map coalition limited its campaign largely to the African–American community.

172. In spite of the manner in which the City Council broke down during the redistricting process, the referendum campaign contained little advertising that could even remotely be termed as making a racial appeal. Much of the advertising in favor of the Referendum Map highlighted the extent to which the map retained traditional ward boundaries and kept neighborhoods intact. It is not surprising that the incumbent of the 10th ward campaigned by focusing on the fact that the Fair Map split the 10th ward between the 7th, 8th, 9th and a reconstituted 10th ward while the Referendum Map retained the traditional neighborhoods of the ward. (PJX 57). Nor does the "council wars" flyer, distributed by some aldermen, which offered voters a choice between a "vote for a new ward map which will keep Chicago moving forward, or one that will bring warfare back to City Council" necessarily make a racial appeal, although it certainly does make a veiled reference to the "council wars" era of the Washington administration. The flyer observes that the Mayor and a multiracial coalition consisting of a majority of the City Council also supported the Referendum Map while the opposing map had not received such broad support. (PJX 56).

173. The Referendum Map was approved at the March 17, 1992 referendum by a vote of 257,769 for the present ward map and a vote of 163,258 for the Fair Map.

174. The referendum vote broke down along racial lines. African–Americans supported the Fair Map at an estimated rate of approximately 89% while non–African–Americans supported the current ward map at an estimated rate of approximately 87%. The Latino turnout for the referendum was estimated to be less than 1% of the Latino voting age population so it was not possible accurately to estimate Latino support for the proposed maps. (BAPX 13).

175. The first elections using the current ward map were the February 1995 aldermanic elections. As a result of these elections 24

white, 19 African–American, and seven Latino aldermen were elected to the City Council. To reiterate a previously stated fact, the final elections under the *Ketchum*-settlement map in 1991 resulted in the election of 28 white, 18 African–American, and 4 Latino aldermen.

### D. The Contours of the Referendum Map and Incumbency Protection

176. Plaintiffs contend that the Referendum Map was drawn to protect powerful white incumbents to the detriment of Latino and African–American representation. This Court concludes that concerns about the effectiveness of the new Latino wards rather than the protection of white incumbents provided the basis for the drawing of the relevant ward boundaries in the Referendum Map. The question of possibly improper incumbency protection revolves around the 14th ward represented by Alderman Burke, the 11th ward represented by Alderman Huels, the 33rd ward represented by Alderman Mell, and the 32nd ward represented by Alderman Gabinski, who are among the most senior and powerful aldermen in the City Council. As an initial observation, the Court notes that the Referendum Map contained wards which effectively made it impossible for three white aldermen to succeed in their reconstituted wards—the 12th ward represented by first-term Alderman Fary was significantly transformed into a ward with a 72.53% total population Latino majority; the traditional 1st Ward, represented by Alderman Mazzola was eliminated and moved to the near northwest side and Mazzola's residence was moved into the 42nd ward represented by Alderman Natarus; the 30th and 35th wards were combined and reconstituted so as to make room for a new Latino majority 35th ward leaving the incumbents, Aldermen Bialczak and Wojcik in the same ward.

177. That several white incumbents were not protected would not, however, excuse a ward map that simultaneously protected several of the most senior leaders of the City Council in a manner that diluted minority voting power. This Court, however, concludes that the 14th, 11th, 33rd, and 42nd wards were not drawn so as to limit minority representation.

178. As of 1990, under the prior ward map, in terms of total population the 11th ward was a plurality white ward, the 14th ward was a plurality Latino ward, the 33rd ward was a majority Latino ward, and the 32nd ward was also a slim majority Latino ward. (SX 2). Yet in the 1991 aldermanic elections Aldermen Burke, Mell, and Huels all ran unopposed and Alderman Gabinski was reelected. Each of these aldermen had exhibited a degree of skill at responding to Latino constituent concerns, in fact some of Aldermen Mell's best precincts were in Latino areas of the 33rd Ward. (Tr. 1218–Gutierrez).

179. After the Referendum Map was approved, the 11th, 14th and 32nd wards all had white total population majorities, and the 33rd ward had a white total population plurality. The decrease in Latino population in each of these wards was according to Judge Ruble–Murphy primarily due to the attempt to draw Latino areas with high Latino population concentrations into the new Latino majority wards. (Tr. 865, 6970). Judge Ruble–Murphy testified that she did not attempt to create white majorities in these wards. (Tr. 6885). Nor, is there anything in the record to suggest that any of these incumbents, particularly Burke, Mell, and Huels, needed to be given "safe" white majority wards in order to continue in office. Alderman Mell, for example was quite vocal in expressing his willingness to keep a majority Latino population in his ward since he had historically done very well in Latino precincts.

180. This Court credits Judge Ruble–Murphy's testimony, and that of Alderman Burke, that she first drew the new Latino majority wards and then drew the surrounding wards to fill in the gaps so as take up census blocks that did not have a high enough Latino concentration to be included in the new wards. (Tr. 865, 6970). The 32nd ward for example, has its irregular shape because of the attempt to draw a 1st ward with a Latino total population majority greater than 68% which necessitated the connector to the Ukrainian Village neighborhood. Similarly, the oddly shaped trunk-like southwest

portion of the 11th ward was drawn because that neighborhood did not have a high enough percentage of Latinos for the new 12th ward. (Tr. 821–Huels).

181. Similarly, the new configuration of the 14th ward was not drawn in a manner protecting Alderman Burke to the detriment of minority voters. The movement of the 14th ward was necessitated by two legitimate concerns: the creation of the new 12th ward and the repopulation of the 16th ward. The African–American majority 16th ward, was underpopulated by 14%. All the African–American wards adjoining the 16th ward were also underpopulated. Meanwhile, the 14th ward was overpopulated by approximately 24% and was, therefore, a logical candidate to contribute population to the neighboring wards. In order to restore the population of the 16th ward, the ward's borders were shifted to the northwest to add the northern portion of the 15th ward (which moved to the west) and then added the northeast corner of the 14th ward adding a portion of the predominantly African–American and Latino Back of the Yards neighborhood. At the same time the eastern boundaries of the 14th ward were imposed by the new 12th ward which was drawn as a snaking corridor connecting a portion of the Little Village neighborhood, most of the predominantly Latino areas of the old 12th ward, and the northern half of the Back of the Yards neighborhood—the new 12th ward contained only a slim portion of the old 12th ward, a sliver which cut through the center of the old ward. The 11th ward added most of the eastern portion of the old 12th ward (meanwhile the eastern end of the 11th ward was transferred to the 3rd ward) and the 14th ward was moved to the northwest to add the western portion of the old 12th ward. (SX 1, SX 3).

182. While plaintiffs astutely observe that the earliest draft partial maps concentrated on the southwest side and included configurations for the 14th ward similar to the one included in the Referendum Map, it is equally true that several of the early partial draft maps envisioned a new Latino ward following the long, narrow boundaries of the 12th ward as included in the Referendum Map. (SX 25, 26, 27, 32, 45, 53, 54, 70, 82, 107). Creating a new Latino majority ward on the southwest side necessarily required the inclusion of much of the 14th ward into that new ward, and given the thinking of the time, because of concerns about citizenship, registration, and the population percentage needed to create an effective Latino ward, Judge Ruble–Murphy as well as the members of the Latino Committee felt that it would be more responsible to include a portion of the old 22nd ward in the new Latino majority ward rather than try to create a ward including the areas of Gage Park and Marquette Park which have less dense Latino majorities. This decision, not a desire to protect alderman Burke's incumbency, led to the carving up of the old 12th ward and the movement of the 14th ward into the void left by the creation of the new 12th ward.

183. The manner in which the 11th, 14th, and 33rd wards were drawn also exhibits a laudable level of political realism which had the effect of ensuring Latino electoral success rather than, as plaintiffs now suggest, limiting minority political representation. Drawing either Alderman Burke, Huels or Mell into a new Latino minority ward would likely not have furthered the goal of increasing Latino representation because of the risk, given the previous success of all three aldermen among their Latino constituents, that the incumbents would prevail. No prudent candidate would have sought to run against three of the most successful, powerful, and popular aldermen in the City, and no one during the process seriously suggested that the new Latino majority wards should overlap with the 11th, 14th, or 33rd wards. (Tr. 257–6, 6861–Burke). Coincidentally, although it is not of much relevance, the Fair Maps also preserve the incumbencies of Aldermen Burke, Mell, Huels, and Gabinski. (SX 96, 99, DX 198).

184. This Court cannot detect any evidence that the 42nd ward was drawn in a manner which diluted minority voting strength for the benefit of the incumbent alderman, Burton Natarus. Prior to the redistricting, the 42nd ward had long included the Cabrini–Green Housing project which

had a population that was almost entirely African–American. The old 42nd ward was approximately 26% African–American. Alderman Natarus was adamantly opposed to removing Cabrini–Green from the 42nd ward because he objected to drawing ward boundaries which focused solely on race. (Natarus Dep. Des. 59–60, 104–05). In addition, Alderman Natarus had long received electoral support from African–American voters who historically preferred him over African–American aldermanic candidates and had in the past relied on African–American support to defeat white challengers. (BAPX 150).

### E. The Southwest Side—The 18th Ward

185. Judge Ruble–Murphy's decision to retain the 18th Ward in substantially the same form as it had been drawn in the *Ketchum* settlement map was a particularly thorny area of dispute in this case.

186. The dispute concerning the 18th ward can be adequately considered only when the population figures of the surrounding wards are also taken into account. As of the 1990 census the relevant population figures for the 18th and the surrounding wards were as follows:

| Ward | TP | Deviation % | TP (VAP)% African-Am | TP(VAP) % White | TP (VAP) % Latino |
|---|---|---|---|---|---|
| 18 | 55,141 | − .958% | 55.63 (53.93) | 41.34 (43.48) | .43 (.40) |
| 13 | 59,567 | .991% | .19 (.19) | 85.27 (87.83) | 13.54 (11.06) |
| 15 | 55,169 | − .908% | 81.39 (78.73) | 11.91 (15.05) | 5.83 (5.33) |
| 17 | 51,671 | − 7.191% | 98.31 (98.02) | 1.03 (1.36) | .43 (.40) |
| 21 | 52,197 | − 6.246% | 98.76 (98.63) | .71 (.85) | .36 (.32) |
| 19 | 57.011 | 2.401% | 20.57 (19.37) | 77.03 (58) | 1.76 (1.46) |

187. In summary, the surrounding African–American wards were generally significantly underpopulated and needed to add population. Meanwhile, the white majority wards were very near or significantly over the target population. Thus as of 1990, Judge Ruble–Murphy faced a situation where the two corner wards, 18 and 19, were very near the ideal population and the surrounding African–American majority wards were generally underpopulated and had to be adjusted.

188. Early in the redistricting process, it appeared that the 18th ward would be significantly reconfigured. Alderman Murphy, who was a first term incumbent, was advised in his August meeting with Alderman Burke to begin looking for new employment. (Tr. 3430, 3432–Murphy). At this time, Judge Ruble–Murphy was drafting very preliminary maps which included an 18th ward that

either 1) combined the white population of the 18th and 19th wards and transferred the African–American populations of those wards to the adjoining African–American majority wards or 2) moved the 13th ward to the west and south adding the white population of the 18th ward and transferring the African–American population of the 18th ward to the adjoining African–American majority wards. (SX 25).

189. Meanwhile, in his appointments at the computer room, Alderman Murphy worked on draft maps for his ward which took account of the likelihood that his ward would undergo significant change, and also increased the white percentage in the ward, in general these draft maps resulted in the transfer of African–American population to the seriously underpopulated 17th ward and the addition of population from the neighboring 13th ward. (SX 50, 79). These draft

maps were nothing more than drafts. It was highly unlikely that the 13th ward would undergo any significant changes in its borders to benefit Alderman Murphy since it was doubtful that the 13th ward Democratic Committeeman and State Representative, and Speaker of the Illinois House of Representatives, Michael Madigan would approve of these changes to his ward.

190. During the September and October public hearings on the southwest side, Alderman Murphy, more than any other alderman, effectively mobilized his constituents who overwhelmingly testified that they did not wish to see the 18th ward's boundaries changed. (SX 7, 16).

191. In October 1991 Alderman Murphy attended a meeting also attended by Congressman Lipinski, Committeeman of the 23rd Ward, Speaker of the House Madigan, Committeeman of the 13th Ward, and Alderman Burke, Committeeman of the 14th ward, in which the likely relocation of the 14th ward, and its effects on the neighboring southwest side wards was discussed. (Tr. 3490–93–Murphy). Several proposals were discussed at this meeting, several of which would have resulted in the 13th ward moving to the south and the 18th ward being bumped to the east. As a first term alderman who had been elected less than a year earlier, Alderman Murphy did not wish to see the boundaries of the ward he represented undergo a significant change. Eventually, Alderman Murphy agreed to a compromise which would leave the 18th ward largely untouched. (Tr. 3494–95). This strategy was eventually followed in both the Equity Map and the Referendum Map, and the 14th Ward, in making room for a new Latino majority ward, was shifted to assume portions of the 13th ward and the western portion of the 12th ward. This strategy minimized the extent to which the boundaries of neighboring wards would have to be changed.

192. It simply flies in the face of logic to contend that the 18th ward was drawn in the manner it was in order to protect the incumbency of Alderman Murphy. Under the circumstances, very few participants in the process, other than Alderman Murphy himself, attached much value to the protection of his incumbency. Alderman Murphy won election in 1991 in a very close race, and the effect of the Referendum Map was to leave him in a ward in which he would likely face a close race in the future.

193. At this stage of its analysis, this Court can find no discriminatory intent in the drawing of this ward, one of the few wards where a racial identification of the ward cannot be readily applied. This is one of the few wards in the City of Chicago where candidates, in order to succeed, cannot take it for granted that they will be assured victory without having to appeal to voters of another race or ethnic group. It is, in theory, a laudable notion that in the 18th ward it is necessary to build a biracial coalition in order to achieve electoral success. The need to compromise, to bargain, to barter, and to seek a majority if not a consensus is a necessary part of the political process, a part of the political process which should hasten the end of racial divisions in our society. It is preferable that a candidate should be forced to seek the support of a diverse electorate, as is necessary in the 18th ward, than that voters be fenced into wards were they are unlikely to be exposed to a diversity of political views. It is likely that a candidate, of any race, will be more responsive to the diversity of public concerns if he or she has to be elected from a diverse ward instead of from a segregated ward. Adequate representation cannot be equated with racial tokenism, in theory the 18th ward is precisely that type of ward where it is impossible to equate representation with racial tokenism.

194. The 18th and 19th wards were corner wards which were very close to ideal population. Meanwhile many of the surrounding wards were either very overpopulated (the 14th and 13th wards) or were severely underpopulated (the 17th and 16th wards). Rather than significantly alter a corner ward that was near the target population, the nearby underpopulated wards were repopulated by population transfers from the overpopulated 14th ward, which also permitted the creation of a new Latino supermajority ward.

## II. LEGAL STANDARDS

### A. Voting Rights Act Section 2

#### 1. General Standards

■ Section 2 of the Voting Rights Act (the "VRA") was intended to enforce the Fifteenth Amendment's guarantee that no citizen's right to vote "be denied or abridged ... on account of race, color, or previous condition of servitude." U.S.C. Const. Amend. 15, *Voinovich v. Quilter*, 507 U.S. 146, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993).

■ Congress amended the Voting Rights Act in 1982 to make it explicit that a finding of intent to discriminate was not required in order to establish a Section 2 violation. S.Rep. 97–417 (1982), 1982 U.S.C.C.A.N. 177, 179. The 1982 amendments were intended to abrogate the Supreme Court's decision in *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), which held that the VRA required plaintiffs to make a showing of discriminatory intent. *Thornburg v. Gingles*, 478 U.S. 30, 34, 106 S.Ct. 2752, 2758, 92 L.Ed.2d 25 (1986). The 1982 amendment reinstituted the discriminatory results test previously employed in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). "Congress substantially revised § 2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard, the 'results test,' applied by this Court in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 ... and by other federal courts before *Bolden* ..." *Gingles*, 478 U.S. at 35, 106 S.Ct. at 2758.

§ 2 of the Voting Rights Act, 42 U.S.C. § 1973, provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race, or color,

or in contravention of the guarantees set forth in section 1973b(f)(2) [12] of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered:

*Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973. Therefore, VRA § 2 requires, as its most essential characteristic, a searching analysis of the myriad increments of the particular political process which might establish that minority voters have less opportunity to participate in the political process or to elect representatives of their choice:

The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives.

*Gingles*, 478 U.S. at 47, 106 S.Ct. at 2765 (applying the VRA to an at-large electoral system); *Voinovich*, 507 U.S. at 152–53, 113 S.Ct. at 1155–56 (applying the VRA to a challenge of a single-member district system). Thus, while VRA § 2 is not meant to provide an assurance of proportional success for minority candidates at the polls, *See Johnson v. De Grandy*, 512 U.S. 997, 1017–18, 114 S.Ct. 2647, 2660, 129 L.Ed.2d 775

---

**12.** 42 U.S.C. § 1973b(f)(2) states:

No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political

subdivision to deny or abridge the right of any citizen of the United States to vote because he is a member of a language minority group.

(1994), it is, at least, supposed to provide an assurance of fairness. *Uno v. City of Holyoke,* 72 F.3d 973, 979 (1st Cir.1995).

■■■ The Voting Rights Act does not require a federal court to micro-manage or strictly scrutinize the districting choices of legislative bodies, for a federal court's review of districting legislation represents a significant intrusion into what has traditionally been one of the most primary of local political functions. *See, Miller v. Johnson,* 515 U.S. 900, 915, 115 S.Ct. 2475, 2488, 132 L.Ed.2d 762 (1995) (equal protection challenge to a "race-based" district). It is not enough for a plaintiff in a Section 2 case merely to claim that lines could have been drawn differently because some dividing and combination which disappoints some part of the community is inevitable in the districting process and is bound to befall any population group of substantial size. *De Grandy,* 512 U.S. at 1015, 114 S.Ct. at 2659; *African American Voting Rights Legal Defense Fund v. Villa,* 54 F.3d 1345, 1355 (8th Cir. 1995).

### 2. Types of Vote Dilution

■■■ The inequality of opportunity which the Voting Rights Act seeks to eradicate includes not merely schemes limiting actual minority access to the polling place or a minority member's ability to seek elective office. The VRA also addresses electoral schemes which minimize the ability of minority members to elect candidates of their choice by diluting minority voting strength. Plaintiffs may allege, not only that they have no opportunity to elect their preferred candidates, but also that they have been denied as much opportunity as that to which they are entitled:

> Plaintiffs challenging single-member districts may claim, not total submergence, but partial submergence; not the chance for some electoral success in place of none, but the chance for more success in place of some.

*De Grandy,* 512 U.S. at 1012–13, 114 S.Ct. at 2658. The appropriate measure of Section 2, however, can never be the failure to maximize the number of minority wards:

> One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast ... The failure to maximize cannot be the measure of Section 2.

*De Grandy,* 512 U.S. at 1016–17, 114 S.Ct. at 2659–60.

■■■ Vote dilution, as it is relevant to this case, can take the form of: 1) packing, the concentrating of minority members into districts in which they constitute an excessive majority; or 2) fracturing, the dispersing of a minority community into separate political districts thus preventing a minority community from constituting a majority within a single district. *Hastert v. State Board of Elections,* 777 F.Supp. 634, 646 (N.D.Ill. 1991). Fracturing is the process by which a minority group which could form a sizeable majority in one district is split into two or more districts where the minority members constitute an ineffective political grouping in each. *Ketchum,* 740 F.2d at 1408, n. 8. It is particularly relevant evidence of a Section 2 violation if packing or fracturing has occurred in a manner disproportionately affecting minority communities. *See De Grandy,* 512 U.S. at 1015, 114 S.Ct. at 2659.

### 3. Influence Districts

■■■ In addition to the recognized forms of vote dilution demonstrated by packing and fracturing, courts have increasingly been called upon to consider claims for the failure to create "influence districts." An influence district is a district including sufficient members of a minority group able substantially to influence an election but not numerous enough to comprise a majority in a district. *Uno,* 72 F.3d at 979, n. 2; *McNeil v. Springfield Park Dist.,* 851 F.2d 937, 947 (7th Cir.) *cert. denied,* 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1988). The few courts that have recognized the viability of an "influence district" claim have generally held that an influence district exists when members of a minority group compose more than 25% of the VAP of a district. *Rural West Tennessee African–American Affairs Council v. McWherter,* 877 F.Supp. 1096, 1101

(W.D.Tenn.1995), *aff'd,* —— U.S. ——, 116 S.Ct. 42, 133 L.Ed.2d 9 (1995).

The Supreme Court has declined on four occasions explicitly to decide whether an influence dilution claim is cognizable under VRA § 2. *See De Grandy,* 512 U.S. at 1009, 114 S.Ct. at 2656; *Voinovich,* 507 U.S. at 158, 113 S.Ct. at 1157–58; *Growe v. Emison,* 507 U.S. 25, 41, n. 5, 113 S.Ct. 1075, 1084, n. 5, 122 L.Ed.2d 388 (1993); *Gingles,* 478 U.S. at 56–47, n. 12, 106 S.Ct. at 2764, n. 12. The Seventh Circuit, however, has rejected the claim that the failure to create an influence district can be a basis for a claim under Section 2. *McNeil,* 851 F.2d at 947. Courts in this district have generally refused to recognize influence districts because of the extent to which "influence dilution claims" would broaden the scope of Section 2 and would require a complete reappraisal of the *Gingles* analytical framework. *Illinois Legislative Redistricting Commission v. LaPaille,* 786 F.Supp. 704, 715 (N.D.Ill.1992); *Hastert,* 777 F.Supp. at 651. Courts could well be flooded by marginal claims if plaintiffs needed only to show that their ability to influence elections has been weakened—the requirement that a minority group be large enough to control a district, not merely influence it, enables courts to adjudicate VRA claims with a modicum of consistency. *LaPaille,* 786 F.Supp. at 715. It is also extremely difficult to make any sort of objective, non-speculative assessment of the ability of a particular community to "swing" an election; while political consultants may feel comfortable making such guesses, such speculative assessments are far beyond the expertise of most courts. *Id.*

The judicial review of districting decisions under VRA § 2 is not intended to require judicial supervision of every map drawing choice. The entertaining of influence district claims would force courts to intrude further into an area best left to legislative discretion by requiring courts to scrutinize the legitimacy of district boundaries even where it is impossible to create a district in which minorities would constitute a majority. This Court can see no justification for going beyond the requirements of VRA § 2 and the analytical framework of *Gingles* in order to entertain a claim alleging that the City failed to create an adequate influence district on the southeast side.

The discussion of influence districts cannot end, however, with the absence of a cause of action for influence dilution under the Voting Rights Act. *De Grandy's* discussion of the obligation of minority voters to "pull, haul, and trade, to find common political ground ... the virtue of which is not to be slighted in applying a statute meant the waning of racism in American politics," appears to recognize the relevance of influence districts, not as a basis for a VRA § 2 cause of action, but as a factor in considering the totality of the circumstances surrounding minority voters' ability to participate in the political process. *See De Grandy,* 512 U.S. at 1020, 114 S.Ct at 2661. In this context, the relevant question is not whether the VRA requires the creation of influence districts, but whether the voluntary creation of influence districts should be counted as a factor weighing against finding a Section 2 violation. *McWherter,* 877 F.Supp. at 1102. This consideration must be undertaken cautiously, however, since the creation of influence districts could well be a subtle form of fracturing. Since *De Grandy* requires a searching analysis of the totality of the circumstances concerning the ability of minority members to participate in the political process, the extent to which minority voters can exert influence in districts which are not majority-minority districts should be included in the calculus. *See Id.* Voters in districts in which they constitute a sizeable, possibly decisive, portion of the population have the opportunity to elect candidates of their choice, even if they do not have the opportunity to elect their ideal candidate.

### 4. Gingles Test

The Supreme Court first interpreted the amended Section 2 in a case involving a challenge to a multi-member at-large districting scheme instituted by the North Carolina legislature. *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752. The *Gingles* Court held that three threshold conditions must be established by plaintiffs in order to prevail on a Voting Rights Act § 2 claim:

First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district ... Second, the minority must be able to show that it is politically cohesive ... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it-in the absence of special circumstances, ...—usually to defeat the minority's preferred candidate.

*Gingles*, 478 U.S. at 50–51, 106 S.Ct. at 2766. The Supreme Court subsequently applied, without modification, the *Gingles* test to claims alleging vote dilution in connection with single-member districts. *Growe*, 507 U.S. at 37–42, 113 S.Ct. at 1084; *Voinovich*, 507 U.S. at 157, 113 S.Ct. at 1157. While the *Gingles* preconditions were applied without modification in the single-member district context, in *Voinovich* the Court stated that the *Gingles* factors ought not to be applied mechanically but must be considered in the light of the specific dilution claim being made. *Voinovich*, 507 U.S. at 158, 113 S.Ct. at 1157. The application of the *Gingles* test, originally designed for at-large districting schemes, to a multi-district single-member districting scheme requires significant gymnastics on the part of a reviewing court. A test more closely tailored to the relevant districting scheme would likely ameliorate the present complexity and confusion of voting rights jurisprudence. In *De Grandy*, the Court recognized that in the context of partial-dilution claims in single-member districts, a court may not rest uncritically on assumptions about the force of the three *Gingles* factors. *De Grandy*, 512 U.S. at 1013, 114 S.Ct. at 2658.

In order to prevail on a VRA § 2 claim, plaintiffs must first establish each of the three preconditions by a preponderance of the evidence. *Gingles*, 478 U.S. at 50, 106 S.Ct. at 2766.

■ The first two *Gingles* preconditions ask whether minority voters within a constituency have the potential to elect representatives of their choice. *Growe*, 507 U.S. at 39–41, 113 S.Ct. at 1084; *Uno v. City of Holyoke*, 72 F.3d at 979. In essence, these two preconditions ask the trial court to anticipate whether it can fashion a remedy for a violation of Section 2 of the Act. *Nipper v. Smith*, 39 F.3d 1494, 1511 (11th Cir.1994) (en banc), *cert. denied*, 514 U.S. 1083, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995). There can be no § 2 violation, or potential remedy, for a group that lacks the population, or geographical compactness, or political cohesiveness to benefit from the drawing of an additional single-member district. *McVeil*, 851 F.2d at 942. It is important, however, to keep in mind that when considering the feasibility of various alternative maps the maximization of minority districts can never be the touchstone of Section 2. *De Grandy*, 512 U.S. at 1016, 114 S.Ct. at 2659.

■ Since *Gingles* propounded a functional evaluation of whether the minority population is large enough to form an additional district, courts have been flexible in assessing the showing made for this precondition. Plaintiffs' proposed districts are not cast in stone, they are merely presented in order to demonstrate that additional minority districts are feasible. *Sanchez v. State of Colorado*, 97 F.3d 1303, 1311 (10th Cir.1996); *Clark v. Calhoun County, Miss.*, 21 F.3d 92, 95 (5th Cir.1994).[13]

13. At this juncture it is worthwhile to discuss the Supreme Court's recent rulings in *Shaw v. Hunt*, — U.S. —, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) (*Shaw II*) and *Bush v. Vera*, — U.S. —, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996). *Shaw II* and *Bush* investigated the outer limits of race-based districts where § 5 of the VRA mandated a remedy which the Court found violated the Equal Protection Clause. Yet adherence to *Gingles* and a remedy of a VRA § 2 violation necessarily implicates race. It would approach theater of the absurd to impose a rule stating that a remedy intended to correct race-based discrimination in districting could not be race-conscious. In the domain of identifying a VRA § 2 violation, *Gin-*gles retains its full vitality. *Shaw II* and *Bush*, however, operate as a brake upon the extent of a remedy to a VRA § 2 violation. *Shaw II* and *Bush* instruct that race cannot override all other traditional districting principles any more than reasonably necessary to remedy a VRA § 2 violation. *Sanchez v. State of Colorado*, 97 F.3d at 1327. So long as a remediation plan comports with traditional districting criteria, it is presumptively constitutional. In her separate concurrence in *Bush*, Justice O'Connor announced that "compliance with the results test of § 2 of the Voting Rights Act is a compelling state interest." *Bush v. Vera*, — U.S. at —, 116 S.Ct. at 1968.

■ In *McNeil* the Seventh Circuit has ruled that voting age population ("VAP") is the relevant population standard for determining the first *Gingles* prong. *McNeil*, 851 F.2d at 945. This standard has never been overturned by the Seventh Circuit. While several circuits have adopted a citizenship voting age population ("CVAP") standard as the population benchmark for the purposes of the first *Gingles* prong, *see Campos v. City of Houston*, 113 F.3d 544 (5th Cir.1997); *Romero v. City of Pomona*, 883 F.2d 1418 (9th Cir.1989), this Court sees no reason for revisiting this circuit's use of VAP as a benchmark.

While the use of CVAP as a benchmark for evaluating plaintiffs' alternative ward maps might have the benefit of focusing the VRA § 2 analysis on minority members who are indeed eligible to vote, there are too many difficulties with the use of such data for this Court to endorse the use of CVAP.[14] As a population benchmark, the use of CVAP leaves much to be desired from a representational perspective. The one person one vote criteria is based upon total population; the ideal ward population benchmark utilized by defendants in this case in Chicago was based upon total population. The use of total population as a benchmark, rather than either VAP or CVAP, might better reflect the principal of virtual representation implicit in the one person one vote rule. *See e.g., Barnett v. Daley*, 32 F.3d 1196, 1200 (7th Cir.1994). At least it would be a more empirical standard.

The trial testimony, particularly the testimony of Professors Estrada and Rives, also demonstrated that citizenship data is inherently less precise and reliable than either total population or VAP. (*See* III.B.2.d ¶¶ 225–234). Citizenship data is based upon sample data, rather than full count data.

Citizenship data is also derived at the census block group level, rather than at the census block level upon which the redistricting was based. Citizenship data also does not become available until after the redistricting process is completed. These reasons render CVAP inappropriate to be used as a benchmark for VRA § 2 liability.

Additionally, the record in this trial indicates that Latino VAP majority wards, with a Latino VAP of approximately 59% have been effective Latino wards in aldermanic elections. The record in this trial also indicates that judicial districts, although judicial elections have different outcome rules than aldermanic elections, with bare Latino majorities have been effective Latino districts. (BOPX 74). The methodologies for determining Latino CVAP are at best approximations that would not add any additional precision to this analysis.

■ The second *Gingles* precondition combines with the third precondition to ask whether "the challenged districting thwarts a distinctive minority vote by submerging it in a larger white voting population." *Growe*, 507 U.S. at 40, 113 S.Ct. at 1084; *Reed v. Town of Babylon*, 914 F.Supp. 843, 863 (E.D.N.Y.1996). Although the second and third preconditions are analytically distinct, courts frequently group these preconditions together in their polarization analysis. Richard Grofman, Lisa Handley, Richard Niemi, *Minority Representation and the Quest for Voting Equality*, Cambridge University Press (Cambridge: 1992), 68. The third *Gingles* precondition asks whether the challenged practice, districting scheme or electoral structure is a cause of the minority group's inability to mobilize its potential vot-

---

Where there is a VRA § 2 violation, therefore, a jurisdiction would have a compelling interest to seek a remedy tailored to its traditional districting principles. At the present juncture, as this Court is reviewing the illustrative maps provided in connection with *Gingles'* first prong, it is important to keep in mind that plaintiffs' maps are merely illustrative and are not etched in stone and, therefore, it is reasonable to apply a slightly less rigorous standard of review. *See, e.g., Goosby v. Town Board of the Town of Hempstead, New York*, 956 F.Supp. 326, 350, n. 28 (E.D.N.Y. 1997).

14. For the purposes of this case, the use of CVAP would have the most significant effect on the Latino community. According to the 1990 census figures: whites constitute 46.15% of the City's CVAP; African–American constitute 40.34% of the City's CVAP; and Latinos constitute only 11.14% of the City's CVAP. The use of CVAP data from 1990 would fail to take account of the significant numbers of Latinos who have regularly become citizens in ceremonies presided over by judges of this district in recent years.

ing power and to elect its preferred candidates. *Uno,* 72 F.3d at 980, (1st Cir.1995). The third *Gingles* prong seeks to identify "legally significant white bloc voting," that is, white bloc voting that normally defeats the combined strength of minority support plus white 'crossover' votes. *Gingles,* 478 U.S. at 56, 106 S.Ct. at 2769.

When analyzing racial bloc voting, *Gingles* instructs this Court that a pattern of racial bloc voting extending over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election. *Gingles,* 478 U.S. at 57, 106 S.Ct. at 2769; *NAACP v. City of Niagara Falls,* 65 F.3d 1002, 1012 (2d Cir.1995). Plaintiffs, however, cannot prevail on the third *Gingles* prong in the face of significant probative evidence establishing that whites vote as a bloc for reasons wholly unrelated to race. *Uno,* 72 F.3d at 981.

When analyzing voting patterns and behavior in order to determine minority cohesion and white racial bloc voting, it is important to look to who is actually running for office—whites or African–Americans or Latinos—in order to determine whether minorities are voting for certain candidates because they are "truly" minority representatives of choice and whether the majority is voting against candidates for reasons of race. *NAACP v. City of Niagara Falls,* 65 F.3d at 1014. While it is misplaced to argue that a court must be color-blind to the race of candidates when analyzing patterns of minority voting cohesion and majority racial bloc voting, it would be equally mistaken to fall into a sloppy tokenism assuming that only minority members can be the minority candidate of choice. As Judge Cabranes of the Second Circuit has so eloquently observed:

> We decline to adopt an approach precluding the possibility that a white candidate can be the actual and legitimate choice of minority voters. Such an approach would project a bleak, if not hopeless, view of our society—a view inconsistent with our people's aspirations for a multiracial and integrated constitutional democracy.

*NAACP v. City of Niagara Falls,* 65 F.3d at 1015.

The satisfaction of the three *Gingles* preconditions, while necessary for the establishment of a VRA § 2 vote dilution claim, is not sufficient to establish the existence of dilution. *De Grandy,* 512 U.S. at 1012, 114 S.Ct. at 2657; *N.A.A.C.P. v. City of Niagara Falls, N.Y.,* 65 F.3d at 1007. Certainly, proof of the three *Gingles* preconditions creates an inference that minority members have been injured by the challenged electoral practice and structure. *Uno,* 72 F.3d at 980. It is the exception, rather than the rule, that plaintiffs would establish the three *Gingles* yet fail to establish that under the totality of the circumstances, the challenged standard, practice or procedure "impairs the ability of ... [minority] voters to participate equally in the political process and to elect candidates of their choice." *Clark v. Calhoun County, Miss.,* 88 F.3d 1393, 1396 (5th Cir.1996); *NAACP v. City of Niagara Falls, N.Y.,* 65 F.3d at 1019, n. 21; *Jenkins v. Red Clay Consol. School Dist. Bd. of Educ.,* 4 F.3d 1103, 1135 (3rd Cir.1993), *cert. denied,* 512 U.S. 1252, 114 S.Ct. 2779, 129 L.Ed.2d 891 (1994). Nonetheless, the analysis does not end with the three *Gingles* preconditions:

> But if *Gingles* so clearly identified the three as generally necessary to prove a § 2 claim, it just as clearly declined to hold them sufficient in combination, either in the sense that a court's examination of relevant circumstances was complete once the three factors were found to exist, or in the sense that the three in combination necessarily and in all circumstances demonstrated dilution ... [T]he ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts. Lack of electoral success is evidence of vote dilution, but courts must also examine other evidence in the totality of circumstances, including the extent of the opportunity minority voters enjoy to participate in the political process.

*De Grandy,* 512 U.S. at 1011, 114 S.Ct. at 2657.

#### 5. *Totality of the Circumstances*

This Court, therefore, must engage in a searching examination of the "totality of the

circumstances" in order to determine whether plaintiffs have established that they have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973; *De Grandy,* 512 U.S. at 1011, 114 S.Ct. at 2657–58; *Gingles,* 478 U.S. at 79–80, 106 S.Ct. at 2782; *Niagara Falls,* 65 F.3d at 1008; *Nipper,* 39 F.3d at 1513. The need for this totality review springs from the historic ingenuity of state and local governments at hobbling minority and opposition voting power—in order to determine that the political process is 'equally open', this Court must engage in a searching practical evaluation of the past and present realities. *De Grandy,* 512 U.S. at 1018, 114 S.Ct. at 2660. Both *Gingles* and *De Grandy* treat as relevant to evaluating the totality of the circumstances the nine factors set out by the Senate Judiciary Committee in the Senate Report accompanying the 1982 amendment to the Voting Rights Act. S.Rep. 97–417; *De Grandy,* 512 U.S. at 1010, n. 9 114 S.Ct. at 2656, n. 9. The Senate factors are:

1. The extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, to vote, or otherwise to participate in the political process;

2. The extent to which voting in the elections of the state or political subdivision is racially polarized;

3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. The extent to which the members of the minority group in the slate or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the process;

6. Whether political campaigns have been characterized by overt or subtle racial appeals;

7. The extent to which members of the minority group have been elected to public office in the jurisdiction.

S.Rep. 97–417 at 28–29, 1982 U.S.C.C.A.N. at 206–207; *De Grandy,* 512 U.S. at 1010, n. 9, 114 S.Ct. at 2656, n. 9; *Gingles,* 478 U.S. at 44–45, 106 S.Ct. at 2762–64. *Gingles* identifies two additional factors from the Senate Report which may have some probative value:

8. Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

9. Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, standard, practice or procedure is tenuous. *Id.*

▆▆ This list of relevant factors is intended to be "neither comprehensive nor exclusive." *Gingles,* 478 U.S. at 44–45, 106 S.Ct. at 2763. Rather, in deciding whether VRA § 2 has been violated, courts are given broad discretion to engage in a "searching practical evaluation of the 'past and present reality.'" *Gingles,* 478 U.S. at 45, 106 S.Ct. at 2764; *NAACP v. City of Niagara Falls,* 65 F.3d at 1008. The responsibility of the Court to canvass the totality of the circumstances exhaustively has been emphasized by the Supreme Court in *De Grandy:*

... ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts.

*De Grandy,* 512 U.S. at 1011, 114 S.Ct. at 2657. In this case, for instance, the totality of the circumstances analysis requires a careful canvassing of the practical political considerations which counseled the members of the Latino Committee to reach a compromise for the seven Latino-majority wards that were included in the present ward map. In short, a prudent compromise was reached recognizing the need to develop effective Latino ward organizations in anticipation of

continued Latino population growth. This case also requires a careful consideration of the extent to which the 10th, 18th, 19th, 46th and 49th wards, among others, encourage the development of multi-racial and ethnic political coalitions, thereby hastening the end of polarized voting.

■ The Voting Rights Act is meant to address the evils of racial bias, and the denial of the rights of minorities to participate in the political process; it is not, however, intended to function as the guarantor of minority political success. The results test of VRA § 2 protects racial minorities against a stacked deck but it does not guarantee that they will enjoy a winning hand—i.e., an electoral structure is not illegal if the defeat represents nothing more than the routine operation of political factors. *Uno*, 72 F.3d at 982. The creation of safe, majority-minority districts, when they are not be necessary to achieve equal political and electoral opportunity, bears the mark of a rank racial-tokenism and relies upon a crude racial-calculus which has been described as the "politics of the second best." *See De Grandy*, 512 U.S. at 1020, 114 S.Ct. at 2661.

■ VRA § 2, a statute intended to ensure minority voters equal political access, is not meant to absolve minority voters from the responsibility of being actual participants in the political process, nor is it meant to be a free pass permitting minority members to bypass the sometimes messy process of participating in the hurly-burly of political life:

> If the lesson of *Gingles* is that society's racial and ethnic cleavages sometimes necessitate majority-minority districts to ensure equal political and electoral opportunity, that should not obscure the fact that there are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice. Those candidates may not represent perfection to every minority voter, but minority voters are not immune from the obligation to pull, haul, and trade, to find common political ground, the virtue of which is not to be slighted in applying a

statute meant to hasten the waning of racism in American politics.

*De Grandy*, 512 U.S. at 1020, 114 S.Ct. at 2661. Politics can sometimes be a very messy business, and nowhere is that more true than in the decennial process of redistricting. Those who have a power base, whether they are white or African–American or Latino or other, want, not surprisingly, to keep what they already have. Certainly, racial and ethnic consciousness, or even animosity, will often be one factor in the process, but it will rarely be the only factor driving the map-drawing process. The desire to even old scores with political adversaries or perceived turncoats; the desire to serve one's community or neighborhood; the desire to reward valuable political allies; the desire of incumbents to cut potential adversaries off at the knees; the desire to improve the social or economic condition of one's constituents; the desire of legislative leaders to use the districting process to lay the groundwork for ensuring future governing coalitions; the desire of an alderman to keep a particular neighborhood because it has an extremely effective precinct captain or generous contributors or to jettison a particularly nettlesome portion of a ward; or the desire to serve the public good are simply a sample of the myriad factors which enter into the messy process of drawing ward maps in a large city such as Chicago. It is this Court's responsibility to piece together this elaborate jigsaw puzzle in order to ascertain the openness of the political process to the City's minority members.

### 6. *Proportionality of Representation*

■ While the proportionality of majority-minority districts in relation to the minority percentage of the total population, by itself, is never dispositive, it is relevant to the totality of the circumstances to be analyzed when determining whether members of a minority group have "less opportunity than other members of the electorate to participate in the political process and to elect representative of their choice." *De Grandy*, 512 U.S. at 1000, 114 S.Ct. at 2651.

While proportionality is not a safe-harbor for a particular districting scheme, when substantial proportionality exists, courts are re-

luctant to find a violation of VRA § 2 absent some evidence of disproportionate treatment of minority members. *De Grandy*, 512 U.S. at 1015, 114 S.Ct. at 2659. Proportionality of representation is a factor in the totality of the circumstances analysis, but it cannot be the sole factor for even a system in which minorities have more or less proportional representation can mask dilutive processes. *See De Grandy*, 512 U.S. at 1019, 114 S.Ct. at 2661.

### B.  Discriminatory Intent Claim

■ Plaintiffs' discriminatory intent claim is governed by the standard used in connection with 14th Amendment equal protection claims. *Rogers v. Lodge*, 458 U.S. 613, 617, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012 (1982); *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Garza v. County of Los Angeles*, 918 F.2d 763, 771 (9th Cir.1990), *cert. denied*, 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991). Plaintiffs need not establish that a racially-discriminatory motive was the sole or primary purpose, but they need only establish that it was a motivating factor of the challenged districting scheme. *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. at 265, 97 S.Ct, at 563; *Garza v. County of Los Angeles*, 918 F.2d at 771. The fact that a discriminatory plan may have other motives that are not discriminatory does not make it any less intentional. *Barnett v. Daley*, 32 F.3d at 1199.

■ The drawing of ward maps in order to protect incumbents is particularly relevant to the intent claim. The desire to protect incumbents, as such, is not a form of racial discrimination. If, however, in order to protect incumbents, the redistricting scheme deliberately adopted devices for limiting minority representation, the map drawers have engaged in deliberate racial discrimination. *Barnett v. Daley*, 32 F.3d at 1199; *Ketchum v. Byrne*, 740 F.2d at 1408.

■ In order to determine whether maps drawn in order to protect incumbents were in fact racially motivated, it is necessary to investigate the extent to which, in the particular case, the requirements of incumbency were intertwined with the need for racial dilution. Where the record shows that ethnic or racial communities were split in order to assure a safe seat for an incumbent, i.e., where the protection of a white incumbent is accomplished by means of manipulations of racial populations, there is a strong inference that this was the result of intentional discrimination. In such instances the protection of incumbents is virtually coterminous with a purpose to practice racial discrimination. *Ketchum v. Byrne*, 740 F.2d at 1408; *Garza v. County of Los Angeles*, 918 F.2d at 779; *Rybicki v. State Board of Elections*, 574 F.Supp. 1082, 1109 (N.D.Ill.1982). Thus to the extent that fracturing, packing, and the disparate and excessive movement of minority populations were present in order to protect incumbents, a discriminatory intent was at work.

Where ward maps are drawn merely to protect incumbents, and large shifts and manipulations of racial populations are not evident, the protection of incumbency does not necessarily amount to purposeful racial discrimination. *Ketchum*, 740 F.2d at 1408.

■ In *Arlington Heights*, the Supreme Court also identified several additional general factors that may be probative to a finding of discriminatory intent. These factors include:

a) the impact of the official action;

b) the historical background of the decision, in particular if the background reveals a series of official actions taken for invidious purposes;

c) the specific sequence of events leading up to the challenged decision;

d) departures from normal procedural sequences;

e) substantial departures from factors usually considered important by the decision-makers and which strongly favor a decision contrary to the one reached.

*Arlington Heights*, 429 U.S. at 266–67, 97 S.Ct. at 565–66.

■ Where plaintiffs have made a showing of intentional discrimination, they need not establish as high a degree of injury as is required VRA § 2, nonetheless they must

make some showing of injury so that this Court can impose a meaningful remedy. *Garza,* 918 F.2d at 771.

### III. FINDINGS WITH RESPECT TO THE EXPERT WITNESSES

#### A. General Overview

195. While lay testimony is instructive for the presentation of anecdotal evidence of minority cohesiveness or racial bloc voting, statistical evidence in the form of ecological regression analysis and extreme case analysis, presented through expert testimony, is also typically offered. *Gingles,* 478 U.S. at 52–54, 106 S.Ct. at 2767–68; *Reed v. Town of Babylon,* 914 F.Supp. at 863. Statistical evidence is likely to be the most helpful tool for deciphering patterns of voter behavior as relevant to deciding a VRA § 2 claim. That is not to say that the opinions of those significantly involved in the political process might not also be of relevance. *UNO,* 960 F.Supp. at 523–24.

196. Courts also frequently look to testimony from other social science and demographic experts for assistance. Social scientists can help in identifying communities of interest within and across ethnic and racial groups by looking at socio-economic data. Expert testimony from demographic experts can assist in determining whether minority members are sufficiently large and compact to constitute a majority in additional districts.

197. Since *Gingles,* ecological regression analysis has become the usual technique used to infer voting behavior between identifiable population groups. The privacy of the voting booth precludes the actual correlation of one's race or ethnicity with how one votes. It would be equally impractical individually to canvas each voter in an effort to determine their race or ethnicity and their voting behavior. Given this absence of concrete data, the various forms of statistical analysis used by the social sciences provide a useful method for approximating and fairly accurately estimating minority and majority voting behavior. The methods of statistical analysis most frequently used to aid courts in estimating voting patterns are ecological regression analysis and extreme case analysis.

198. This Court, however, must pause to note that while ecological regression analysis has become a preferred tool to assist courts in divining voter behavior, it is hardly perfect and must not be accepted uncritically. As a first hurdle, the social-science disciplines in general, and ecological regression analysis in particular, utilize methodologies which are foreign to most judges and lawyers. Particularly troubling is the extent to which ecological regression is susceptible to subtle manipulation which may well be invisible to all but the most discerning of cognoscenti. In particular, ecological regression is susceptible to errors due to the "ecological fallacy" of attributing the average behavior of voters in a given area to all voters in that area. *See Lewis v. Alamance County, North Carolina,* 99 F.3d 600, 605, n. 3 (4th Cir.1996). *cert. denied,* —— U.S. ——, 117 S.Ct. 1820, 137 L.Ed.2d 1028 (1997); *Overton v. City of Austin,* 871 F.2d 529, 539, n. 12 (5th Cir.1989). To a large extent, ecological regression assumes what it intends to prove—that there is political cohesiveness among minority voters and racial bloc voting among majority voters. In order to perform a regression analysis it is necessary to make estimates of the ethnic or racial makeup of a ward, as well as estimates of the voter turnout within wards. It is also necessary to select parameters of the selection of the variables entered into the regression equation. This conglomeration of assumptions may easily lead to sophisticated statistical errors. *Overton,* 871 F.2d at 539, n. 12. Nonetheless, there is no better analytical tool for interpreting voter behavior available to courts. Courts, therefore, must use these analytic techniques aware of their imperfections and limitations.

199. There are four basic analytical methods utilized by courts in order to determine voter behavior:

1) *Simple Regression Analysis:* Measures a candidate's share of the votes received in a particular election district as a percentage of the number of voters at the polls in that district. That percentage is then correlated with the racial composition of the district, measured in terms of percentage

of the voting age population in that district, A correlation coefficient is generated demonstrating how consistently voter support for a candidate or group of candidates varies with the racial composition of the election district. Simple regression does not allow for the effects of racial differences in voter turnout but it assumes that turnout rates across racial groups are the same. *NAACP v. City of Niagara Falls,* 65 F.3d at 1006, n. 2.

2) *Double–Equation Regression Analysis/Bivariate Ecological Regression Analysis:* Generates an estimate of the voting behavior of the electorate by race as well as an estimate of voter turnout by race. In this method of analysis, two regressions are performed. One regression is performed with the percentage of VAP who are minority members as the independent variable, and the other regression is performed with the percentage of VAP who are white as the independent variable. When each data point is plotted, a regression curve can be drawn through the points. This curve will have a slope measuring the degree of change in the dependent variable produced by one unit change in the independent variable. The curve will intercept the left and right vertical axes (the intercept points) which will provide a statistical approximation of the percentages of white and minority voters voting for a particular candidate. A correlation coefficient ("r" value) measuring the strength of the relationship between the dependent and independent variables can be determined (the coefficient may range from 0.0, indicating that the two variables are independent, to +1.0, indicating that the two variables are perfectly correlated in a positive direction). Statistical significance can also be calculated for each correlation coefficient, indicating the probability that the coefficient is "true" or non-random. *NAACP v. City of Niagara Falls,* 65 F.3d at 1006, n. 4; *Jenkins v. Red Clay Consol. School Dist. Bd. of Educ.,* 4 F.3d at 1119, n. 10; *Reed v. Town of Babylon,* 914 F.Supp. at 851–53.

3) *Multi–Variate Regression Analysis:* Involves the inclusion of additional variables into the regression analysis. This process results in a tri-axial graph. In theory, multi-variate regression analysis permits an examination of the reasons for differences in voter behavior. Grofman, Handley, and Niemi, *Minority Representation and the Quest for Voting Equality,* at 100; *Sanchez v. Colorado,* 97 F.3d at 1316. The use of multi-variate regression analysis is fairly recent in the Voting Rights context, and it has not yet been received with general acceptance. (Grofman, Handley, p. 100). One of the possible uses of multi-variate regression analysis has been to explain the different voting behavior between racial groups. Multi-variate regression analysis can also be used to estimate voter-behavior in wards in which there are more than two racial or ethnic groups, e.g., in wards with white, Latino, and African–American populations. Caution should be exercised, however, when utilizing multi-variate regression because, despite the theoretically greater accuracy and analytical precision offered by multivariate regression, it is also subject to abuse, error, and manipulation absent adequate cross-checking procedures.

4) *Extreme Case Analysis/Homogenous Precinct Analysis:* Examines the actual voting percentages received by candidates in the most heavily white and most heavily minority districts. *NAACP v. City of Niagara Falls,* 65 F.3d at 1006, n. 3; *Jenkins,* 4 F.3d at 1120, n. 12. While conceptually simple, this analytic method is of limited applicability, because it is of questionable accuracy in districts which are less than 90% homogenous. *See Jenkins,* 4 F.3d at 1120, n. 12. This technique is frequently used as a cross checking device in conjunction with regression analysis by verifying how accurately the regression curves predict actual voter behavior in homogenous wards.

200. This Court is troubled by the extent to which regression analysis, and the other methods of estimating voter behavior tend to presuppose the truth of what those methods seek to prove—namely the existence of racially or ethnically polarized voting. In the real world of politics there are countless factors, such as the perceived ability of a

candidate to deliver governmental services, besides race which are intrinsically important in explaining voter behavior. Race or ethnic origin, however, is also often a factor in the real world of elections and by looking at enough elections it is possible to isolate the racial or ethnic component of voting behavior and to determine whether there is an identifiable correlation between race or ethnicity and voting behavior. This Court is also satisfied that it would be a methodological impossibility adequately to quantify the effect of the "fire in the belly" or the gravitas of a political candidate. Nor, despite their contention that plaintiffs have failed to analyze the additional possible other causes of voter behavior, did defendants make a significant effort to refute the plaintiffs' experts by indicating the extent to which other factors play a role in voting behavior.

## B. *Bonilla Experts*

### 1. *Professor Paul Kleppner*

201. Professor Paul Kleppner, a professor of history at Northern Illinois University, was the first expert to testify for the *Bonilla* plaintiffs. Professor Kleppner is an historian and his testimony focused upon the history of past redistrictings and the Latino experience in Chicago.

202. Professor Kleppner's report (BOPX 26) and testimony was not so much an expert work-product as it was a proposed findings of fact summarizing the last 70 years of political history of the City of Chicago. This Court observed during trial that this report was not objective and presented a less than complete account of the relevant Chicago political history. (Tr. 1506). Both Professor Kleppner's report and his testimony were so conclusory that its value as objective expert opinion was dubious.

203. This Court was particularly troubled by Professor Kleppner's research methodology which consisted largely of borrowing excerpts from party depositions in previous litigations and newspaper articles. While party statements and contemporaneous newspaper articles are certainly part of the research arsenal of any historian of recent events, they should certainly not be the principal source material since they often present an incomplete picture.

204. Nor does this Court see the relevance of much of Professor Kleppner's report to the *Bonilla* case—since by Professor Kleppner's admission the Latino immigration is a relatively recent addition to the ethnic melting pot of Chicago, and much of Professor Kleppner's report deals with the African–American political experience in Chicago. (Tr. 1543, 1553).

205. These defects, however, are largely besides the point since plaintiffs rely upon Professor Kleppner's report for only a few discrete points involving some documentary evidence of certain unfortunate racial appeals made during the 1983 mayoral elections, the racial tension in the City Council during the first term of the Washington mayoral administration, and references to judicial records concerning previous redistricting litigation in the City chiefly *Cousins v. City Council*, 503 F.2d 912 (7th Cir.1974), *cert. denied, Rayner v. City Council*, 420 U.S. 992, 95 S.Ct. 1429, 43 L.Ed.2d 674 (1975), and *Ketchum v. Byrne*, 740 F.2d 1398 (7th Cir.1984).

### 2. *Dr. Leobarda Estrada*

206. Professor Leobardo Estrada, a professor of Architecture and Urban Planning at UCLA, has also acted as a consultant to the Census Bureau concerning Latino undercount and citizenship issues. Dr. Estrada prepared reports and testified concerning: alternative ward maps prepared pursuant to the first *Gingles* prong; socio-economic statistics concerning Chicago's Latino population; an analysis of the fragmentation of Latinos under the current ward map; and his analysis of Latino citizenship levels in Chicago. (BOPX 21, 23, 134, 178). This Court generally credits Professor Estrada's testimony insofar as it related to his general expertise. The credibility of Dr. Estrada's testimony, and the value of his alternative maps, were limited by his unfamiliarity with Chicago's neighborhood geography, diversity, and political life.

### a) *Bonilla Alternative Maps*

207. Dr. Estrada presented five alternative ward maps which were intended to demonstrate that the alleged fracturing of Latino

population could have been avoided in order to establish the *Bonilla* plaintiffs' burden under the first *Gingles* prong—that the Latino community is sufficiently large and geographically compact enough to constitute a majority in an additional single-member district. *Bonilla* plaintiffs contend that Professor Estrada's maps establish that at least two additional Latino-majority wards can be drawn regardless of whether total population, voting-age population, or citizenship is used as the measure of Latino population.

208. Professor's Estrada's maps are intended solely to demonstrate that it is demographically possible, based upon racial and ethnic statistics, to draw additional Latino majority wards. This is the sole purpose of the alternative maps. The majorities in some of the alternative wards, however, would be razor-thin, by no means ensuring Latino electoral success. The very likely possibility that additional Latino majority wards would be ineffective, taken together with the concerns about the effectiveness of the new Latino majority wards which were expressed by the participants in the remap process, will be decisive to this Court's consideration of the totality of the circumstances.

209. While it would be a pyrrhic victory for a VRA § 2 plaintiff to prevail in order to draw minority wards that diluted minority voting strength by splitting the minority population amongst several additional wards in which they constituted ineffective majorities, the alternative maps, for the purposes of *Gingles,* are merely intended to be illustrative. Maps drawn to demonstrate that a remediable harm exists do not require precisely the same level of scrutiny as a judicially crafted ward map intended to remedy an adjudicated harm. None of the alternative maps have been offered as a final ward map, nor is it likely that a final ward map would necessarily take the shape of any of the proffered alternative maps. Taken as a group, however, the *Bonilla* alternative maps likely reduce Latino population majorities in the southwest side wards to such an extent that those wards could well be ineffective.

210. It is worth keeping in mind that the *Bonilla* alternative maps have Latino population concentrations well below those thought necessary during the ward remap process. All the parties involved in negotiating the final ward map thought that supermajorities of at least 65% would be necessary for the northwest side wards to be effective. The *Bonilla* alternative ward maps contain Latino population percentages below this threshold level. The southwest side Latino majority wards in the alternative maps have Latino population concentrations significantly lower than those proposed by the Latino community during the redistricting process. The Latino majority wards in *Bonilla* alternative maps 1, 2 and 3 also include majority white neighborhoods which were excised from the Latino majority areas during the negotiation process.

211. Of less weight is the defendants' contention that the *Bonilla* alternative maps should be disregarded because they include wards which make use of connectors through unpopulated areas, such as ward 14 in *Bonilla* alternative map one. The wards in the first two *Bonilla* alternative maps are no less compact than the 12th ward in the present ward map. The present ward map also makes occasional use of one-block wide connectors which slice through populated areas dividing discrete and contiguous neighborhoods in the 12th and 32nd wards.

212. Defendants also contend that this Court should reject the *Bonilla* alternative maps because they are not compact and were drawn based solely on race or ethnicity. While the first prong of *Gingles* does not contain a compactness requirement, this Court could not accept an illustrative map which evidently ran afoul of the equal protection clause. It is illogical, however, to contend that a remedy intended to correct a particular racial or ethnic group's access to the political process could not be racially or ethnically conscious. That is particularly the case where, as here, this Court is merely determining whether it is possible to draw additional minority districts. So long as a remediation plan comports with traditional districting principles, it would presumably be constitutional. Certainly, at the remedy

stage, a court should not go to such an extreme that it violates the equal protection clause. At the present stage, however, it is reasonable to apply a slightly less exacting standard of review for compactness purposes.

213. This Court also notes that the *Bonilla* alternative ward maps are no less compact than some of the wards included in the present ward map. While specific wards in the *Bonilla* alternative maps are no model of compactness; such as the 11th or 30th wards in the first alternative map. Those wards are no more diffuse than the present 12th, 26th, 30th or 32nd wards. Of particular relevance to this Court's compactness consideration, is the manner in which the *Bonilla* alternative maps show that it is possible to draw an additional Latino ward on the southwest side without resorting to the unwieldy shape of the present 12th ward.

214. Also of little relevance to this phase of the analysis is defendants' critique of the manner in which the *Bonilla* alternative maps bring together dissimilar neighborhoods by joining Marquette Park/Gage Park and the Back of the Yards in a new 14th ward. The Marquette Park/Gage Park neighborhood is somewhat more affluent with a more stable housing stock in which a larger segment of the population owns homes rather than rents. That the two areas are somewhat dissimilar is evidenced by Professor Estrada's own socio-economic survey which indicates that the income in the Marquette Park/Gage Park area is higher than it is in the Back of the Yards areas. (BOPX 21,23). While this Court does not concur with Professor Estrada's decision to downplay this important socio-economic factor, the neighborhoods also share several important such characteristics. While Professor Estrada looked only at very select statistics, therefore presenting a less than complete picture of the socio-economic condition of the Latino community, those statistics indicate that the Marquette Park/Gage Park and Back of the Yards populations share similar rates of families with children, high school graduation rates, and the use of English as the household language. (BOPX 21). Nor is it likely, nor desirable, that any one ward in the City be entirely homogenous in terms of these characteristics. Diversity is, in general, a desirable trait for a ward—defendants' own characterization of the 46th, 48th and 49th wards as "all–American" wards attests to the value of economic diversity as a means of broadening the perspective of an alderman and indeed increasing the opportunities for such an alderman to be elected.

215. The *Bonilla* alternative maps do not establish that the *Barnett* and *Bonilla* cases are mutually opposed, i.e., that additional Latino majority wards could be created only by decreasing the number of African–American majority wards. This Court notes that under the *Bonilla* alternative maps the African–American community would fare no worse, in terms of the total number of effective wards, than it does under the ward maps at issue.

#### b) *Latino Communities of Interest*

216. Professor Estrada also compiled selected indicators in an effort to demonstrate that disparities exist between Latinos and non–Latinos and that Latino inhabitants of the City constitute a distinct community of interest. In order to make this demonstration, Professor Estrada compared census block groups with respect to five socio-economic indicators compiled in the Census sample data: per capita income, high school education, families with children, public assistance, and the use of English as the language spoken at home. Professor Estrada compiled this data on both a citywide level and, using demonstrative maps, at the block group level. While census socio-economic statistics are extremely helpful in establishing "communities of interest" it is important to keep in mind that they are not the only means of ascertaining community commonalities. This census data was not used during the actual redistricting process since this information had not even been released until after the ward map had been submitted to referendum. At the time of redistricting, the participants in the process relied upon their own understanding of the relevant communities and the opinions of the participants. While not imbued with statistical accuracy, the opinions of community representatives more accurately portrayed the perceptions

of the City's residents. Courts should be reluctant to strictly impose socio-economic criteria upon the redistricting process insofar as socio-economic communities of interest are but one of many criteria considered by the participants, and they, by their very nature, can mischaracterize the nature of the electorate.

217. Professor Estrada's initial city-wide compilations of socio-economic indicators are of little utility in identifying a Latino community of interest, in part because Professor Estrada's analysis reviews the data only in terms of Latinos and non–Latinos which prevents a comparison of the socio-economic conditions of the Latino community to that of other discrete communities, such as the African–American or Asian communities. Professor Estrada apparently selected indicators which would most starkly distinguish the Latino community from the African–American community without selecting data which would show similarities. Only the most generalized observations can be drawn from Professor Estrada's citywide data, namely that Latinos have a significantly lower rate of high school graduation than the citywide average, have a generally higher rate of participation in the labor force, have a higher overall rate of poverty for married couples than the rest of the City, have a median income lower than that for the rest of the City, and have a lower overall rate of home ownership than the non–Latino home ownership rate. In general, the Latino community in Chicago has a very high rate of participation in the labor market but, because, of its significantly lower median education rates also has a lower median income than average. In a City with the particular racial and economic mixture of Chicago, it is difficult to ascertain the extent to which these socio-economic figures indicate a discrete Latino community of interest as opposed to Latino membership in a broader minority community of interest.

218. Of more relevance is Professor Estrada's regional breakdown of the socio-economic data. This data exhibits the extent to which the wards in the *Bonilla* alternative maps share similar traits. While Professor Estrada did not prepare the alternative maps relying upon that data, there is nonetheless a rough correlation between the contours of the *Bonilla* alternative wards and ascertainable commonalities. The Latino majority wards in the *Bonilla* alternative maps have generally similar socio-economic characteristics. In the alternative maps, the Latino majority wards have a higher than average rate of families with children, and include within them the largest concentrations of families with children in the City. The alternative Latino majority wards predictably, with some exceptions, contain block groups within the lower half of per capita income but distinct from the adjoining African–American wards the Latino majority wards contain a lower percentage of block groups in the lowest quartile of per capita income. The Latino majority wards also contain extremely high percentages of non-high school graduates aged 25 or older. In fact, the highest concentrations of adult non-high school graduates generally fall within the Latino majority wards. Not surprisingly, the Latino majority wards also have extremely high concentrations of households in which English is not the primary language spoken at home. This indicator also distinguishes the Latino majority block groups from the adjoining African–American block groups. Based upon these socio-economic indicators, the Latino community does indeed appear to constitute a particular community of interest within the City with particular socio-economic concerns not necessarily shared with other segments of the City. While there are some gradations within the alternative wards with respect to these indicators, the alternative wards have more in common internally than they do with other areas. There are some exceptions to this rule in the alternative maps, however, such as the long connecting corridor joining the 35th ward with the small pocket of Latino population presently in the far northwest corner of the present 29th ward and the 14th ward contained in *Bonilla* alternative map 2.

219. A final demographic indicator is of relevance to future ward maps. The relatively young age of the Latino population, particularly the high rate of children within the Latino community indicates a significant

potential for continued growth in the Latino community. Approximately 37% of the Latino population of Chicago was under 18 years of age in 1990. At the time of redistricting, however, the large percentage of the Latino population that was not of voting age also led the participants, at least in part, to advocate very large total population majorities in the new Latino majority wards.

### c) Fragmentation of the Latino Community

220. Professor Estrada's fragmentation analysis is of particular relevance to the *Bonilla* case. That there is fragmentation of Latino inhabitants of the City is relevant to the ability of this Court to remedy any dilution of minority voting strength. Professor Estrada defined fragmentation as the partitioning of a community of concentrated population into separate wards when that community could have been included in a single district (BOPX 21). Professor Estrada referred to fragmentation as the unnecessary splitting of a contiguous block of majority blocks. (Tr. 3627). Both these definitions imply that in order to be legally relevant, fragmentation or fracturing (the terms are used interchangeably), must involve majority-minority population blocks that could be included within a majority-minority district. It is not legally significant to refer to the fragmentation of a majority Latino census block that could not possibly be included within a Latino majority ward.

221. The first stage of Professor Estrada's fragmentation analysis was to characterize each census block in the City by its racial or ethnic population majority. Each block was then designated according to its assignment in a white, African–American, Latino, or no voting age population majority under both the *Ketchum* and the present ward maps. According to this method, under the present ward map: 90% of whites (92% if the 18th ward is viewed as white), 95% of African–Americans (92% if the 18th ward is white), and 74% of the total population of Latinos reside in wards where they comprise the majority voting age population. Under the *Ketchum* settlement map, as of the 1990 census, only 49.8% of all Latinos were in Latino VAP majority wards. The present

ward map, therefore, effects a significant diminution of Latino fragmentation.

222. Professor Estrada's analysis failed to limit itself to legally relevant fragmentation. Given his method, even census blocks which could not be located in a Latino majority ward, because of their remote location from Latino population cores, were counted as fragmented. This runs counter to his own definition of fragmentation. His fragmentation analysis addressed this defect by subjecting the *Ketchum* map and the *Bonilla* alternative maps to the same fragmentation analysis. The *Bonilla* alternative maps result in an average of 86% (86.2% for the first alternative map and 85.5% for the second alternative map) of all Latinos being included in Latino VAP majority wards. Apparently, therefore, since the *Bonilla* alternative maps were drawn with the intent of placing as many Latinos in Latino majority wards, the majority of the "fragmented" Latino majority census blocks are in areas of the City where they could not be included in Latino majority wards. It is possible to correct a portion of Latino fragmentation as evidenced by the alternative maps. Even under the alternative plans, however, Latinos would remain the most fragmented group in the City. This structural fragmentation is due to the fact that only approximately 61% of the City's Latino community lives in Latino majority census blocks.

223. More telling to the identification of legally relevant fragmentation, is Professor Estrada's analysis of Latino fragmentation on the south side. Under the present ward map, the south side Latino majority wards 12, 22, and 25 all have Latino total population majorities of at least 73%. Under the present ward map, there are also sizeable Latino total population blocks in the adjoining wards: the 11th ward is 28% Latino, the 14th ward is 35% Latino, the 15th ward is 12% Latino, and the 16th ward is 21% Latino. The bulk of this Latino population resides in what Professor Estrada termed the "south side growth area" which encompasses the Back of the Yards, Marquette Park and Gage Park neighborhoods. No other identifiable or similarly-sized population group was divided into as many wards.

224. In order to correct this fragmentation, and to create an additional Latino ward, it is necessary to draw some problematic wards—in the first *Bonilla* alternative map, the reconstituted 14th ward which encompasses 97.2% of the "south side growth area" and is 70.03% Latino stretches from approximately 16th Street on the north to 63rd Street on the south. The 14th ward in the second alternative map is much more compact, comprising approximately 98.8% of the south side growth area, however, it has a much smaller Latino majority of only 57.33% TP and a VAP majority of only 51.16%. Thus, while the fragmentation of Latinos on the south and southwest side can be significantly ameliorated by the drawing of an additional Latino majority ward—it can, apparently, be corrected only by drawing a ward with a bare Latino majority or by drawing a highly elongated Latino majority ward. Nonetheless, at this stage of the analysis, it appears that it is at least theoretically possible to moderate the fragmentation of Latinos on the southwest side of the City.

### d) Methods for Estimating Latino Citizenship Rates

225. While this Court ultimately rejects defendants' contention that citizenship rates are relevant to the *Bonilla* plaintiffs' satisfaction of the first *Gingles* prong, it is nonetheless worth discussing the competing methodologies for estimating citizenship. Because of the flaws of the offered methods of determining CVAP, and the methodological quagmire in which courts would find themselves if they were to adopt CVAP as a benchmark, this Court finds that VAP is a more adequate indicator of the effectiveness of the alternative Latino wards.

226. Part of the difficulty in using citizenship data lies in the manner in which it was collected by the Census Bureau. Citizenship data was derived from sample data compiled at the block group level. Block groups are clusters of blocks containing between 250 and 550 housing units. Ward boundaries are based upon census blocks rather than block groups. Ward boundaries do not necessarily correspond to the block group boundaries. If ward boundaries indeed corresponded to the boundaries of the census block groups,

CVAP might have been a valid population benchmark.

227. Nor was the citizenship data derived from full count data. Only one of every eight households in Chicago received the long form questionnaire from which citizenship data was derived. As with any sample data, there was necessarily the danger of sampling error and, therefore, it is best used for inferring general characteristics of large population groups and it is less reliable when applied to smaller population measures, such as census blocks.

228. Professor Estrada's method of estimation involved the application of the sample data for citizenship to those portions of an actual ward which contained a particular block group. In short, Professor Estrada applied the citizenship rate of a particular block group to the actual full count population of the portion of the ward which was contained in the block group straddling ward boundaries. This method had the benefit of using the actual, full-count census data for total and voting age population and using sample data only for the citizenship estimate. This method also had the benefit of establishing a citizenship estimate for an actual ward.

229. Professor Rives, on the other hand, relied upon sample data to determine voting-age and total population even though it was possible to obtain that information from the full-count data. (DX 509,866). This use of sample data, when full data was available, had the effect of understating Latino voting age population by approximately 1%.

230. Nor did Professor Rives attempt to determine the citizenship rate to actual wards. To the contrary, he redefined ward boundaries by the inclusion or exclusion of block groups on the borders of wards. When a block group straddled a ward boundary, the entire block group's citizenship population was applied to the ward with the largest proportion of the block group's voting age population. This method resulted in a wholesale veiled reconstitution of the wards. While approximation of this type might be appropriate at a grosser level, this methodology becomes increasingly less competent when applied at smaller demographic levels. Professor Rives', methodology resulted in

consistently lower estimates of Latino citizenship rates in every district analyzed. Nor did Professor Rives' "goodness of fit" analysis indicate that his method of estimating citizenship was any more reliable than Professor Estrada's method. Professor Rives did not adequately explain his criteria for goodness of fit. At best, based upon his testimony, Professor Rives' goodness of fit analysis meant only that his ward approximations generally included more than 90% of the actual wards within their boundaries. (Tr. 6503, 6507–8).

231. Professor Estrada's method for estimating citizenship itself contained some problematic assumptions. His method assumed that each block within a block group had the same citizenship rate. This is precisely the same assumption, but on a smaller level, upon which the sample data is based—that deviations of this nature will tend to cancel each other out throughout the statistical sample. The danger of citizenship rate variations across block groups points to the problematic applicability of citizenship rates at the census block level, the data is increasingly unreliable as it is applied to a decreasing population base. Applied to the City as a whole the sample data is reasonably reliable, but at the ward or block level it is not. Sample data is by its nature subject to sampling error, requiring an analysis of point estimates and confidence intervals for the citizenship estimates, statistical devices which courts are notoriously ill-equipped to handle. Not only is this Court uncomfortable with the notion of applying statistical methodologies with which lawyers and courts are often less than adroit, it is equally hesitant to rely upon estimates that are intrinsically inaccurate and subject to various sampling errors.

232. The redistricting process is intrinsically political, and for all the testimony concerning statistical sciences which this Court heard at trial, it is not convinced that the participants in the process were less cognizant of the population needed to constitute an effective ward than the various experts, even though they did not have the benefit of the citizenship sample data.

233. It is also inappropriate to use citizenship as a population benchmark for VRA § 2 because that data, besides being subject to sampling error, was not even available at the time the ward maps were being prepared. The redistricting process is difficult and drawn out enough as it is without forcing the persons drawing a ward map to perform a metaphysical impossibility and to use citizenship population figures that were not yet even available when the ward map was being prepared.

234. It is unclear in any event that CVAP, rather than VAP, would be a more accurate indicator of the effectiveness of a ward, since by Professor Rives' estimation method, the present 12th ward does not have a Latino CVAP majority, yet it operates as an effective Latino majority ward.

### 3. Professor Allan Lichtman

235. Professor Allan Lichtman, a professor of History at American University, testified on behalf of the *Bonilla* plaintiffs concerning: 1) polarized voting between Latinos and non–Latinos in the City of Chicago; 2) the effect of racially polarized voting on the capacity of the Latino electorate to elect candidates of their choice; 3) voter registration and turnout levels; and 4) the percentage of Latino voters necessary to give Latino voters an opportunity to elect their candidates of choice in aldermanic elections. (BOPX 74, 76, 180).

### a) Latino Political Cohesiveness and Polarized Voting

236. Professor Lichtman analyzed 28 elections in an effort to determine the extent to which Latinos tend to vote for Latino candidates and the extent to which non–Latinos tend to vote for non–Latino candidates (and correspondingly the extent of any crossover voting for Latino candidates by non–Latinos). This analysis pertains to the second and third *Gingles* preconditions—that is, whether minority voters are politically cohesive, and whether the white majority votes sufficiently as a bloc to defeat usually the minority's preferred candidate.

237. In his analysis Professor Lichtman studied a group of 28 elections, both aldermanic and non-aldermanic. Professor Licht-

man reviewed all single-seat, non-partisan and democratic primary elections between 1987 and 1995 involving both Latino and non–Latino candidates. He further winnowed the field of eligible elections by eliminating those elections which contained marginal candidates. Professor Lichtman used as his threshold for a marginal candidacy the winning of at least 15% of the vote by the losing Latino or non–Latino candidate(s).

238. Professor Lichtman's analysis was based solely upon data retrieved from election returns and census data. All the voting behavior experts relied upon the same information, in fact the parties created a joint computer base containing this information. Defendants criticize Professor Lichtman because he did not attempt to go "behind the numbers" to account for such variables as a candidate's gravitas, charisma, funding, experience, incumbency or endorsements. The relevant issues to Professor Lichtman's analysis were simply whether minority voters are cohesive and whether whites vote as a bloc to defeat the minority candidate of choice. If plaintiffs establish evidence of a pattern of polarized voting, defendants may attempt to overcome the inference of racially polarized voting by presenting evidence that whites vote as a bloc for reasons other than race or that minority candidates have lacked whatever it takes to prevail in the normal course of politics. *Uno,* 72 F.3d at 981. Defendants, however, have not come forward with enough evidence to disprove the historical trend of polarized voting established by Professor Lichtman.

239. While this Court is somewhat perplexed by Professor Lichtman's exclusion of non multi-ethnic elections, it nonetheless concludes that there is adequate evidence of polarized voting between Latinos and whites in the City of Chicago to satisfy the second and third *Gingles* prongs. By examining only Latino versus white elections, Dr. Lichtman apparently presumed that there was no identifiable Latino-preferred candidate in those elections. It is troubling to suppose that Latino voters could never prefer or be adequately represented by non–Latino candidates. The opportunity to participate in the political process is not reducible to being ensured of electing candidates of one's own race or ethnicity. Focusing on multi-ethnic elections, however, highlights the evidence of polarized voting. *See, LULAC v. Clements,* 999 F.2d 831, 864 (5th Cir.1993), *cert. denied,* 510 U.S. 1071, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994).

240. Looking only at multi-ethnic elections has flaws, however. Where minority voters supported a particular white candidate, and white voters supported another white candidate that information could be relevant to the vote dilution analysis. Professor Lichtman's analytical method failed to recognize that communities within this City might develop multi-ethnic or multi-racial coalitions, in which social or economic interests rather than racial or ethnic factors dominate an electoral choice. By neglecting to look at elections in multi-ethnic wards which did not have elections with multi-ethnic candidates, Professor Lichtman's analysis failed to account for the possibility that voters could coalesce around issues other than race or ethnicity.

241. While Professor Lichtman's analysis was not entirely complete because it failed to consider non multi-ethnic elections, it still established that polarized voting exists within the City of Chicago. Since an issue in this case is whether the VRA requires the drawing of additional Latino majority wards which would have lower Latino majorities than the present wards, the outcome of multi-ethnic elections is relevant to this Court.

242. In order to satisfy the second and third *Gingles* preconditions, Professor Lichtman sought to identify the Latino candidate of choice, the extent to which the Latino community has voted cohesively, and whether non–Latinos usually prevent by default that candidate from prevailing. Professor Lichtman's analysis simplified this analysis by analyzing a series of elections and determining whether there has been a pattern indicating that Latinos and non–Latinos tend to prefer other candidates. Given this information, along with an analysis of Latino and non–Latino voter turnout, it was possible to estimate the ability of Latinos to elect their candidates of choice and the effectiveness of the alternative wards. Certainly, there are

numerous factors which might influence an election other than race or ethnicity, but this Court has heard testimony concerning only one election, in the 10th ward in 1991, attributing the polarization in the electorate to a cause other than race or ethnicity.

243. Professor Lichtman's analysis of polarized voting combined candidates by race or ethnicity. Rather than analyzing the level of support for each candidate, Professor Lichtman looked at the level of support for Latino candidates and non–Latino candidates as a group. In elections with multiple candidates, Professor Lichtman did not consider the level of support for any individual candidate. This methodology presented the polarization issue in its clearest terms and allows for the identification of electoral polarization where Latinos tend to vote predominately for Latinos and non–Latinos for non–Latinos. As the leading scholarly literature has observed, the failure to look at the combined candidate data often results in a misleading picture of minority political cohesion. Grofman, Handley, Niemi, *Minority Representation and the Quest for Voting Equality,* at 99. The practice of combining candidates permits a clear view of the level of racially or ethnically polarized voting. It is, however, independently instructive to look at the election data for individual candidates in order to identify the extent to which minority voters have coalesced around a particular candidate of choice. In the end, however, requiring minority voters to coalesce around a single minority candidate in order to demonstrate their cohesiveness, when they have clearly demonstrated their preference to vote for minority candidates would be a strange way of encouraging minorities to participate in the political process.

244. Professor Lichtman made extensive use of exogenous elections, that is elections for other offices, in his analysis. Professor Lichtman himself recognized that endogenous (here, aldermanic) elections are generally preferred. Endogenous elections have the benefit of having a similar pool of voters, of having the same size pool of voters, and of having the same election rules—all of which help ensure the reliability of the analysis. The pool of multi-racial or ethnic aldermanic elections, which satisfied Professor Lichtman's criteria was very small—consisting of only 6 elections.[15] Professor Lichtman, therefore, also reviewed the results of non-aldermanic elections including judicial elections, democratic ward committeeman elections, and democratic primaries for city clerk, state representative, county commissioners, congressional representatives, and city treasurer. The same general pool of candidates is eligible for the non-partisan aldermanic elections as for the democratic primaries since more than 90% of the Chicago electorate is Democratic. (Tr. 3042). The review of additional elections, in this instance, also permitted a broader indication of the existence of polarized voting since aldermanic races in the Latino majority wards have not tended to be competitive insofar as competitive white candidates have tended not to run in these wards. The absence of competitive multi-ethnic elections races in the Latino majority wards skews the polarization analysis, while the more competitive non-aldermanic elections better indicate the extent to which polarized voting takes place in elections with significant candidates. With four exceptions, Latino candidates have prevailed only in Latino-majority districts. (Tr. 3102).

245. While expanding the pool of eligible elections to include exogenous elections permitted a broader sampling of elections, it also raised several difficulties with Professor Lichtman's analysis. Some of the non-aldermanic elections had different election rules. For example, in the judicial elections, more than one candidate was elected from each district. (Tr. 3100). The absence of winner-take-all outcome rules made it easier for a minority group that would otherwise be ineffective to elect its candidate of choice. In fact, in the judicial elections the Latino candidate prevailed because whites split their votes between multiple candidates. (Tr.

---

**15.** In order to meet Professor Lichtman's selection criteria an election had to be both multi-ethnic, and the losing Latino or non–Latino candidate(s) had to each receive at least 15% of the vote. In the Latino supermajority wards, however, only Latino candidates tend to run or white or non–Latino candidates tend to offer only token opposition. Given the large Latino majorities in the present wards, it is unlikely that any serious white or African–American contender would run.

3102). Professor Lichtman's use of multiple-winner elections rendered his analysis of the effectiveness of the *Bonilla* alternative maps highly questionable, since he relied in large part upon Latino success in these districts, with bare Latino VAP majorities, to conclude that the alternative wards would be effective. The Court cannot give much credence to conclusions derived from elections with different decisional rules, other than to conclude that instituting cumulative voting for aldermen would likely increase minority representation.[16]

246. Additionally, while the pool of the eligible electorate might be the same for democratic primaries as for non-partisan aldermanic races, it is equally likely that the character, education or motive of the voters who vote for less visible offices in party primaries will likely be different in many ways from voters in local aldermanic elections.

247. The pattern of polarization for non-aldermanic and aldermanic elections differed, but aldermanic elections were still for the most part polarized (other than the 1991 aldermanic election in the 33rd ward in which Alderman Mell was the Latino candidate of choice), although "Anglos" and Latinos tended to vote more similarly in aldermanic elections. This phenomenon can likely be explained by the large Latino supermajorities in the Latino majority wards—assuming the validity of an explicitly racial calculus, it would make more sense for non-Latino voters to throw their support behind a palatable Latino candidate than to mount what would likely be a futile non-Latino candidacy. The one aldermanic election with a clear showing of racially polarized voting took place in the 10th ward in 1991, a ward that had a Latino plurality rather than a supermajority.[17]

Even defendants' polarized voting expert, Professor Weber, analysis looking solely at aldermanic elections revealed some polarized voting. (DX 506). The exogenous elections merely strengthened the ambiguity of the polarization finding derived from endogenous elections. Thus even though there were significant problems with Professor Lichtman's selection of elections, those problems discredited only a portion of his analysis but did not discredit the central finding that in competitive elections there is polarized voting between Latinos and "Anglo" voters and there is polarized voting, albeit less extreme, between Latinos and African–Americans.

248. While there have been many elections in which Latino candidates have won, those elections have generally been in Latino VAP supermajority districts. Where Latinos have won in other districts, they have often won due to the effects of multiple-winner election rules or because of a fractured field of candidates. (Tr. 3100, 3102). There have been two elections in which Latino candidates have prevailed in non–Latino districts with a majority of the votes, namely in the 1991 and 1995 Democratic primaries for City Treasurer. Also of some relevance in those elections was the fact that Miriam Santos was the preferred candidate of the Democratic Party leadership, which likely contributed to the level of white support she received.

249. Professor Lichtman relied upon three chief forms of statistical methodology to analyze voter behavior: multi-variate ecological regression, extreme case analysis, and an examination of the actual outcomes of elections. Professor Lichtman also relied upon the $R2$ values (or squared-correlation

---

**16.** Professor Guinier, for one, has recognized that the use of cumulative voting, among other remedial measures, would likely hasten proportionate interest representation broadening the opportunities for minority interests to participate in the legislative process. Lani Guinier, *The Triumph of Tokenism: The Voting Rights Act and the Theory of Black Electoral Success*, 89 Mich. L. Rev. 1077, 1135–1144 (1991).

**17.** Nor does this Court find that Professor Lichtman's conclusions concerning ethnically polarized voting were contradicted by the testimony of

Mr. Ortiz, a former aldermanic candidate in the 10th ward. Mr. Ortiz testified that by his rough estimates he probably received a majority of the Latino vote but not of the white vote. (Tr. 7140). Mr. Ortiz attributed his defeat to his lack of previous experience. While testimony from a candidate explaining the reasons for his or her defeat can be relevant to show a non-ethnic reason for voting patterns, *UNO*, 960 F.Supp. at 523–24, there was some additional evidence of polarized voting in the 1988 election for 10th ward Democratic Committeeman.

coefficient) to assess the reliability of his regression analysis.

250. Courts, and respected experts in the field have been reluctant to accord much value to multi-variate regression analysis which is prone to extensive manipulation. Grofman, Handley, Niemi, *Minority Representation and the Quest for Voting Equality,* at 100. One accepted use of multi-variate regression analysis is to analyze voter behavior in areas with multiple racial or ethnic groups (as is the situation in Chicago in which there are Latino, African–American,' and white residents in many wards) and in which there are also homogenous precincts. Multi-variate regression permits the simultaneous analysis of the voting behavior of all three relevant racial or ethnic groups.

251. By adding a third variable, however, the complexity of the regression equation is increased geometrically. Using tri-variate regression it is no longer as readily possible to make use of scatterplots of the regression equation in order to double-check the neatness of fit of the regression line. Nor is it as easy to identify "outliers", that is, individual precincts in which voters behave outside of the trend of the other voters and which might, by their aberrant result, affect the average outcome of the regression equation.

252. Based on his analysis, Professor Lichtman found that Latino voters tended to vote for Latino candidates at an overall average of 86%. The mean "Anglo" (which meant all non–Latino and non–African American voters) level of support for Latino candidates was 33%, meaning that 67% of "Anglo" voters did not support Latino candidates. The mean African–American level of support for Latino candidates was 55%. There were, however, several elections in which there were significant exceptions to this average, for example in the 1991 aldermanic election in the 33rd ward, Alderman Mell received the plurality of Latino votes, and in the 1991 and 1995 Democratic primaries for the City Treasurer, a Latino candidate, Miriam Santos, received the majority of "Anglo" and

Latino votes, additionally in several Democratic primaries for County Commissioner and Sanitary Commissioner, Latino candidates received the majority of "Anglo" votes.

### b) *Latino Majority Necessary to Constitute an Effective Ward*

253. Although the parties disagree on the possible cause, they concur that the registration and turnout rates of Latinos are significantly lower than those of whites. Professor Lichtman's analysis of turnout rates, however, indicated that the lower Latino turnout cannot be attributed solely to citizenship. According to Professor Lichtman's data, in the south side wards, the Latino turnout in terms of VAP is frequently one half to a quarter of the turnout rate of whites. On the north side, the differential in turnout rates is generally not as large.

254. This Court is not satisfied that Professor Lichtman's analysis supports his conclusion that the *Bonilla* alternative wards would be effective Latino wards. The lowest Latino VAP majority in any of the current aldermanic wards is 59.6% in the 35th ward; all of the other aldermanic wards have VAP majorities of at least 62.7%. The state representative districts all have VAP majorities of at least approximately 65%. The county commissioner districts have Latino VAP majorities of approximately 56.7%. Additionally, in the primary elections analyzed for these exogenous offices, it is not necessary to obtain a majority vote to prevail. Only the judicial districts have a Latino VAP majority lower than a sizeable majority with a Latino VAP majority of approximately 50.8% in one of the districts. These judicial elections, however, have multiple winners making it easier for Latino candidates to prevail. No aldermanic election has ever been won by a Latino candidate with less than a 59.5% VAP majority.[18]

255. Under the *Bonilla* alternative maps, the southwest side alternative wards would have lower Latino VAP majorities than the present southwest side Latino majority

---

**18.** It is likely that the actual Latino VAP in this ward was in actuality even higher. This election took place in the 31st ward in 1987. According to the 1980 census this ward had a Latino VAP

majority of 59.5% but by the 1990 census, this same ward had a Latino VAP majority of 64.6% (SX 2).

wards. Under the current ward maps, the Latino majority wards have sizeable Latino VAP supermajorities (the 12th ward has a VAP majority of 65.44%, the 22nd ward has a VAP majority of 74.49%, and the 25th ward has a VAP majority of 68.153%). Under *Bonilla* alternative map I the Latino VAP majorities are lower (12th ward—VAP majority of 63.35%, 14th ward—VAP majority of 64.23%, 22nd ward—VAP majority of 65.10%, 25th ward—VAP majority of 64.71%). The margins are even smaller in some of the *Bonilla* alternative II maps (12th ward— 66.05% Latino VAP majority, 14th ward— 51.16% Latino VAP majority, 22nd ward— 68.14% Latino VAP majority, and 25th ward—71.90% Latino VAP majority).

256. By the calculations provided by *Bonilla* counsel, guided by Professor Lichtman's estimates, it would be possible that Latino-preferred candidates could prevail in the alternative southwest side wards, although by those calculations these elections would be extremely close. Given the very close margin for error, it is not difficult to discern why representatives of the Latino community preferred that there be three Latino supermajority wards on the southwest side with high supermajorities in order to cement Latino political gains for the present time rather than seek four wards in which electoral success was not assured.

## C. Barnett Experts

### 1. Dr. James H. Lewis

257. Dr. James Lewis, Vice-President for Research and Planning for the Chicago Urban League, testified on behalf of the *Barnett* plaintiffs concerning: 1) racial divisions in recent City Council votes, and 2) disparities in the fund-raising opportunities available to African–American and white candidates. (BAPX 109). In his professional capacity, Dr. Lewis has extensive experience at conducting and overseeing research on public policy issues and, despite defendants' contentions to the contrary, was qualified to testify as an expert for the purpose of assembling and analyzing the public records which were compiled in his report and rendering an opinion regarding the impact of racial divisions on City Council votes and the financing of aldermanic elections.

258. While Dr. Lewis is indeed qualified to testify as an expert regarding public policy concerns, his testimony was not entirely credible. This Court was particularly troubled by Dr. Lewis' repeated reliance upon head signals from counsel during his cross-examination. (Tr. 2345).

### a) City Council Voting and Race

259. In total, Dr. Lewis' testimony was not very instructive. The methodology and selection criteria in his analysis of city council votes left much to be desired. Dr. Lewis' analysis of city council voting patterns consisted of three steps: 1) he examined public opinion by selecting several survey questions from the Metro Chicago Information Center expressing public opinion on a variety of public policy questions; 2) he selected several City Council votes which he believed showed racial divisions on important public policy issues; and 3) he attempted to correlate public opinion to the City Council votes. Each of these steps contained choices which Dr. Lewis could not explain to an extent precluding this Court from giving great credence to his analysis. Nonetheless, Dr. Lewis' report and testimony does tend to indicate that as a general matter there are slight, general differences of opinion concerning issues such as housing, health services and affirmative action and fair housing, between the African–American and white communities in Chicago which are reflected in City Council votes. Dr. Lewis' report and testimony established these divergences in such a cursory and superficial manner that this Court can give Dr. Lewis' findings only little weight.

260. Dr. Lewis based his analysis of public opinion upon the selection of Metro Chicago Information Center ("MCIC") survey questions concerning policy issues about which African–Americans and whites allegedly have differing opinions. To support his findings, Dr. Lewis selected 15 survey questions from the MCIC survey, a survey which had more than 100 pages and several hundred questions. This Court was not given an adequate account of Dr. Lewis' selection criteria nor of the possibly relevant questions

which he chose not to include in his analysis. In general terms, Dr. Lewis selected questions concerning: homeless shelters and housing, health services privatization, fair housing compliance, affirmative action, gambling, schools and employment.

261. In many cases, the differences in the survey answers were not significant—for example: 72% of whites and 92% of African–Americans believed that government spending on health care is very important; 64% of whites and 82% of African–American favored affirmative action set asides for college or employment; or 23% of whites and 20% of African–Americans have gone to a legal casino in the last year while African–Americans tended to spend twice as much as whites on the lottery each week. Reliance upon survey responses such as those reduced Dr. Lewis's conclusions to nothing more than a statement of superficial generalities.

262. The problematic selection criteria used by Dr. Lewis point to the chief problem with this section of Dr. Lewis' report—his entire report presumed that any difference in white and African–American responses to the survey questions were necessarily due to racial differences. Given Dr. Lewis' selection of particular survey questions in isolation this Court must query whether in their entirety, the differences in the survey responses were due to non-racial factors such as income or religious affiliation. By taking survey responses in isolation, Dr. Lewis presupposed that his hypothesis was correct and selected survey questions which tended to support his position without accounting for other factors which may or may have not supported his views.[19] Therefore, this Court concludes that, while the report indicated that there were some differences in the opinions of the white and African–American communities concerning housing, education, fair housing issues, affirmative action and health services, the extent to which these differences can indeed be attributed to divergent communities of interest is not at all clear.

263. The second step in Dr. Lewis' analysis, the analysis of City Council votes, was equally troubling. Once again, Dr. Lewis apparently selected data that would prove his hypothesis, disregarding, without any justification, data that would not support his theories. Nor was the procedural posture or the eventual outcome of any particular piece of legislation plain from Dr. Lewis' report and testimony—for example, there were apparently several South African disinvestment ordinances contemporaneously before the City Council and the support for a more moderate proposal by white aldermen did not necessarily indicate racial division in the City Council. It was impossible to tell how often there were similar situations in which there were competing pieces of legislation before the Council one of which was viewed as an administration proposal and one which was viewed as an independent proposal, or one of which might require modifications to the budget or other appropriations.

264. Dr. Lewis chose 12 votes which took place between 1989 and 1994, leaving this Court to wonder how many other votes were held which might also have been relevant. Many of the votes referred to by Dr. Lewis were procedural votes, and Dr. Lewis could not identify the final outcome on these substantive issues. Two of the Council votes, South African disinvestment and the establishment of a Fred Hampton Day, did not have any relation to the MCIC Survey data results but were selected for their symbolic value. Fred Hampton was also a political and social lightning rod about whom well-intentioned people could have very different opinions.[20] While the votes selected by Dr. Lewis indicated that at least 12 City Council votes between 1989 and 1994 broke down along racial lines, the report did not lead to a broader conclusion than that there were 12

**19.** For example, in support of his contention that whites and African–Americans have different opinions with respect to health services privatization, Professor Lewis relied upon two survey questions: 1) whether the respondent works for the government (5% of whites, and 9% of African–Americans responded that they worked for the government); and 2) whether it is important to spend state/local taxes on health (72% of whites and 92% of African–Americans responded that government spending on health is very important).

**20.** The Fred Hampton vote did not even exhibit the 2:1 ratio formula which Dr. Lewis otherwise used as his selection criterion.

divided votes concerning various issues in the City Council.

265. The final step of Dr. Lewis' analysis was to attempt to match the MCIC survey data to City Council votes. The match between the two was often not entirely clear. The purpose of this analysis was to show that the votes of African–American aldermen tended to track the opinions of African–American community more closely than the votes of white aldermen. There were no survey questions related to Fred Hampton Day or South African disinvestment and with respect to these two votes, Dr. Lewis simply intuited, the interests of the African–American and white communities. Dr. Lewis' conclusions in this phase of his analysis were beset by the difficulty of tracking the generalized interests identified in the survey data to particular pieces of legislation. For example, most respondents to the survey stated that it was very important to spend state/local taxes on health (72% of whites and 92% of African–Americans responded "yes") yet it was not clear how those opinions related to a resolution "urging the Department of Health to postpone negotiations, contracts or studies affecting privatization of public health services." Professor Lewis' report is rife such grapes and raisins comparisons.

266. For example, it was unclear how the survey response indicating that more African–Americans than whites (32% over 13%) fell behind on housing or utility bills related to the extension of Commonwealth Edison's utility license agreement. Nor was it obvious how a survey question asking why a person has been unable to find work (to which 6% of whites and 13% of African–Americans responded that they were not working because they could not find work) related to a proposed ordinance which would have required a public hearing before waiving the City residency requirement on City contracts.

267. In summary, Dr. Lewis' report did not lend itself to anything more than the most general conclusions concerning differences in opinion on public issues between the African–American and white communities and the corresponding policy differences in the City Council. Dr. Lewis set out to find

racial cleavages and he evidently disregarded any information which did not support his conclusions. The report and testimony was filled with oversimplifications and generalities which often approached characterization and stereotyping. Dr. Lewis's report and testimony was little more than anecdotal evidence dressed up in the garb of expert opinion.

### b) Campaign Fund Raising and Race

268. Nor did Dr. Lewis' analysis of disparities in access to campaign financing permit anything more than the most generalized and superficial of conclusions. Once again, his report amounted to a type of stereotyping or self-fulfilling prophecy insofar as he disregarded any other factors which may have had an impact of fund-raising by a candidate such as incumbency or the character of the ward.

269. Dr. Lewis' compilation of fund-raising records made no effort to account for several factors which the data itself indicated had a serious impact on fund-raising abilities—incumbency and the seriousness of the candidate. While the data indicated that on average white aldermanic candidates raised more than African–American candidates, Dr. Lewis' report made no effort to go beyond the most superficial statement of that fact. There was no attempt to separate out candidates who were not serious contenders. For example, in 1991 several of the African–American wards had elections with as many as 5 candidates running against an incumbent—in each of these elections the incumbent raised substantially more than any of the other candidates. According to Dr. Lewis' data, African–American incumbents generally, with a few exceptions, raised as much as their white counterparts. Incumbency is a particularly important consideration in fund-raising abilities: as an incumbent in 1995 Alderman Murphy of the 18th ward raised twice as much as he had four years previously. Another indicator of the importance of incumbency is found in the fund-raising figures for Alderman Streeter of the 17th ward, in 1991 when facing no opponents who had submitted financial disclosures, he raised only $16,373, while in 1995 facing several adversaries he raised more than twice as

much. Dr. Lewis' report and testimony made no effort to account for the effect of incumbency on fund-raising ability.

270. The financial disclosure statements from the 1995 18th ward aldermanic election are of some interest. This was the only election included in Dr. Lewis' report in which a white candidate ran against African–American candidates. In that election the incumbent white candidate raised nearly 10 times as much as the combined total for the three African–American candidates. How much of this disparity was due to incumbency, or the skill of the candidates and how much was due to racial disparities in fund-raising access was left to speculation but both factors were likely at play. This Court is leery, however, of making broad conclusions based upon one election.

271. While there are many non-racial reasons for disparities in fund-raising ability that were not touched upon in Dr. Lewis' report or testimony, on average, African–American candidates tended to raise less than their white counterparts. Dr. Lewis' data also included, though, several African–American aldermen who, for whatever reason, were able to raise substantially more than any other aldermen, white or black. This indicates that fund-raising ability is not entirely race-specific.

### 2. Dr. D. Garth Taylor

272. Dr. D. Garth Taylor was called by the *Barnett* plaintiffs to present expert testimony concerning the differing communities of interest between the white and African–American communities. He is the executive director of the Metro Chicago Information Center ("MCIC"), a non-profit research organization. His report and testimony focussed on several areas: 1) an examination of city-wide patterns of per-capita income, public school enrollment, families in poverty and other socio-economic indicators which Dr. Taylor testified are closely correlated to race; 2) his historical discussion of racial hostility by whites in the 18th and 19th wards on the southwest side of the City; 3) a socio-economic analysis focusing on the southwest and southeast sides; and 4) his city-wide canvassing of the divergences of African–American and white opinion on a spectrum of public policy issues including the ward map referendum and an analysis of the incidence of hate crimes in the City. (BAPX 78–107). The bulk of Dr. Taylor's analysis was presented in the form of maps illustrating the various socio-economic indicators and public opinions selected by Dr. Taylor.

### a) City-wide Socio-economic Communities of Interest

273. This Court's criticism of Dr. Taylor's analysis of city-wide socio-economic data is similar to that of Dr. Lewis' analysis. Dr. Taylor's analysis begs the question of the correlation between the socio-economic data he selected and race thanks to Dr. Taylor's selection of data which only proved his hypothesis. Again, as was the case with Dr. Lewis' analysis, Dr. Taylor's opinions merely stated the obvious in a manner placing an expert patina on what was essentially subjective or anecdotal evidence.

274. Dr. Taylor's analytical method consisted of mapping socio-economic data derived from either census data or the MCIC survey and then attempting to draw conclusions concerning the correlation between race and communities of interest based upon the patterns revealed on the maps. The chief defect of Dr. Taylor's city-wide socio-economic analysis was in his selection of the parameters for his illustrative charts. The break-points in his illustrative maps were puzzling and were never adequately explained. His city-wide socio-economic maps merely established that based upon per capita income, percent public school enrollment, percent single parents with children, and percent of families in poverty with children there were differing core socio-economic communities of interest with poorer areas centered around the west-side and the center of the south side, and more affluent areas in the periphery of the City with the boundary areas being somewhere in the middle of the two extremes.

275. The difficulty of characterizing the "border" areas of the city is typified by the vote for the referendum map. According to Dr. Taylor's compilation of the data, the African–American level of support in the 18th and 19th wards for the referendum data was

generally higher than it was in other areas of the City—somewhere between 15% and 49.99% as opposed to the 0–14.99% support in the core African–American sections of the City. Dr. Engstrom's regression analysis estimated the African–American level of support for the Referendum Map in the 18th ward at 15%, higher than the city-wide rate of African–American support (BAPX 13).

276. Despite these difficulties, Dr. Taylor's analysis still demonstrated that there are differences, at the extremes, between the two communities. It is nearly impossible, given Dr. Taylor's extremely selective use of the data, to determine precisely how pervasive those differences are.

### b) Communities of Interest in the Southwest and Southeast Sides

277. The first phase of Dr. Taylor's analysis of the southwest side was a non-quantitative analysis of historical events concerning housing and education in the 18th and 19th wards intended to illustrate cleavages between the white and African–American communities in this area of the City. Dr. Taylor did not perform a similar analysis for any other part of the City—this was likely due to the history of this area of the City and the focus of the Barnett case on the 18th and 19th wards.

278. While much of Dr. Taylor's analysis of the 18th and 19th wards concerned incidents which occurred 20 or more years ago, the report also discussed more recent incidents which implied continuing racial tensions in this area of the City. While the racial divergences in this part of the City are neither as virulent nor as obvious as they were in response to the school desegregation efforts, including bussing, and the fair housing initiatives of the 1960's and 1970's, the African–American and white communities still have different interests with respect to education and affordable housing policies.

279. Dr. Taylor's contemporary analysis revolved around: 1) the debate to expand the High School for Agricultural Sciences, a successful magnet school with a largely African–American student body situated in the majority white Mt. Greenwood neighborhood of the 19th ward, and 2) the controversy surrounding the development of low-income and affordable housing projects in the 19th ward. While this Court does not question the good faith of the elected representatives in the 19th ward in their opposition to these projects due to fears of overdevelopment and overcrowding, the relevant issue is whether whites tended to have a different valuative calculus than their African–American counterparts and whether white elected representatives tended to favor the interests of their white constituents to the detriment of their African–American constituents. Well-intentioned people could have had radically different opinions, which were entirely non-racial, with respect to each of the recent incidents discussed by Dr. Taylor. What is relevant is whether these differences tracked differing communities of interest between the white and African–American communities.

280. In order to illustrate the existence of disparate communities of interest in the southeast and southwest sides, Dr. Taylor made use of socio-economic data and maps illustrating that data. Dr. Taylor's illustrative maps were intended to indicate the extent to which residents of the relevant areas had similar needs and desires and therefore constituted a community of interest. It is likely, of course, an oversimplification to equate a person's socio-economic condition with his or her opinions on public policy matters. In order to attempt to establish his hypothesis, Dr. Taylor selected six socio-economic factors: households per census block, percent rental units, per capita income, percent vacant dwelling units, percent public school enrollment, percent of families in poverty with children, percent single parents with children, and percent African–American. Why these data were selected instead of other, or additional, socio-economic data was never explained. Apparently this data was selected because it captured the differences Dr. Taylor sought to portray. This, of course, does not confront the issue of whether self-fulfilling indicators were selected to the exclusion of data that would not have confirmed Dr. Taylor's hypothesis. Nor was it clear that these indicators are ones which were relevant in the redistricting process. Given the trial record, the factors relevant to

redistricting were not necessarily socio-economic or racial but were the preservation of traditional ward boundaries, the preservation of neighborhoods and parish boundaries, and population equalization.

281. This Court is troubled by Taylor's analytical method in this phase of his report. Dr. Taylor's method consisted of mapping the socio-economic data and then drawing conclusions concerning the correlation between race and communities of interest based upon a review of the patterns revealed on the maps. The keys prepared by Dr. Taylor significantly effected the overall patterns identified on the maps and rendered Dr. Taylor's identification of communities of interest problematic.[21]

282. The statistics displayed in Dr. Taylor's southwest side and southeast side maps were exceptionally skewed by his selection parameters. A recital of the keys contained in Dr. Taylor's maps illustrates the problem:

a) in his households per census block graph, Dr. Taylor's parameters were 0–15, 16–30, 31–40 and 41–366 households per block, a statistical division which made little sense in a city with as many apartment buildings as Chicago;

b) in his percent of rental units graph, Dr. Taylor's parameters were 0–9.99%, 10–19.99%, 20–29.99%, and 30–100% rental units, once again no reasonable justification was offered;

c) in his per capita income graph, Dr. Taylor's parameters were $0–$12,000, $12,001–$17,000, and $17,001$–50,281 per capita income, a set of parameters exhibiting a rather bewildering selection of breakpoints insofar as a community where the average per capita income is approximately $17,500 would have little in common with one where the average per capita income is $50,000, yet in Dr. Taylor's analysis these two communities would be identical;

d) in his graph of percent vacant dwelling units, Dr. Taylor's parameters were 0–.00%, 1–2.99%, 3–5.99%, and 6–100% vacant rental units;

e) in his graph of public school enrollment, Dr. Taylor's parameters were 0–50%, 50.01–80% and 80%–100%;

f) in his graph of the percent of families in poverty with children, Dr. Taylor's parameters were 0–.99%, 1%–3.99%, 4%–7.99%, and 8%–100%;

g) in his graph of the percent African–American population, Dr. Taylor's parameters are 0–50%, 50.01–80%, and 80.01–100%.

These particular break points were so extreme, and were apparently calculated for the purpose of creating the starkest possible differences in the communities by concealing the more nuanced nature of the socio-economic spectrum.

283. Even accepting these fragmented socio-economic data, only the most generalized conclusions concerning socio-economic communities of interest could be reached based upon them. While there were some differences between the western and the eastern ends of the 18th and 19th wards, these areas were not so disparate that they could confidently be characterized as containing different communities of interest. Nor were the eastern sections of the 18th and 19th wards significantly more similar to the areas to their east than they were to the areas to their immediate west, except in terms of being super-majority African–American areas. If Dr. Taylor's socio-economic analysis of the southwest side established anything, it was that the eastern ends of the 18th and 19th wards are transitional areas with mixed socio-economic characteristics which are not readily stereotyped or diagramed.

284. Dr. Taylor's compilation of socio-economic indicators for the southeast side led to a similar conclusion. The 10th and the 7th wards have very similar socio-economic conditions. There were no clear cut socio-economic breaking points in these areas—in particular the Latino community to the north of the Chicago Skyway expressway, which was included in the 10th ward is not significantly different from the Latino community south of

---

**21.** This Court, however, explicitly rejects defendants' contention that Dr. Taylor's methodology was derived from a book entitled *How to Lie with* *Maps.* This claim is wholly unsupported by the record.

the Skyway expressway. Additionally, in general terms Dr. Taylor's charts did not indicate that Latinos share a socio-economic community of interest more similar to African–Americans than to whites. The only thing clearly established by Dr. Taylor's socio-economic analysis of the southeast side was that there are several majority Latino census blocks on the border between the 7th and 10th wards which were included in the 7th ward rather than in the 10th ward.

285. Dr. Taylor's 'hate crimes' map, however, indicated that the southwest side, particularly the 18th and 19th wards, and the Marquette Park areas, as well as Hyde Park and Kenwood, Bridgeport and portions of the downtown area and the far north side and Uptown are sites of some tension. While the 'hate crimes', included in Dr. Taylor's map were not limited to racially based 'hate crimes', the areas of the highest incidence of hate crimes on the southwest side corresponded roughly to those areas experiencing racial change or which could be characterized as border areas. While this data indicated that these neighborhoods were unfortunately unstable, the conclusion that the eastern ends of the 18th and 19th wards should be joined with the wards to their east does not necessarily follow.

### 3. Professor Richard Engstrom

286. Professor Richard Engstrom, a Professor of political science at the University of New Orleans, testified on behalf of the *Barnett* plaintiffs concerning: 1) racially polarized voting between African–Americans and non–African–Americans; 2) alternative ward maps intended to establish that additional African–American wards could be drawn; 3) differential rates of packing and fracturing between African–Americans and whites under the present ward map. (BAPX 13, 14A, 38–57, 70, 149, 150).

287. Professor Engstrom is a seasoned veteran at considering the validity of districting schemes under the VRA. He is generally considered one of the foremost experts in the field of studying voting behavior. He has also published numerous articles on election systems. Even the defense experts recognized that he is one of the foremost experts in the field whose reputation for integrity is

beyond cavil. (Tr. 7838–Weber). This Court mentions Professor Engstrom's professional resume in light of defendants' attempts to characterize him as an unreliable "professional" witness with little practical experience, and to imply that Professor Engstrom's testimony and reports were authored by other persons. This Court finds no reasonable basis to conclude that Professor Engstrom's opinions were not his own or that he failed to familiarize himself with the factors he considered to be relevant to his analysis.

### a) Racially Polarized Voting and the African–American Community

288. As was the case with Professor Lichtman, Professor Engstrom used several selection criteria in determining which elections to analyze for racially polarized voting. Professor Engstrom analyzed all biracial aldermanic and democratic primary elections between 1983 and 1995 in which he could estimate the behavior of both African–American and non–African–American voters. Initially Professor Engstrom analyzed only elections in which both African–American and non–African–American candidates received at least 15% of the vote, but in response to critiques by the defendants he subsequently considered elections with minor African–American candidates. This addition of these elections did not change Professor Engstrom's determination that there is racially polarized voting in Chicago.

289. As with Professor Lichtman, Professor Engstrom grouped together African–American and non–African–American candidates as a single entity for the purposes of his polarization analysis in order to determine the extent to which the African–American electorate votes for African–American candidates and non–African–American voters tend to vote for non–African–American candidates. Professor Engstrom, however, also attempted to identify individual candidates of choice of African–American voters, in fact in most of the elections he analyzed, racially polarized voting was identifiable without combining candidates. (BAPX 13).

290. Professor Engstrom sought separately to determine Latino voting behavior only in City-wide elections and the alderman-

ic elections in the 1st and 10th wards in 1991. Other than this group of elections, Professor Engstrom, simply looked at "African–American" and "non–African–American" voting patterns. "Non–African–American" included Latinos, and any racial or ethnic group, other than African–Americans. While this may not have been the most nuanced of methods, it was not inconsistent with the VRA insofar as it compared the voting behavior of the relevant minority group, African–Americans, with that of "other members of the electorate." This method, however, concealed the extent to which minority coalitions played a key role, at this time, in the aldermanic elections in the far north-side lakefront wards.

291. In total, Professor Engstrom's reports contained regression analyses for 8 City-wide elections, and 22 aldermanic primaries and runoffs. The Professor also analyzed the city-wide elections on a regional, multi-ward basis. In addition, he analyzed voter behavior in the 1992 referendum for the ward map. One of the city-wide and 5 of the aldermanic elections were held in 1983. While these elections were somewhat old, and were held under the pre-*Ketchum* ward boundaries, they were nonetheless of some value in displaying the continuing pattern of racially polarized voting in Chicago—the more recent elections were as polarized as the older elections.

292. Professor Engstrom's analysis of exogenous elections was justifiable given the residential patterns and the ward composition in the City of Chicago. The number of wards in which there are significant African–American and significant white populations is limited, as is the number of wards in which there are competitive biracial elections. Therefore in order to develop a broad and reliable cross-sample of elections, sufficient to make generalizations concerning the patterns of voter behavior, it was necessary to resort to exogenous elections.

293. Just as Professor Lichtman relied only upon multi-ethnic elections, Professor Engstrom analyzed only bi-racial elections. As was the case with Professor Lichtman, this Court concludes that this method, while it provides a less than complete picture of voter behavior, nonetheless isolated the racial-bloc voting phenomenon by focusing on the extent to which African–American voters, when given a choice, preferred African–American candidates, and whether that preference was shared by non–African–American voters and whether they voted as a bloc contrary to the preferences of African–Americans. This method was imperfect, and it necessarily presupposed that real minority political choice is limited to voting for candidates of one's own race or ethnicity, but it nonetheless provided the clearest means of identifying the extent to which cleavages remain in the behavior of majority and minority voters. It remains, perhaps, only an aspiration to hope that the electorate and our jurisprudence might both move beyond the presupposition that racial identity between a candidate and the electorate is synonymous, and co-extensive, with political responsiveness.

294. Professor Engstrom relied upon several modes of statistical methodology to analyze voter behavior: bi-variate ecological regression analysis, extreme case/homogenous precinct analysis, and the use of a correlation coefficient to verify the results of the regression analysis. Defendants raise the same methodological critiques of ecological regression as they did with Professor Lichtman's analysis and this Court's analysis of the validity of ecological regression remains unchanged. Regression is a helpful analytical tool but it does not provide a means for explaining every reason for voter behavior. Regression, verified by homogenous precinct analysis, provides a helpful tool for estimating the extent of polarization and cohesion in the electorate.

295. Professor Engstrom's conclusions with respect to polarization between African–American and Latino voters were very mixed. In aldermanic elections, namely in the 7th ward in 1987 and the 10th ward in 1991, regression analysis indicated that Latinos did not cast any votes for African–American candidates. On a City-wide level, the results are much more ambiguous, in three of the eight citywide elections analyzed by Professor Engstrom, it was estimated that Latinos cast a majority, or very nearly a majori-

ty, for African–American candidates. In the balance of the City-wide elections, however, there was very low Latino support for African–American candidates, in fact in four of the eight elections the estimated level of Latino support for African–American candidates was lower than the catch-all "non-minority" level of support.

296. Not surprisingly, Professor Engstrom's reports and testimony focused particularly on the 18th ward in which there is a slim African–American VAP majority (approximately 51.7% under the 1980 census and 53.6% under the 1990 census).

297. Defendants contend that the record of elections establishes three non-racial reasons for the absence of African–American electoral success in the 18th ward: 1) the present alderman, Thomas Murphy, has successfully managed to build a bi-racial coalition; 2) low African–American turnout because of the lack of a dynamic candidate who would mobilize minority voters; and 3) an absence of African–American cohesion around a single candidate.

298. In 1987, a single African–American candidate received an estimated 90.7% of the African–American vote (and an estimated 0.0% of the white vote) with a 68% minority turnout rate. By 1995, the combined African–American candidates received an estimated 73.4% of the African–American vote, split between 5 African–American candidates, and the leading African–American candidate received an estimated 27.7% of the African–American vote with an African–American turnout rate of only 24%. In 1995, the estimated white vote for all the African–American candidates was estimated at 4.5%, and at 3.0% for the leading African–American candidate. White turnout had also fallen significantly during this period from 83% to 53%. (BAPX 13). In the 1995 election, Alderman Murphy received approximately 25.5% of the African–American vote as estimated by regression analysis and approximately 31% of the African–American vote by homogenous precinct analysis.

299. No matter what these election results indicated about the inability of the African–American community in the 18th ward to find a single candidate around whom the community could coalesce and for whom the community will turn out en masse to vote, these election results also indicated that there remains polarization in the electorate in the 18th ward. This Court notes, meanwhile, that Alderman Murphy has been very successful at obtaining African–American electoral support insofar as he apparently ran a dead heat with the leading African–American vote-getter in the African–American electorate (the ecological regression analysis and the homogenous precinct analysis resulted in different estimates of who received more support in the 1995 election). The clearly established fact remains, however, that voting patterns in the 18th ward have historically been and remain racially polarized.

300. The polarization of the 18th ward was further exhibited by the ward's vote for the redistricting referendum—an estimated 85% (by ecological regression) of the African–American voters cast ballots for the Fair Map while an estimated 96.3% of the non–African–American voters preferred the present ward map. The African–American rate of support for the referendum map in this area of the City was higher than it was in most other wards.

301. This Court's discussion of the 18th ward cannot end here. This Court was impressed by Alderman Murphy's testimony and his expressed and evident sincerity in attempting to respond to the needs of all his constituents no matter what their racial or ethnic origin (Tr. 6105). While the 18th ward is not an effective African–American ward, it is a ward in which it is impossible for a white candidate to ignore the desires of the African–American electorate. Given the level of support Alderman Murphy received from African–American voters in the 1995 election, receiving approximately the same percentage of votes as the most popular African–American candidate, it is impossible to characterize the 18th ward as one in which African–Americans do not have an opportunity to exercise a real impact on the political process. Given a choice between African–American and white candidates, Alderman Murphy, a white candidate, was the candidate of choice of at least as many African–

American voters as any other candidate. Evidently, significant portions of the African–American community and the current alderman in the 18th ward have learned the importance of forming political coalitions based upon a community of interests other than race—this is a lesson which will hopefully one day be learned by the rest of the electorate of Chicago. Until that day arrives, however, the fact remains that Professor Engstrom's reports and testimony successfully established that African–Americans are generally politically cohesive and that the white majority votes sufficiently as a bloc, absent special circumstances, to defeat the minority's preferred candidate thereby satisfying the second and third *Gingles* prongs.

302. The 18th ward, however, is one of the few wards in the City of Chicago in which it is possible for there to be either competitive bi-racial aldermanic elections or for a skillful candidate to forge a bi-racial electoral coalition. It is only by encouraging such elections, in which voters have a real choice, that it might be possible to bring about an end to the unfortunate phenomenon of polarized voting. Drawing wards which are easily identifiable as either white or African–American, in which it is unnecessary to build bi-racial coalitions, only perpetuates polarized voting by denying voters any real opportunity to learn new voting habits and attitudes. But the task of crafting racially and ethnically diverse wards is properly a legislative rather than a judicial project.

### b) Barnett Alternative Maps

303. Professor Engstrom also testified concerning the first *Gingles* prong, that the African–American community is sufficiently large and compact enough to constitute an additional African–American majority ward, by means of the preparation of alternative ward maps.

304. Professor Engstrom's reports included 10 alternative ward maps, as well as several additional ward maps intended to illustrate assorted contentions contained in his reports. As this Court observed with Professor Estrada's *Bonilla* alternative maps, the *Barnett* alternative maps were offered for the limited purpose of illustrating that additional African–American majority

wards can indeed be drawn and they were not offered as final remedial proposals. This Court is satisfied, pending its analysis of the totality of the circumstances, that the alternative maps established that an additional African–American majority ward can be drawn, likely on the southeast or southwest sides of the City with acceptable population deviations.

305. The *Barnett* alternative ward maps also established that it was possible to draw a "least-change" map that did not shift as much population as the present ward map. (BAPX 46). Following a strict least change policy, however, would not necessarily have resulted in additional Latino or African–American majority wards. Although it was possible to draw an additional African–American ward and still make fewer shifts in population than the present ward map. (BAPX 47).

306. Dr. Engstrom's reports also contained maps indicating that, if maximization of African–American wards was a goal, it would have been possible to draw 24 African–American wards, as well as 9 Latino majority wards and one mixed Latino/African–American ward. (BAPX 44). In order to achieve this mix of wards, however, it would have been necessary for the ward boundaries to be bizarrely shaped, cutting in long narrow swathes through completely disparate neighborhoods. Professor Engstrom acknowledged that this map would likely require strict scrutiny under the *Shaw* line of cases. (Tr. 4235–6) This map was illustrative of little more than the proposition that anything is possible when one ignores traditional districting criteria.

307. The bulk of the objections raised by defendants to the *Barnett* alternative maps are largely irrelevant to the issues addressed by the maps. To the extent that the first *Gingles* precondition requires that plaintiffs draw additional minority wards, it is necessary that those wards be drawn with race in mind. It is disingenuous to contend that, at this phase of the trial, it is not possible to consider race when drawing alternative ward maps. The only limit is that the alternative maps cannot seriously transgress other traditional districting concerns.

308. Not surprisingly, the *Barnett* alternative maps proposed changes to the 18th and 19th wards in order to enable the drawing of an additional African–American ward on the southwest side. The general strategy of the *Barnett* alternative maps was to move the 13th ward to the south to acquire the western portion of the 18th ward, for the 19th ward to acquire some of the southernmost portions of the 18th ward, and to include the African–American majority blocks at the eastern ends of the 18th and 19th wards within a new African–American majority ward. (BAPX 39). These changes were not dissimilar to some of the changes proposed in Judge Murphy's early draft wards.

309. *Barnett* alternative map 3 presented another strategy for the preparation of an additional African–American ward on the southwest side. This map resorted to extremely long, narrow wards extending from the western edge of the City to the center of the south side which are not dissimilar to the bizarrely shaped "chimney" wards of the Equity map. (BAPX 40).

310. *Barnett* alternative map 5 demonstrated that it is theoretically possible to draw four, rather than three, African–American wards in the area occupied by the 7th, 8th, 9th and 10th wards. (BAPX 42). This four ward area has a total population that is approximately 71% African–American, so the three African–American majority wards in this area under the present ward map are roughly proportional to the African–American share of the population. In order to effect this proposed change it was necessary to make significant changes in the traditional ward boundaries in this area of the City. The alternative maps split the white areas in the present 10th ward into several wards.

### c) Packing and Fracturing of the African–American Community

311. This Court has already concluded that total population is the appropriate measure at the first glance for determining whether there has been vote dilution in the form of packing or fracturing since redistricting is, in the first instance, based upon total population. This Court has also previously determined that the legally significant packing or fracturing is that which is legally remediable under VRA § 2. This Court, therefore, concludes that Professor Engstrom did not misstate the character of fracturing and his "eyeball" fracturing and packing analysis is methodologically permissible.

312. This Court is satisfied that Professor Engstrom successfully identified areas of fractured African–American population. Professor Engstrom's alternative maps adequately identified the extent to which minority members were separated into different political districts disabling them from constituting an effective majority within a single district. The 41,000 African–Americans in the eastern end of the 18th and 19th wards, as well as the 6,000 African–Americans in the southern and western areas of the 10th ward, can be characterized as fractured. The fracturing in the 10th ward could not be remedied, however, without drawing rather unconventionally shaped wards, that would have to cross large unpopulated areas, would negatively impact other groups, and would split communities that had traditionally been a part of the same ward.

313. This Court, however, is unconvinced by Professor Engstrom's packing analysis. African–American majority wards have, on average, a nearly 20% higher concentration of African–American population than white majority wards (87% as opposed to 68%). Much of this apparent packing is a function of the population patterns in the City in which over 80% of the African–American population lives in census blocks that are at least 90% African–American. Even the Fair Map submitted to referendum had eight wards with over 90% African–American population. (¶¶ 317, 318). While it would have been possible to draw the ward map with a larger number of African–American wards, with lower percentage majorities of African–Americans, the only way to do so would have been to resort to extremely long, narrow "chimney" wards which would have required a drastic restructuring of traditional ward boundaries. Such a map would likely have been as unpopular as the Equity Map which was submitted to the City Council on October 28th, 1991.

314. This Court also concludes that Professor Engstrom's characterization of the present ward map as containing 24 white wards, 19 African–American wards, and 7 Latino wards is inaccurate. By this Court's calculation, the present ward map contains 19 white wards, 19 African–American wards, 7 Latino wards, and 5 wards in which it is impossible for any candidate to succeed without managing to obtain bi-racial or multi-ethnic support. (10, 18, 46, 48, 49).[22]

315. Therefore, Professor Engstrom's testimony demonstrated that the *Barnett* plaintiffs established the three *Gingles* preconditions.

### D. Defendants' Experts

#### 1. Professor Norfleet Rives

316. Defendants called Professor Norfleet Rives, a Professor in the business school of Franklin University, to testify concerning: 1) residential concentrations, 2) fracturing of minority members, and 3) the Latino citizenship rate. Professor Rives also testified concerning the number of minority wards which might result if redistricting were performed in a race-neutral manner in which compactness was the only criterion for the contours of the wards. (DX 509, 510, 866, 867A). This Court declines to rely upon Professor Rives' testimony, other than his analysis of the residential concentrations in the City, Professor Rives was consistently unable to explain his methodologies for his fracturing and race-neutral benchmark map analysis, stating that he relied upon counsel to identify appropriate methodologies. (Tr. 6647, 6651, 6653).

#### a) Residential Patterns in Chicago

317. Professor Rives' testimony concerning residential patterns in the City was instructive and helpful in identifying the reasons for the high African–American population percentages in the African–American majority wards. As of the 1990 census, over 80% of the African–American population, either in terms of VAP or TP, resided in census blocks with at least 90% majority African–American populations. 90.0% of the African–American VAP and 90.7% of the African–American TP lived in census blocks that were at least 50% African–American. The white population in Chicago, while highly concentrated, was somewhat more diffuse. 32.5% of the white TP and 35.4% of the white VAP lived in census blocks that were at least 90% white. Despite the significantly smaller percentage of whites living in 90% white majority census blocks than African–Americans a similar percentage of whites lived in white majority census blocks—86.1% of the white VAP and 83.1% of the white TP lives in blocks that were at least 50% white. A slim majority of whites lived in census blocks in which whites constituted between 50 and 90% of the population—50.7% of the white VAP and 50.6% of the white TP resided in such census blocks. The Latino population of Chicago was much more dispersed, 60.8% of the Latino TP and 54.1% of the Latino VAP lived in census blocks that were at least 50% Latino. (DX 509, 510).

318. Accordingly, the population patterns of the City indicated that there were a significant of number of census blocks where minority residents were submerged in white majority concentrations while the vast majority of African–Americans resided in areas that were at least 90% African–American. It was unavoidable, therefore, that a significant percentage of minority voters were essentially submerged within white majority wards. This population pattern highlights the difficulty of drawing super-majority Latino wards, since only half of the Latino population resided in Latino majority wards. Pro-

---

22. The white aldermen in the 46th, 48th, and 49th wards are extremely responsive to minority needs and desires. (*See, e.g.,* Tr. 6211–17–Smith, Tillman Dep. Des. 9/20/95 126–27; E. Smith Dep. Des. 424–26; Shaw Dep. Des. 173). In the 46th ward, Alderman Schiller has consistently been the candidate of choice of both Latino and African–American voters, while not of white voters. (Tr. 7162–63, 7169, 7181–Atkins, DX 506).

Alderman Moore of the 49th ward has also consistently relied upon minority support for electoral success. (DX 506). Alderman Smith of the 48th ward has also received significant minority support. (Tr. 6225–26–Smith). According to Dr. Lewis, Aldermen Schiller and Moore voted in accordance with his identification of African–American interests more often than did many African–American aldermen. (Tr. 2444–2445).

fessor Rives's concluded that this population pattern would result in a large number of moderately concentrated white majority wards and a slightly smaller number of highly concentrated African–American wards. (Tr. 6597).

#### b) *"Race–Neutral Benchmark" Maps*

319. Professor Rives' race-neutral benchmark ward maps, however, were not nearly as useful. In fact, this Court finds this analysis to have been minimally instructive. Under Professor Rives's direction a computer analyst prepared four ward maps using visual compactness, contiguity, and minimal population deviations as the only districting criteria. It insults the intelligence to contend that only four random ward maps, drawn without any consideration of the City's geography or demography, might somehow constitute a "benchmark." Redistricting is necessarily a highly intentional process—even the random drawing process requires numerous choices. Does one use only major roads as ward boundaries? Does one begin drawing maps beginning from the north and moving south or visa versa, or does one draw from east to west? Does one tend to draw square-shaped wards or rectangular wards? Does one use an extant ward map as a template or does one begin from scratch? All of these, and more, rather minor considerations might have had significant consequences on the contours of the "race-neutral" maps. By preparing only four "race-neutral" maps, Professor Rives made no effort to draw enough maps to obtain a meaningful sample.

320. In essence, the *Gingles* test already employs a benchmark map, namely the alternative maps offered by plaintiffs in an effort to show that non-dilutive maps could have been drawn. *See e.g., Reno v. Bossier Parish School Board,* —— U.S. ——, ——, 117 S.Ct. 1491, 1498, 137 L.Ed.2d 730 (1997). The relevant benchmark of VRA § 2 is non-dilution, not randomness.

321. Not surprisingly, there is very little support for the "race-neutral" benchmark—other than a suggestion from defense counsel. (Tr. 6400).

322. One scholarly article, written more than twenty years ago, when the judicial interpretation of the VRA required that intent had to be established in order to prevail on VRA § 2 claim, prepared by Professors Engstrom and Wildgen, who was a consultant to defendants, has raised the possibility of using random race-neutral maps as a benchmark. Richard Engstrom, John Wildgen, "Pruning Thorns from the Thicket: An Empirical Test of the Existence of Racial Gerrymandering," *II Legislative Studies Quarterly,* 465 (1977). Professors Engstrom and Wildgen, however, suggested that a large number of maps, at least 100, needed to be prepared using this method in order to obtain a significant sample.

323. This Court, in any event, is extremely troubled by the proposition that ward maps prepared without any knowledge of the relevant jurisdiction can have much value other than as a potential tool for misadventure. Redistricting is necessarily an amalgam of pragmatic and prudential considerations and compromises; that is the nature of our representational system. Utilizing randomly drawn "benchmarks" would fail to account for the importance of the political considerations which necessarily drive the redistricting process—for example a random "benchmark" would fail to provide for the value of drawing supermajority wards in order to cement the gains of a young, rapidly growing minority group in a city. Professor Rives'· "benchmark" map also failed to account for the value of maintaining discrete neighborhoods within single political units. The redistricting process, at its best, is a crucible for considering the competing representational concerns of a community and a final map of the relevant districts is the hard fought product of the amalgam of those difficult choices. A benchmark is of no use if it disguises or fails to take account of the political realities of the redistricting process.

#### c) *Defendants' Fracturing Analysis*

324. Professor Rives also performed a fracturing analysis. This Court finds that analysis flawed for several reasons. First, as this Court has already discussed in the context of Professor Estrada's testimony, total population is the appropriate measure for identifying fractured population. An en-

tire population, not voting age population, alone, is fractured just as an entire population is used to populate a ward. During the redistricting process, entire populations were placed in particular wards, not just voting age populations. When the 12th ward was drawn to snake down to pick up a portion of the Back of the Yards neighborhood the non-voting age population of that neighborhood did not remain in the 14th ward. The fracturing of VAP is not remediable, since wards are not drawn in terms of VAP. VAP is certainly relevant to a fracturing analysis, but it is relevant at a second stage when considering the effectiveness of alternative wards.

325. Professor Rives utilized a three-step method for identifying fractured communities. First, he identified VAP racial or ethnic majority census blocks that were situated outside wards of the same majority but were adjacent to wards of the same majority. Second he added majority census blocks that were contiguous to the above boundary blocks. Third, he attempted to identify other majority blocks which could be joined with the blocks identified in the first two steps. Professor Rives chose to exclude the analysis under his third step from his reports because of that step's subjectivity. By not including his third step, Professor Rives artificially decreased the fracturing of Latinos because most of the Gage Park/Marquette . Park neighborhood in the 14th, 15th and 16th is more than several blocks removed from a Latino majority ward.

326. Professor Rives concluded that whites are fractured at a higher rate than any other group in the City. Professor Rives, however, made no effort to show how these fractured whites, particularly those on the north and the southwest sides could have been included into additional white majority wards. Professor Rives' conclusion was based upon several baffling choices—namely his definition of the white population in the 18th ward as fractured. The "fractured" white population of the 18th ward accounts for 17,411 out of the 51,743 white VAP fractured under Rives's methodology, approximately 1/3 of the total fractured white population. This Court declines to term the white

population of the 18th ward as fractured, therefore decreasing the fractured white population, accepting for now Professor Rives' definition, to 34,332. Professor Rives also defined pockets of white population in the 9th ward and the north side Latino wards as fractured since they could have augmented white majorities in other wards. The definition of these areas as fractured bore no resemblance to the *Ketchum* standard for fracturing which requires that in order for a population to be fractured it must be possible to create an additional ward using the fractured population. *Ketchum v. Byrne*, 740 F.2d at 1408, n. 8.

327. Professor Rives' analysis that the white VAP is fractured more than any other group was further skewed by his unsound methodology. Professor Rives simply tallied the total "fractured" population and then determined the proportion of that total fractured VAP represented by whites, Latinos and African–Americans. This method artificially disfavored groups with smaller total populations. Adjusting for his perplexing selections of fractured population and considering the impact of the fracturing on the population of the affected community rather than as a percentage of the total "fractured" population, Professor Rives' own calculations revealed that both African–Americans and Latinos were disproportionately fractured more than whites.

328. This Court is also troubled by the extent to which the adoption of a VAP standard for fracturing would have no effect other than adversely affecting the Latino community. Given the 7 years which have passed since the census was taken, the Latino community, approximately 40% of which was below the voting age at the time of the 1990 census, has likely seen its VAP increase dramatically. The census is a snapshot taken at a specific moment in time, and basing the fracturing analysis on VAP would tend to submerge unduly the opportunity of a younger minority community to participate in the political process.

329. This Court has already discussed Professor Rives' method for determining citizenship and rejected it as being unreliable. (¶¶ 225–234). In any event, this Court has

declined to adopt citizenship as the measure for the first *Gingles* prong.

### 2. Professor Ronald Weber

330. Professor Ronald Weber, a Professor of Government at the University of Wisconsin–Milwaukee, testified on behalf of the defendants concerning: 1) minority political participation, and 2) polarized voting in aldermanic elections in Chicago. (DX 506, 515). While Professor Weber's analysis was of value because of his inclusion of several elections which were not included in plaintiffs' analyses, this Court concludes, for the reasons stated below, that Professor Weber's analysis understates the extent to which the plaintiffs satisfied the three *Gingles* prongs.

### a) Minority Opportunities to Participate in the Political Process

331. Professor Weber analyzed minority equal opportunity to participate in the political process in terms of voter registration, turnout on election day, and the number of ballots cast on election day. Professor Weber's analysis assumed that if minority members and whites have an equal opportunity to register to vote, and the two groups of voters tend to turn out and to vote and at a roughly equal rate, then minorities have an equal opportunity to participate in the political process. While this was an interesting theory, it bears no cognizable relation to VRA § 2.

332. Professor Weber's participation analysis completely ignored the extent to which a vote cast by a minority voter would have less weight than the vote of a non-minority voter because of a dilutive districting scheme. Given his participation analysis, Professor Weber would find that minority voters had an equal opportunity to participate in the political process in a redistricting scheme which diluted minority voting strength through packing and fracturing so long as minority members registered to vote and voted at a rate equal to that of whites no matter how polarized voting might have been. An equal opportunity to participate in the political process necessarily includes, among other things, having the opportunity to elect the candidate of one's choice. Being given an chance to vote in a jurisdiction with a redistricting scheme that renders one's vote meaningless is not an equal opportunity

to participate. To the extent that Professor Weber's analysis would conclude that a dilutive redistricting scheme afforded minority voters an equal opportunity to participate in the political process, that analysis is not due any weight.

333. This Court gives little credence to Professor Weber's testimony concerning registration rates in the City of Chicago. While the registration rolls of the City are official government records maintained by the Board of Elections, Professor Weber recognized that the registration data was somewhat dubious. Most of the African–American wards had registration rates that exceeded 90%, a registration rate Professor Weber admitted that he viewed with suspicion. (Tr. 7679). The registration rolls also indicated that approximately 10% of the City's precincts had registration rates that exceeded the VAP of the precinct. (BAPX 150).

334. Nonetheless, Professor Weber's participation analysis did contain some figures concerning minority turnout and voting rates which are of relevance to this Court's analysis of the effectiveness of possible additional minority wards.

335. Of relevance, is Professor Weber's analysis of turnout and voting rates for whites, African–Americans, and Latinos in Chicago in the 1987, 1991 and 1995 aldermanic elections. He performed his analysis of turnout and voting rates in three manners: 1) by gross turnout of voters in wards categorized by the racial or ethnic VAP majority in the relevant ward; 2) by regression and extreme case analysis in each ward for each group insofar as possible; and 3) by citywide regression. The analysis of the gross turnout of voters was of little relevance since it provided no insight into the manner in which turnout was broken down by race or ethnic group in mixed wards.

336. While Professor Weber's regression analysis indicated that on a citywide level white and African–American turnout and voting rates are approximately the same, there were some relevant differences in turnout rates in the wards that are the principal focus of this case. In the 10th, 18th, and 19th wards in the aldermanic elections in

1987, 1991, 1995 African–American turnout was significantly lower than white turnout in every election for which Professor Weber provided regression estimates. The differential in turnout in these wards ranged from 10% to as much as 41%. For example, according to Professor Weber's regression estimates in the 18th ward in terms of VAP: 31% of African–Americans and 68.2% of whites participated in the first round of the 1991 aldermanic elections; 27.9% of African–Americans and 69.3% of whites participated in the 1991 runoff elections; and 23.8% of African–Americans and 54.8% of whites participated in the first round of the 1995 aldermanic elections. Therefore, in the wards that are relevant to this case, African–American participation was significantly lower than white turnout. (DX 506).

■ 337. Professor Weber's regression and extreme case analysis established conclusively that Latino turnout and voting rates are lower than the corresponding white and African–American rates. For example in the Latino majority wards, in terms of participation as a percentage of VAP, Latino participation in aldermanic elections was significantly lower than that of whites and African–Americans. The regression estimates for the first round of the 1995 aldermanic elections in Latino majority wards starkly displays the low participation rates in those wards:

Voter Participation as % of VAP in Latino Majority wards Regression Estimates

| Ward | White | African–American | Latino |
|------|-------|------------------|--------|
| 1 | 21.1 | 33.7 | 13.7 |
| 12 | 39.4 | — | 9.6 |
| 22 | — | 30.7 | 10.3 |
| 25 | 45.1 | 43.1 | 11.3 |
| 26 | 22.7 | — | 11.0 |
| 35 | 23.3 | — | 18.5 |

(DX 506). These participation rates indicate why it was necessary to draw Latino majority wards with sizeable supermajorities in order to ensure Latino electoral success in those wards. With Latino turnout lagging so far behind the turnout rates of other groups in the City, it was necessary to draw wards with large Latino supermajority in order to give Latinos a reasonable chance of electoral success.

### b) Minority Vote Dilution

■ 338. Because of its numerous shortcomings which have the cumulative effect of significantly understating the extent of minority electoral cohesion, racially polarized voting, and the absence of white cross-over voting, this Court makes little use of Professor Weber's dilution analysis with the exception of his estimates of the aldermanic elections in the 46th, 48th and 49th wards. His dilution analysis was premised upon a fundamental misunderstanding of VRA § 2 and the record of minority electoral success. That minority candidates have prevailed in some wards, chiefly those in which they constituted supermajorities of the eligible electorate, does not prevent them from prevailing on a VRA § 2 claim. After all "plaintiffs challenging single-member districts may claim, not total submergence, but partial submergence; ... the chance for some success in the place of some." *De Grandy*, 512 U.S. at 1012–13, 114 S.Ct. at 2658.

339. Professor Weber analyzed both rounds of the 1987, 1991, and 1995 aldermanic elections. He did not consider any exogenous elections although he has frequently considered such elections in other cases (Tr. 7743–64). Professor Weber did not consider exogenous elections in this case because aldermanic elections are the only non-partisan contests with a majority voting requirement. The logic of this selection criterion, however, is lost when aldermen who make the runoff round, i.e., those who are among the top two vote getters when no candidate receives a majority of the vote, are treated as winners, which Professor Weber did.

340. In only a fraction of the elections he considered, was Professor Weber able to estimate African–American and white voting behavior by means of both ecological regression and extreme case analysis. The same was true of Latino and white voting behavior as well.

341. The value of Professor Weber's estimates of voting behavior was further limited by the relevant information which he choose to omit from his analysis. Professor Weber

failed to identify the race of the candidates, thereby making it difficult to account for the response of minority and white voters when they were presented with a choice between a white and a minority candidate. It is probative to this Court's consideration whether African–American or Latino voters express a preference, when given an opportunity, to vote for minority candidates but are frustrated from prevailing by the absence of white crossover voting. Professor Weber's analytic technique made an investigation of this phenomenon impossible. Professor Weber, in fact, downplayed the relevance of white crossover voting. (Tr. 7804–07). The Professor, however, during cross examination did recognize that white crossover voting is minimal in Chicago. (Tr. 7805).

342. Even more troubling were some of the conditions Professor Weber inserted into his analysis of voting patterns. Weber limited the cohesiveness requirement to cohesiveness behind a single candidate. For Weber, an electorate is cohesive and has an identifiable candidate of choice only if at least 60% of the relevant electorate cast their ballots for a single candidate in a two candidate race, or at least 50% of the relevant electorate cast their ballots for a single candidate who received at least 60% of the vote cast for the top two candidates in a multi-candidate primary. Professor Weber further defined cohesiveness by breaking it down into strong cohesion with levels of support of 80% constituting strong cohesion and levels of support of between 60 and 79% constituting moderate cohesion.

343. There is virtually no support for this interpretation of cohesiveness in the case law or in the scholarly literature. Besides the fact that this standard was troubling insofar as it implied that there was something undesirable about encouraging people to run for public office, it completely ignored the character of aldermanic elections which quite often tend to have a free-for-all character with many candidates frequently running in a single ward. Professor Weber's cohesion analysis, however, was of some relevance to this Court's consideration of the totality of the circumstances insofar as it was extremely instructive as to the political realities of the relevant wards. By failing to look, at least, at the combined level of minority support for minority candidates and the combined level of white support for white candidates, Professor Weber provided an inaccurate view of minority political cohesion and racially or ethnically polarized voting.

344. Absent his cohesiveness requirement, the outcomes of Professor Weber's regression analyses would have been quite different. Professor Weber found Latino cohesion in only 25 of the 40 elections he analyzed. In these elections, voting by whites defeated Latinos in those elections only three times. Without his cohesion requirement, whites and Latinos would have differed in their preferred candidates in 17 of 40 elections, and in the majority of those elections the white candidate of choice prevailed. Latino candidates prevailed in Latino supermajority wards. A similar pattern was revealed with respect to African–American candidates.

345. Defendants' contention that Professor Weber's methodology paid greater heed to the "usually defeats" language of *Gingles* is disingenuous. The "usually defeat" language in *Gingles* refers to white bloc voting which acts to block the minority candidate of choice. This necessarily requires an analysis of the extent of white crossover voting, something which was impossible to ascertain with Professor Weber's methodology. Nor did it make any sense to claim that minority candidates of choice were not "usually defeated" because they prevailed in majority-minority wards, if they are consistently defeated in wards in which they do not constitute a majority.

### E. Summary of Expert Conclusions

346. In summary, this Court reaches the following key conclusions, in the light of the relevant legal standards, based upon the expert testimony and reports.

347. The *Barnett* and the *Bonilla* plaintiff classes have each satisfied the three *Gingles* prongs.

348. Through the testimony of Professor Estrada, the *Bonilla* plaintiffs established that the Latino community is suffi-

ciently large and geographically compact enough to constitute a majority in an additional ward. By means of joining together Latino majority blocks which are not presently in a Latino majority ward and decreasing the Latino population majorities in the existing Latino majority wards, it is possible to create an additional Latino majority ward on the southwest side of the City.

349. Through the testimony of Professor Lichtman, the *Bonilla* plaintiffs successfully established that Latino voters consistently prefer Latino candidates and that, where conditions permit, white voters vote as a block sufficiently to defeat usually the Latino preferred candidate. With the exception of the 1991 aldermanic election in the 10th ward, defendants did not offer any alternative explanation for polarized voting wholly unrelated to race or ethnicity.

350. Latino candidates have emerged victorious in aldermanic elections in wards with Latino VAP majorities as low as 59.5%. Latino candidates have also emerged victorious in judicial elections in districts with bare Latino VAP majorities, although such elections have different outcome rules which minimizes the probative value of such elections as an indicator of the likelihood of Latino electoral success in an aldermanic election.

351. Latino voter turnout in aldermanic elections is consistently less than half that of whites.

352. Given the very low Latino turnout rates, and the lower Latino majorities in the *Bonilla* alternative wards on the southwest side, a Latino candidate would rot be ensured victory in additional southwest side Latino majority wards. In particular, the Latino candidate of choice would likely not prevail in a ward which joined together the Back of the Yards, Marquette Park, and Gage Park neighborhoods.

353. In general, with some exceptions, the Latino community has a distinct socio-economic community of interest characterized by its more recent immigrant status, its comparatively high rate of participation in the labor force, its comparatively lower education rates, its comparatively high rates of households with children, its comparatively low per capita income (but without some of the extreme poverty of some of the African–American majority areas), and the high rate of persons for whom English is not the first language.

354. Through the testimony of Professor Engstrom, the *Barnett* plaintiffs established that the African–American community is sufficiently large and geographically compact enough to constitute a majority in an additional ward. An additional African–American majority ward could be drawn on the southwest side replacing the 18th ward. Reconfiguring the 18th and 19th wards would likely require significant alterations to the traditional boundaries of the adjoining wards or would require resorting to extremely long narrow, oddly shaped wards. An additional African–American majority ward could also be drawn on the southeast side, but only at the cost of dividing the Latino and white population concentrations in that area of the City between several wards.

355. Through the testimony of Professor Engstrom, the *Barnett* plaintiffs also established that African–American voters consistently prefer to vote for African–American candidates and that whites vote sufficiently as a block usually to defeat the African–American preferred candidate.

356. In general, African–American participation rates in aldermanic elections are on a par with white participation rates. The 18th ward is an exception to this rule. In the 18th ward African–American turnout rate was approximately half that of whites in the 1995 aldermanic elections. Additionally, while the 18th ward aldermanic election in 1995 was polarized, with over 70% of African–Americans voting for African–American candidates and only 4.5% of whites voting for African–American candidates, a white candidate was nonetheless the leading vote getter (as estimated by homogenous precinct analysis) among African–Americans.

357. Based upon socio-economic data, there are identifiable areas of the African–American community with distinct communities of interest in areas centered around the west side and the center of the south side.

In general, areas further removed from these core areas have less in common with this distinct community of interest.

358. In general, the expert analyses of minority communities of interest was less than satisfactory. Because of questionable data selection parameters, the analyses provided little more than rough generalities.

359. In the far north side lakefront wards, where no racial or ethnic group constitutes a decisive majority of the population, African–American and Latino voters have been pivotal members of the electoral coalitions pieced together by the incumbent aldermen.

360. As established by the testimony of Professor Rives, the contours of the present ward map were, in part, determined by the residential patterns in Chicago. Over 80% of the African–American population lives in census blocks with 90% African–American populations. Most whites live in white majority census blocks, but only ·one-third of whites live in census blocks that are 90% white. Only approximately 54% of the Latino VAP, meanwhile, live in Latino majority census blocks. This pattern results in roughly equal numbers of white and African–American majority wards and a proportionally smaller number of Latino majority wards.

## IV. THE TOTALITY OF THE CIRCUMSTANCES AND THE ABILITY TO PARTICIPATE IN THE POLITICAL PROCESS

361. Although both the *Barnett* and *Bonilla* plaintiffs have successfully established the three *Gingles* factors, this Court's examination of the relevant circumstances is not yet complete. This Court, rather, must engage in a comprehensive canvassing of the relevant facts. *De Grandy,* 512 U.S. at 1013–13, 114 S.Ct. at 2657–58. This Court must examine all the relevant evidence which in the totality of the circumstances might indicate whether plaintiffs have less opportunity than other members of the electorate to participate in the political process. *Id.*

362. In its consideration of the totality of the circumstances, this Court will examine factors including but not limited to the nine factors set out by the Senate Judiciary Committee's Report accompanying the 1982 amendments to the VRA. In connection with its analysis of the totality of the circumstances, this Court will also consider evidence concerning the proportionality of representation and the practical political concerns which guided the drawing of the present ward map. In short, this Court will consider any factor relevant to the ability of minorities to participate in the political process in Chicago.

### A. The Senate Factors

363. This Court's canvassing of the totality of the circumstances surrounding the extent to which the present ward map might limit minority participation in the political process necessarily begins with a review of the nine factors set out in the Senate Judiciary Committee Report accompanying the 1982 amendments to the VRA. *De Grandy,* 512 U.S. at 1010, n. 9, 114 S.Ct. at 2656, n. 9.

#### 1. Senate Factor One—Official Discrimination Affecting the Right to Vote

364. Thirteen years ago the Seventh Circuit affirmed a district court determination that the ward map of the City of Chicago violated the VRA on the basis of retrogression and the manipulation of racial voting populations. *Ketchum,* 740 F.2d at 1405–6. In addition, a three judge panel had previously found intentional discrimination in connection with the 1981 redistricting of state legislative districts in Chicago which limited both Latino and African–American representation. *Rybicki,* 574 F.Supp. at 1108–12.

365. Approximately twenty-five years ago, an injunction issued compelling the Chicago Board of Election Commissioners to provide voting instructions and assistance in the Spanish language. Plaintiffs in that case successfully established a likelihood of success on the merits with respect to their claim that the absence of Spanish language ballot materials limited the ability of Spanish-speaking persons to vote. *Puerto Rican Organization for Political Action v. Kusper,* 350 F.Supp. 606, 611 (N.D.Ill.1972), *aff'd,* 490 F.2d 575 (7th Cir.1973).

366. This evidence, however, is too remote in time to establish a present impediment to minority participation in the political process. It is always difficult to draw a bright line demarcating the ongoing effects of past official discrimination, but in this Court's conclusion based upon the testimony and exhibits, these past practices have been sufficiently attenuated to have mitigated their present effects. *See Sanchez v. State of Colorado,* 97 F.3d at 1323.

367. There was, however, evidence of continuing official impediments to Latino political participation. Juan Andrade of the Midwest Northeast Voter Registration and Education Project testified, via deposition designation, that there are such continuing impediments, chief among which is the periodic purging of the voter registration rolls. (Andrade Dep. Des. 246ff). Given the low turnout rates of Latino voters, Latino voters are purged from the registration rolls more frequently than other voters. It is difficult to fathom precisely how legitimately purging inactive voters from the rolls of registered voters might, in fact, limits the right of Latino voters to participate in the political process. Nor did the *Bonilla* plaintiffs make any effort to reconcile their contention that the purging of the voter rolls adversely affects Latino voting rights with the *Barnett* plaintiffs' contention that for African–Americans the registration rolls are inflated. (Tr. 7502–19).

368. Nor do Congressman Gutierrez's and State Senator Garcia's testimony concerning the Democratic Party candidate slating process accrue to the *Bonilla* plaintiffs' benefit in establishing the existence of official discrimination. The slating process is the process by which party officials, including Democratic ward committeemen, decide Democratic Party support for candidate for elected office. (Tr. 1197–98–Gutierrez). Senator Garcia observed that being the slated candidate of the Democratic Party is vital for political success in Chicago. (Tr. 1641). Latino candidates, absent support from a figure such as the Mayor, have never been slated in a white-majority ward or district. (Tr. 1642). Besides its value in slating, the control of a Democratic ward organization is important in being able to win election to office. Latinos, however, have not traditionally been able to develop strong ward organizations in wards where whites are a majority of the population. (Tr. 1199–1200–Gutierrez). The creation of the three additional Latino wards in the present ward map gave the Latino community the opportunity to increase its leverage in the Democratic slating process on the county level and to increase its grass-roots level of organization at the ward and precinct levels, all of which are important for continuing Latino political progress and increased participation in the Chicago political process.

369. This testimony also indicates the importance of drawing Latino majority wards with sizeable Latino majorities. The creation of three additional Latino majority wards in the present ward map gave the Latino community an opportunity to create additional strong Latino ward organizations. If the new Latino wards had not been drawn with sizeable majorities, it would have been more difficult to develop the strong Latino ward organizations which are a necessary building block for political success in Chicago. For example, in the Democratic ward committeeman race for the 12th ward in 1992 there was a heated contest for the committeemen seat since the previous committeemen from the old white majority 12th ward did not simply cede his seat. It likely would have been difficult to develop successful Latino-oriented ward organizations in the *Bonilla* alternative wards in which Latinos would have been required to supplant pre-existing, largely extant white-dominated ward organizations.

370. To the extent that Latino participation in the political process was once limited by the Democratic Party slating process and by the comparative weakness of Latino Democratic Party organizations, those impediments have likely now been remedied by the opportunities to develop new Latino ward organizations in the new Latino majority wards.

371. This Court, concludes, therefore, that plaintiffs have failed to establish any present or continuing effect of past electoral discrimination.

## 2. Senate Factor Two—Polarized Voting

372. This Court has previously concluded that both the *Barnett* and the *Bonilla* plaintiffs have established the existence of racially polarized voting in the City of Chicago. (¶¶ 236–252–*Bonilla;* ¶¶ 288–302–*Barnett* ).

## 3. Senate Factor Three—Procedures which Enhance the Opportunities for Discrimination

373. Plaintiffs introduced no evidence and have proposed no findings that there are voting procedures in the City of Chicago which enhance the opportunities for discrimination.

## 4. Senate Factor Four—Slating

374. Since aldermanic elections are nonpartisan, the Democratic Party slating process is not of direct relevance to this case. To the extent that the slating process is coterminous with control of a ward's Democratic Party organization which provides access to campaign resources, the access of Latinos to ward organizations is relevant in this Court's canvassing of the totality of the circumstances. Traditionally in Chicago, control of a ward organization is important to winning election at the aldermanic level.

375. The *Barnett* plaintiffs introduced no evidence and have proposed no findings that the slating process limits African–American access to the political process.

376. As this Court has already found, the additional Latino majority wards have had the beneficial effect of encouraging the development of Latino ward organizations and have given the Latino political community increased opportunities to participate in the slating process. (¶¶ 368–370).

## Senate Factor 5—Effects of Discrimination on the Ability to Participate in the Political Process

377. This Senate Factor asks two related questions: 1) whether minority members in Chicago have lower socio-economic opportunities, and 2) whether these lower socio-economic opportunities impair the ability of minority members to participate in the political process. Both the *Barnett* and the *Bonilla* plaintiffs established, in very broad terms, the existence of socio-economic disparities in education, employment and other areas between minority members and most of the white community. Based upon these broad conclusions and generalities this Court is asked to infer that the socio-economic disparities hinder minority ability to participate effectively in the political process. Courts have long recognized that historic discrimination is relevant to voting rights cases because " 'disproportionate educations, employment, income level and living conditions arising from past discrimination tend to depress minority political participation.' " *LULAC v. Clements,* 999 F.2d 831, 866–67 (5th Cir.1993) (en banc), *cert. denied,* 510 U.S. 1071, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994), *quoting* S.Rep. 94–417 at 29 n. 114, 1982 U.S.C.C.A.N. at 207 n. 117. No causal nexus between lower socio-economic status and lower political participation need be proved. *Niagara Falls,* 65 F.3d at 1021. This factor, therefore, directs this Court only to ascertain if there is a correlation between low minority voter turnout and not whether there is a causal connection between the two.

378. This Court also takes notice of the history of employment discrimination against African–Americans and Latinos in the City of Chicago and the continuing need for affirmative action programs. *McNamara v. City of Chicago,* 959 F.Supp. 870 (N.D.Ill. 1997). *See also, Ketchum,* 740 F.2d at 1405–6.

379. In very general terms, the *Bonilla* plaintiffs successfully established that Latinos, in general, tend to have jobs that pay less than those in the white community. Latinos tend to have a lower median family household income and have a significantly lower median per-capita income than non–Latinos ($6,214.00 as compared to $10,726.00 for non–Latinos). (BOPX 21). The median per capita income of Latinos is the lowest in the City even though the Latino community has high rates of participation in the labor market. The low median income of Latinos is likely a function of the low rate of high school graduation among Latinos—70.5% of non–Latinos over 25 years of age are high school graduates while only 40.8% of Latinos

over 25 years of age are high school graduates. (BOPX 21). Part of the low median Latino income is also due to the young age of the community and the high rate of households with children. Latinos are also much more likely than non–Latinos to have a first language other than English. The Latino community is also very young with the highest rate of families with children of any racial or ethnic group in the City. (BOPX 21). As of the 1990 census, approximately 37% of the Latino population was under 18 years of age.

380. Latinos, as a group, at the present time turn out to vote at rates significantly lower than whites. Latinos turnout, as a percentage of the Latino VAP, at a rate estimated to be one-quarter of the rate of white turnout in citywide elections. (BOPX 76). In their testimony, Congressman Gutierrez and Senator Garcia suggested that Latinos experience socio-economic conditions which uniquely affect the Latino community including difficulties in access to education, to bilingual education, and adequate housing. (Tr. 1189–90–Gutierrez; 1623–Garcia). The unique characteristics of the Latino community, chiefly the lower educational levels, the language barriers, the heavy concentration in lower paying service oriented jobs, as well as the difficulty faced by recent immigrants to adequate, can reasonably be inferred to have an effect on Latino turnout rates.

381. The trial testimony established, however, that the present ward map was prepared in a manner intended to account for the very low Latino turnout rates. In short, this Court has concluded that the administration and the Latino Committee reached a compromise calling for seven Latino wards with high supermajorities rather than eight Latino majority wards with lower majorities in order to adjust for the low rates of Latino electoral participation. By agreeing to seven wards, the parties were able to ensure Latino representation in the City Council roughly proportional to the Latino VAP, while a similar rate of success would not have been as likely if 8 Latino majority wards had been included in the present ward map.

382. The present ward map, therefore, was drawn so as to compensate for the low

Latino turnout rates which might be a residual consequence of the Latino socio-economic condition in the City. It is difficult to ascertain how the remedy proposed by the *Bonilla* plaintiffs, the drawing of an additional Latino ward which would lower the magnitude of the Latino majorities in the wards on the near southwest side (the area of the City with the lowest Latino turnout rate), would ameliorate the effects of low turnout rather than exacerbate those effects.

383. With respect to the claims of the *Barnett* plaintiffs, Dr. Taylor's testimony established in the most generalized manner that, as a whole, African–American have a less affluent socio-economic status than do whites. Dr. Taylor's testimony established that African–Americans have a median family income that is approximately half that of whites. The African–American community also has higher rates of families with children in poverty and of single-parent families with children than any other racial or ethnic groups. (BAPX 80). African–Americans, on average, also have lower rates of educational attainment than whites—63.1% of adult African–Americans have achieved a high-school degree and only 10.5% of African–Americans have attained a BA degree. A higher percentage of African–Americans than whites rely on the Chicago Public School System for their children's education. (BAPX 80).

384. There was, however, little credible evidence to suggest that African–Americans participate in aldermanic elections at a rate significantly lower than whites, with the exception of the declining turnout in the 18th ward. Nor did the evidence suggest that the differential between African–American and white fundraising in aldermanic elections was not due chiefly to incumbency and the number of candidates involved in elections. (BAPX 109).

### 6. Senate Factor 6—Racial Appeals

385. In the past a substantial number of aldermanic and other municipal elections in Chicago were characterized by strong racial appeals (Tr. 3550–41, 3557–59–

Kleppner). The most egregious example of a political campaign infected by racial appeals was in the general election campaign for mayor in 1983. That campaign was characterized by extensive use of the most blatant forms of race-baiting. (Tr. 3550, 3559). There has, however, been little evidence, other than very isolated examples in the 46th ward, of the use of racial appeals in more recent campaigns. (Tr. 7195–Atkins).

386. Nor was the referendum campaign which resulted in the electoral approval of the present ward map marked by racial appeals. This Court has previously found that the referendum campaign flyers introduced by plaintiffs (PJX 56, 57), did not make racial appeals. (¶¶ 171, 172).

387. It is extremely difficult to demarcate clearly the possible continuing effects of past racial campaign appeals. The plaintiffs have, however, presented insufficient evidence to establish that racial appeals remain a component of contemporary political campaigns to an extent sufficient to warrant remedial action pursuant to VRA § 2.

### 7. Senate Factor 7—Minority Representation

388. The "extent to which minority group members have been elected to public office in the jurisdiction" is one of the most important Senate Report factors, together with racial polarization. *Gingles,* 478 U.S. at 48, n. 15, 106 S.Ct. at 2765, n. 15. Thanks in large part to the drawing of majority-minority wards intended to ameliorate the continuing effects of polarized voting, both African–Americans and Latinos enjoy representation in the City Council that,is roughly proportional to their share of the voting age population of Chicago. In addition, African–American and Latino candidates have been successful on several occasions in being elected to City-wide and county-wide offices, including the City Treasurer and Cook County Board President. The relevance of the substantial proportionality of minority representation in the City Council is discussed below at greater length in Section IV,B of this Opinion.

### 8. Senate Factor 8—Responsiveness

389. The Senate Report delegated evidence of governmental responsiveness to minority needs to a secondary role. S.Rep. 94–417 at 29. The process of divining governmental responsiveness to minority needs should be undertaken with some reluctance since it requires deciphering which policy steps indeed qualify as responses to the needs of the minority community. *Niagara Falls,* 65 F.3d at 1023, n. 24.

390. There was substantial evidence that the City is responsive to the needs of minority members. African–Americans and Latinos hold important and influential positions of power within the City's government, as chairmen or vice-chairmen of City Council committees, and within Cook County government. Latinos and African–Americans also serve in several highly influential appointed offices in Chicago. In positions such as these minority leaders enjoy input in guiding the course of public policy.

391. As this Court has discussed in its review of Dr. Lewis' testimony on behalf of the *Barnett* plaintiffs, it is manifestly difficult to ascertain the extent to which a particular policy initiative qualifies as a response to minority community desires. It is possible that several competing pieces of legislation are designed to further the same end but because they seek to effectuate that end in different manners, or they express their ends in different tones, they receive different levels of support in the majority and minority communities. Dr. Lewis' report glanced over the nuances between competing council initiatives and the various gradations of interest within the community. Certainly there are, at the extremes, different poles of interest in public policy initiatives within the Latino, the African–American, and white communities but most people, of any race or ethnicity, share, according to Dr. Lewis's survey data, generally similar concerns. Dr. Lewis's method was incapable of presenting anything more than the most generalized version of the needs of the minority community. Nor did his report establish that white

aldermen are unresponsive to the needs of the minority communities, although they may frequently differ in tone from their minority counterparts.

392. There was, substantial testimony, however, that elected officials, of any race, are responsive to the needs of African–American and Latino voters. This Court is satisfied with the testimony of Congressmen Gutierrez that with some exceptions, non-Latino aldermen are as responsive to the interests of Latinos as are Latino elected officials even though they do not share the same commonality of experience. (Tr. 1195–96). Alderman Burke testified credibly that he makes every effort to respond to the needs of his Latino constituents. (Tr. 6830–40–Burke). This Court is also satisfied with the testimony of Aldermen Murphy and Rugai, of the 18th and 19th wards, that they attempt to represent the interests of their white and African–American constituents and attempt to provide services equally throughout their wards. (Tr. 6098, 6104–06–Murphy; Tr. 6287, 6309–Rugai). Additionally, there is not necessarily any correlation between the race of an alderman and the responsiveness of an alderman to minority interests. To the extent that there is a distinct, identifiable African–American policy agenda, Aldermen Schiller and Moore, of the 46th and 49th wards, are considered to be more responsive in many instances than minority aldermen. (Tr. 5302–Steele).

393. It is important to recall, that in its present makeup no racial or ethnic group enjoys a majority of the seats of the City council. To the extent that there are distinct public policy needs which break down along racial or ethnic lines, it is necessary to compromise with aldermen of other racial or ethnic groups in order to form a majority of the City Council. No community, minority or otherwise, is entitled to a free legislative pass to further its policy needs untempered by compromise or debate.

### 9. Senate Factor 9—Tenuous Boundaries

394. Plaintiffs contend that the present ward map contains tenuous boundaries which evidenced substantial manipulation in order to protect white incumbents. This Court has already discussed plaintiffs claims of boundary manipulation in connection with the alleged protection of incumbencies at ¶¶ 176–184.

### B. Substantial Proportionality of Representation under the Present Ward Map

395. According to the 1990 Census, the population of Chicago is 38.6% white, 37.9% African–American, and 19.6% Latino in terms of total population. In terms of voting age population, Chicago is 46% white, 40% African–American, and 11% Latino. As of the 1990 census, the Latino community was by far the youngest group in the City, approximately 37% of the Latino population was not yet of voting age. Similarly, approximately only 56% of Latinos were United States citizens. Given the seven years which have elapsed since the census, and the intervening citizenship amnesty, both the Latino voting age population and the number of Latinos eligible to vote have no doubt increased substantially, even dramatically. Another significant trend revealed by the 1990 census, which will likely have an effect on future ward remaps, is the continuing growth of Latino population and the concomitant decrease in the African–American and white percentage of the population in the City.

396. The present ward map contains the following number of wards with total population majorities and voting-age population majorities in terms of racial and ethnic groups:

Wards by Total Population Majority

| Racial or Ethnic Group Majority | Number of Wards | % of City Council |
|---|---|---|
| White | 18 | 36% |
| African–American | 20 | 40% |
| Latino | 7 | 14% |
| No Majority | 5 | 10% |

Wards by Voting Age Population Majority

| Racial or Ethnic Group Majority | Number of Wards | % of City Council |
|---|---|---|
| White | 23 | 46% |
| African–American | 20 | 40% |
| Latino | 7 | 14% |

397. When the voting patterns in the wards in the present ward map are taken into consideration, the present ward map has 19 white wards, 19 African–American wards, 7 Latino wards and 5 wards which have tended to elect white aldermen but in which it is impossible for any candidate to succeed without managing to obtain bi-racial or multi-ethnic support (these are the 46th, 48th, 49th, 10th and 18th wards). Considered in these terms 38% of the wards are "white wards", 38% of the wards are "African–American wards", 14% of the wards are "Latino wards", and 10% of the wards are bi-racial or multi-ethnic wards.

398. By any of these measures, the present ward map has created wards in which whites, African–Americans, and Latinos enjoy majorities, either in terms of total population, voting age population or electoral influence, which are roughly proportional to each group's share of the City's population. African–American and Latino voters enjoy proportionality both in terms of majority wards and in terms of their representation in the City Council.

399. Thus, by any relevant measure, minority members enjoy political effectiveness in a number of wards which is substantially proportional to their voting age population. *See De Grandy*, 512 U.S. at 1014, 114 S.Ct. at 2658.

400. While the present ward map was drawn in a manner giving whites, African–Americans and Latinos proportional electoral opportunities, the inquiry cannot end here. Proportionality is never a safe harbor because an inflexible rule would run counter to the command of VRA § 2 that the presence or absence of a violation be assessed "based upon the totality of the circumstances." *De Grandy*, 512 U.S. at 1017, 114 S.Ct. at 2660. This Court must inquire whether the totality of facts, including the history of discrimination, portend any dilutive effects from the present ward map which includes majority-minority wards in substantial proportionality to the minority's share of voting age population. *Id.*, at 1012–14, 114 S.Ct. at 2658.

401. Plaintiffs have succeeded in establishing the three *Gingles* preconditions, but it is necessary to consider what those factors mean in the proper context. The first *Gingles* precondition, that it is possible to draw additional minority wards, does not demand the maximization of minority districts. In fact, "reading the first *Gingles* condition in effect to define dilution as a failure to maximize in the face of bloc voting causes its own dangers and they are not to be courted." *De Grandy*, 512 U.S. at 1016, 114 S.Ct. at 2659. It is possible to suspect vote dilution from political famine, but one is not entitled to suspect dilution from the mere failure to guarantee a political feast. *Id.* While plaintiffs do not, strictly speaking, necessarily seek to maximize the number of majority-minority wards, the same caution is relevant in this case where the Latino and African–American communities already enjoy substantial proportionality. That it is possi-

ble to draw additional majority-minority wards does not mean that VRA § 2 requires the drawing of such additional wards.

402. Plaintiffs have also established that both Latinos and African–Americans are politically cohesive (*Gingles* prong 2) and that, where it was possible to determine, whites voted sufficiently as a bloc to enable them usually to defeat the minority's preferred candidate (*Gingles* prong 3). Plaintiffs also successfully established that minority voters tend to prefer to vote for minority candidates, that white voters trend to prefer to vote for white candidates, and that the absence of white crossover voting usually operates to defeat the minority candidate of choice. Certainly there have been some significant minority political successes in City-wide elections, and similarly, there have been significant minority political successes in wards in which minority members, both Latino and African–American, constitute a VAP majority.

403. This Court must note that the *Gingles* analysis, while valuable, is applied only with great difficulty to a multi-district jurisdiction such as Chicago. The *Gingles* analysis was originally crafted in order to assist courts in determining whether an at-large election scheme diluted the abilities of minority voters to participate in the political process and thereby violated VRA § 2. The *Gingles* analysis fits quite readily to at-large electoral schemes.

404. While *Gingles* was applied, without modification, to multi-district electoral schemes in *Voinovich*, 507 U.S. 146, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993), the test does not fit very well to the aldermanic ward map of Chicago. It is nearly always possible in a jurisdiction as large and diverse as Chicago, to draw additional hypothetical majority-minority districts—this is simply a result of the fact that lines can always be drawn differently and differences of opinion concerning the manner in which boundary lines can be drawn will almost always befall any substantial community. Also troubling to this Court, is the manner in which the analytical techniques used to establish the second two *Gingles* prongs tend to presume the existence of racially polarized voting and presuppose that

minority voters can best be represented only by minority candidates. Voters behave the way they do for many reasons ranging across the spectrum of social and economic interests and affinities.

405. It is doubtful that the drawing of enclosures, in the form of district boundaries, around racial or ethnic groups is really the best way to hasten the end of polarized voting. Yet in their present guise the relevant standards for VRA § 2 require this Court to scrutinize every concentration of majority-minority census blocks that conceivably could have been drawn into different wards.

406. The testimony, both lay and expert, focused on particular areas of the City. The *Barnett* claims were focused on the southwest and southeast sides. The *Barnett* plaintiffs also focused, to a much lesser extent, on the west side. The *Bonilla* claims were also focused on the southwest and southeast sides. To a lesser extent, the *Bonilla* claims focused on the possibility of including additional Latino majority blocks into the northwest side Latino wards. In order to evaluate these claims, it is important to consider the specific considerations which guided the drawing of the present ward map in each of these areas. It is also important, however, to keep in mind the extent to which the particular ward boundaries, as well as the particular changes in the ward map proposed by both plaintiff classes, relate to the present ward map taken as a whole.

407. In an effort to bring together some of the relevant factors evidencing whether minority members have less opportunity to participate in the political process, this Court will now consider the claims of the *Barnett* and *Bonilla* plaintiffs in terms of the specific areas in which they allege that minority voting strength has been diluted.

### 1. *Barnett Plaintiffs' Claims*

408. Given the demographic patterns of Chicago, the *Barnett* claims were focused entirely on the region of the City south of North Avenue at 1600 North. In the 20 ward (wards 1, 26, 30–33, 35, 36, 38–41, 43–50) area which for the most part is to the north of North Avenue, the African–American population is only approximately 6.12% of

the total VAP and approximately 7% of the total population. This 20 ward region has a total population of 1,113,896, approximately 40% of the City's total population. This is relevant only insofar as the residential pattern of the City affected the extent to which additional African–American majority wards could be drawn.

409. In the remaining 30 wards (wards 2–25, 27–29, 34, 37 and 42) the total population is 23.41% white and 59.71% African–American and the voting age population is 27.44% white and 57.52% African–American. Eight of the wards in this region (including the 18th which has African–American VAP and total population majorities and the 10th ward which has a 50.344% white VAP majority) have white aldermen—6 of these wards have white total population majorities and 7 have white VAP majorities. Therefore, African–Americans enjoy electoral control of a proportional share of the wards in the southern two-thirds of the City. There are, chiefly in the 18th and 19th wards, several sizeable blocks of African–American population that could have been included in wards in which African–American candidates are ensured political success.

### a) Southwest Side

410. The wards on the far southwest side of the City, primarily the 18th and 19th wards, are a prime focus of the *Barnett* plaintiffs' claims. The boundaries of the 18th and 19th wards changed very little from their previous contours under the present ward map. Over the past decade, the African–American population in these two wards has risen. At the time of the *Ketchum* settlement, the 18th ward had a total population that was 50.03% African–American and a VAP that was 46.60% African–American. According to the 1990 census, the 18th ward has a total population that is 55.382% African–American and a VAP that is 53.632% African–American. At the time of the *Ketchum* settlement, the 19th ward had a total population that was 14.66% African–American and a VAP that was 12.50% African–American. Today, using the 1990 census figures, the 19th ward has a total population that is 18.691% African–American and a VAP that is 17.629% African–American.

411. While the present 18th ward has an African–American majority, both in terms of total and voting age population, it has never elected an African–American candidate. A combination of polarized voting patterns and the abundance of African–American aldermanic candidates, which has splintered African–American voting strength, have prevented African–American candidates from succeeding in this ward. In the 18th ward, the recent success of the present alderman in gaining African–American support has also contributed to the inability of African–American candidates to succeed at the polls. In the 1995 aldermanic elections Alderman Murphy was estimated to have received as many votes from African–American voters as the leading African–American candidate. The inability of African–American voters to coalesce around a single candidate, and the preference of approximately one-third of the African–American voters for the white incumbent in a ward in which African–Americans are a majority, do not constitute sufficient bases for significantly altering the ward map on the far southwest side.

412. The *Barnett* plaintiffs successfully established that it would have been possible to draw an additional African–American ward in this area of the City. Adding an additional African–American ward to the southwest side would require significant alterations of traditional ward boundaries and, in several of the *Barnett* alternatives, drawing long narrow wards extending in a corridor from the western boundary of the City to the Dan Ryan Expressway in the center of the south side or by removing nearly every African–American majority census block from the 18th and 19th wards and combining the white population of the 13th, 18th and 19th wards into two wards.

413. While some of the initial ward maps prepared by Judge Ruble–Murphy contained reconstituted 18th and 19th wards, those were preliminary maps. As corner wards that were close to ideal population, the reconfiguration of these wards would have set off a domino reaction requiring the alteration of all the adjoining wards as well. Throughout the City, only minimal changes were made to

corner wards, a practice that was followed with respect to the 18th and 19th wards.

414. Removing the African–American population from the 19th ward would also have run afoul of traditional districting criteria such as respecting the ward's traditional boundaries and paying attention to natural and manmade landmarks. The traditional eastern end of the 19th ward, dating back at least to the 1970's is a very sizeable rail yard dividing the northeast edge of the 19th ward from the 21st ward.

415. The 18th and 19th wards are two of less than a dozen wards, the 4th, 5th, 15th, 27th, 29th, 46th, 48th, and the 49th are the others, in which there are sizeable (at least 15% concentrations of both whites and African–Americans). Drawing wards in which the races are completely separated, while ensuring minority political success, is in the end a 'politics of the second best' since such ward boundaries are explicitly premised upon a race-conscious calculus. *See De Grandy*, 512 U.S. at 1019–20, 114 S.Ct. at 2661. Crafting wards in which all members of the community, minorities and majorities are forced to engage in political pulling and hauling and trading in an effort to find common political ground is a project that should be encouraged. It will be in such racially mixed wards that voters finally learn to overcome patterns of polarized voting behavior and begin to practice the dynamics of give and take and of the balancing of interests. *See De Grandy*, 512 U.S. at 1019–20, 114 S.Ct. at 2661.

416. While the experiment in crafting a multi-racial 18th ward has not been entirely successful given the continuing presence of polarized voting and the lack of African–American electoral success in the ward, there is still reason to be optimistic concerning the future of the ward as presently constituted. Alderman Murphy successfully mobilized his constituents in support of retaining the existing ward boundaries more effectively than any other alderman. (Tr. 6081–84). Alderman Murphy also was the leading vote getter, as estimated by extreme case analysis, among African–American voters in the 1995 aldermanic election. While African–Americans, as a whole, voted for African–American aldermanic candidates at a rate estimated at approximately 73%, Alderman Murphy was nonetheless estimated as the leading single vote-getter from the African–American electorate. While African–Americans in the 18th ward overwhelmingly supported the Fair Map at referendum, they did so at a rate estimated to have been lower than that of other African–American voters.

417. This Court is also satisfied with Alderman Murphy's testimony that he attempts to provide city services and allocate funds equally to every area of the 18th ward. (Tr. 6153). This Court was impressed that Alderman Murphy is an aggressive and energetic representative of all the residents of the 18th ward. This Court did not give as much weight to the few hearsay accounts of constituent complaints.

418. Nor does this Court find that there is any basis for redrawing the 18th and 19th wards based on socio-economic considerations. The eastern ends of the 18th and 19th wards share socio-economic traits with both the white majority areas to the west and the African–American majority areas to the east, and function as a transition between those two areas. The aldermen of the 18th and 19th wards credibly testified that the eastern ends of their respective wards are generally more affluent, and have higher concentrations of single family homes, than the areas in adjoining wards to the east. There is, therefore, no reason, based upon socio-economic conditions, to transfer the eastern ends of the 18th and 19th wards into African–American majority wards.

#### b) West Side

419. VRA § 2 also does not demand the drawing of an additional African–American majority ward on the west side. While it is theoretically possible to draw an additional African–American majority ward on the west side, doing so would have required either sizeable population deviations or would have required ward boundaries which might run afoul of compactness requirements. (Tr. 4840–42–Engstrom). The west side African–American community is sandwiched to the north and to the south between the two largest concentrations of Latino population in the City. Using Latino population as filler to

populate an additional west side African–American ward would likely run afoul of VRA § 2. Furthermore, the wards at the eastern and western ends of the west side African–American community are already irregularly shaped and/or contain sizeable white and Latino populations. The present 2nd ward is manifestly irregularly shaped extending from the near south side lakefront to Western Avenue and Washington Boulevard, avoiding the neighboring Latino community to the west and south of the ward, and is 13.028% white in terms of total population. The present 27th ward stretches from Pulaski Avenue on the west to LaSalle Street on the east snaking through industrial areas and the River West area in order to pick up the Cabrini–Green Housing Project, all the while skirting around Latino majority blocks, and is 19.129% white and 9.647% Latino in terms of total population. The present 29th ward on the western edge of the city is 15.152% white and 9.534% Latino in terms of total population. In order to draw an additional African–American majority ward in this area, it would be necessary either to further extend these wards or to use additional non–African–American population as filler in order to populate the African–American wards.

### 2. Bonilla Plaintiffs' Claims

420. The *Bonilla* claims focus on the near northwest side, the near southwest side including the Back of the Yards, Marquette Park and Gage Park areas on the southwest side. The Latino community is generally concentrated in a 22 ward area in the center of the City. The *Bonilla* plaintiffs also made claims seeking the strengthening of the Latino influence ward on the southeast side by including additional Latino majority census blocks into the ward.

421. The number of Latino majority wards is roughly proportional to the Latino share of the population in the 22 ward area in the center of the City (wards 1, 2, 3, 1, 12, 14, 15, 16, 22, 24–33, 33, 37, and 47) where Chicago's Latino population is concentrated. In this area of the City, Latinos comprise 34.21% of the total population and 30.79% of the VAP. Whites comprise 26.08% of the total population and 31.84% of the VAP in

this area. African–Americans comprise 36.64% of the total population and 33.99% of the VAP in this 22 ward area. Seven of the 22 wards in this area have Latino majorities comprising collectively 31.82% of the wards. Thus Latinos control a number of wards roughly proportional to their proportion of the population in the central area of the City. There are, however, several sizeable areas of Latino population concentrations in this area of the City, particularly in the Back of the Yards and Marquette Park/Gage Park communities which could have been included in Latino majority wards but were not.

422. The chief focus of the *Bonilla* case is the near southwest side of the City, in an area contained within the 11th, 12th, 14th, 15th and 16th wards. This area includes the Gage Park, Back of the Yards, and Marquette Park neighborhoods.

423. Under the previous ward map, this area was included within the 11th, 12th, and 14th wards. Between 1980 and 1990, the Latino population grew significantly in this area, between 1980 and 1990 the Latino total population in this area grew from 38,063 to 66,562. Two of these three wards had in 1990 sizeable Latino minorities and one of these wards had a Latino plurality: the 11th ward was 27.98% Latino (24.08% in terms of VAP); the 12th ward was 36.88% Latino (30.85% in terms of VAP); and the 14th ward was 41.31% Latino (37.45% in terms of VAP). The 14th ward had a Latino total population plurality and a white VAP plurality. The 14th ward was also the most overpopulated ward in the City with a population 23.53% over the ideal. This area was clearly one of the areas in which it was necessary to draw at least one additional Latino majority ward in recognition of the explosion of the Latino population in the City.

424. It would have been impossible, however, to craft two Latino majority wards in this area without borrowing population from another area of the City, most likely from north of the Stevenson Expressway which acted as the approximate northern boundary of this three ward area—two Latino super-majority wards with 70% majorities in this area would have required a minimum Latino population of approximately 78,000 assuming

that every Latino could have been included in a Latino majority ward.

425. At the time of redistricting, therefore, it was clear that the 12th, 14th and 11th wards would need to be reconfigured in order to make way for a new Latino majority ward. The 11th and 14th wards were represented by Aldermen Patrick Huels and Edward Burke, two of the most senior, and powerful, members of the City Council. Alderman Burke is the chairman of the Finance Committee and is generally viewed as one of the foremost leaders of the Council. Alderman Burke is also known for his political prowess and longevity—he has been 14th ward alderman since 1969 and ward committeeman since 1968, when he succeeded his father. He has not even been opposed in an aldermanic race since 1971. The 12th ward, meanwhile at the time of redistricting was represented by Mark Fary, a freshman alderman.

426. These factors do not indicate that the present ward map was prepared in order to protect the incumbencies of Aldermen Huels and Burke. Certainly, the testimony indicated that the powerful southwest side incumbencies were on the minds of the parties drafting what eventually became the present ward map. The topic of concern was how to draw a new Latino majority ward that would avoid pitting a Latino challenger against either of these powerful incumbents, rather than how to protect these incumbents. It would have been an extremely risky proposition for a Latino challenger, without an extant ward organization, to mount a campaign against one of the most senior, powerful members of the City Council, who enjoyed the benefits of powerful ward organizations, incumbency, patronage, and funding.

427. The testimony indicated that Judge Ruble–Murphy, as well as the members of the Latino Committee, were aware that it would have been a pyrrhic victory to place the residence of either Alderman Burke or Huels within a new Latino majority ward. Avoiding these two incumbencies while drafting a new Latino majority ward was not an instance of improper incumbency protection so much as it was an instance of attempting to craft a new ward in which the Latino

community would have a good opportunity to elect its candidate of choice. The goal was to draw a new Latino majority ward in which the Latino candidate of choice would likely emerge victorious, not to draw a new Latino majority ward in which it would be necessary to unseat a powerful incumbent.

428. Taking into account the political realities on the southwest side, the 12th ward with a 36.88% total population (30.85% VAP) Latino population was the logical choice for the new Latino majority ward. The 12th ward was substantially reconfigured to add segments of the Latino population from the 22nd ward, the 11th ward, and the 14th ward. The resulting 12th ward has a Latino total population majority of 72.534% and a VAP majority of 65.443%. The white majority portions of the old 12th ward which were not included within the new ward were allocated to the 11th and 14th wards.

429. The attempt to connect different areas of Latino population concentrations necessarily resulted in numerous realignments of population which were compounded by the manner in which the new 12th ward cuts like a ribbon through the center of the old 12th ward. There is nothing in the record to suggest that the new 12th ward was drawn around the 11th and 14th wards. The record, rather, indicates that the 11th and 14th wards were drawn around the new 12th ward. The 11th and 14th wards, in essence, added territory removed from the 12th ward.

430. The new 12th ward did not include the entire Latino concentration in the Back of the Yards and Marquette Park and Gage Park neighborhoods. These neighborhoods are now split between the 3rd, 12th, 16th, 15th and 14th wards. These reallocations of population were necessary in order to repopulate some of the neighboring wards which were significantly beneath the target population. As of the 1990 census, the 3rd ward was 21.54% beneath the target population and the 16th ward was 14% beneath the target population.

431. The *Bonilla* plaintiffs contend that this population could have been the basis for forming a second Latino majority ward on the southwest side. The testimony indicated,

however, that the representatives of the Latino community did not insist on another Latino majority ward in this area because of their practical assessment that an additional Latino ward would have had a lower than acceptable Latino majority population (Tr. 1940–41–Gutierrez). The *Bonilla* alternative maps contained an additional southwest side Latino majority ward, but only at the cost of lowering the Latino majorities in the southwest side Latino wards. Given the majorities contained in the alternative ward maps and the voting patterns in this area of the City, it is not unlikely that a Latino candidate of choice would not prevail in at least one of these wards.

432. It would hardly encourage additional opportunities for Latino participation in the political process to create additional wards in which they constituted ineffective majorities. Nor does it violate VRA § 2 to make the conscious political choice to craft a ward map containing 7 wards in which Latinos constitute an effective majority instead of preparing a ward map containing 8 Latino majority wards but in which 2 of the wards could very well not contain effective majorities.

433. The reasonable political choice made by the Latino political community to cement their political gains by agreeing to safe majorities in a number of wards which was roughly proportionate to the Latino community's share of the population instead of pushing for a larger number of wards with smaller, possibly ineffective, majorities cannot be discredited when considering the totality of the circumstances surrounding opportunities for Latino political participation. Prudent political concerns are necessarily an important component of the political process. Certainly, on the southwest side, there are Latino majority blocks which were fractured from Latino majority wards, but dividing and combining populations is inevitable in the districting process. The possibility that lines could have been drawn elsewhere, without more, does not result in vote dilution when the minority group enjoys substantial proportionality. *De Grandy* 512 U.S. at 1015–16, 114 S.Ct. at 2659. This compromise was both prudent and effective.

434. The *Bonilla* alternative maps also indicated that it would have been possible to draw an additional Latino majority ward on the near northwest side. The Latino majorities in these additional wards would have been significantly lower than those in the present ward map and would have resorted to several long connecting corridors in order to pick up virtually every Latino majority census block on the northwest side. This Court can find no evidence of differential line drawing on the near northwest side disproportionately fracturing Latinos. In fact, the northwest side Latino majority wards, particularly the 26th, 31st and 35th wards contain large concentrations of white population which were included as filler in order to populate these wards.

### 3. The Southeast Side

435. Both the *Barnett* and *Bonilla* plaintiffs claim that minority voting strength was diluted on the southeast side of the City. The southeast side comprises the four ward area including the 7th, 8th, 9th and 10th wards. The *Barnett* plaintiffs claim that an additional African–American ward could have been drawn in this area while the *Bonilla* plaintiffs seek the inclusion of additional Latino majority census blocks into the 10th ward which is presently 43.133% Latino in terms of total population (37.522% Latino and 50.344% white in terms of voting age population).

436. The plaintiffs established that it is possible to draw alternative ward maps in this area including drawing 4 African–American majority wards. Drawing an additional African–American ward in this area would have required the fracturing of several discrete neighborhoods and would have broken up traditional ward boundaries in the 10th ward. It would be necessary to draw irregularly shaped wards snaking around Lake Calumet in order to draw an additional African–American majority ward in this area of the City. The *Barnett* alternative maps for this area of the City would also have reconfigured the 8th ward, which is represented by an African–American alderman, Lorraine Dixon, who has been allied with the present administration. There is also no evidence of frac-

turing or packing of the African–American population in this area of the City.

437. In no case is it possible, using the 1990 census data, to draw an effective Latino majority ward in this area of the City. It would have been possible to consolidate additional Latino population into a single ward, but courts cannot be asked to scrutinize districting schemes to such an extent that they would engage in transferring handfuls of blocks between wards in order to adjust slightly the minority percentages within a ward. The analytical framework of VRA § 2 does not account for influence district claims, although *De Grandy* certainly recognizes the value of electoral districts in which minority members are able to form coalitions with other members of the community. *De Grandy,* 512 U.S. at 1020, 114 S.Ct. at 2661. Nor would judicial intervention be desirable in every instance in which it might be possible to adjust ward lines in order to adjust slightly the population percentages within wards. There simply is no legal precedent for finding that VRA § 2 requires that a ward with a 37.522% Latino VAP be redrawn into a ward with a 40% Latino VAP.

438. Nor would dividing up the 10th ward in order to create an additional African–American ward and consolidating the Latino community into an African–American majority ward necessarily result in greater Latino opportunities to participate in the political process than they enjoy in the present ward map. Voting in this area of the City is polarized between African–Americans and whites and Latinos but it is also polarized between Latinos and African–Americans.

439. Plaintiffs' claims concerning the southeast side of the City ask this Court to engage in the sort of micro-management of districting schemes for which courts are unsuited and which is not consistent with the intent of VRA § 2.

### C. Conclusions Based on the Totality of the Circumstances

440. After examining the record as a whole, this Court concludes that Latinos and African–Americans in the City of Chicago have an opportunity equal to other members of the electorate to participate in the political process and to elect representatives of their choice.

441. While by no means perfect, the 1991–1992 redistricting process was the most open in Chicago's history. The record does not indicate that Alderman Burke seized control of the process in order to protect his position. Rather, the record indicates that Alderman Burke properly performed according to his leadership role in the Council by laying the groundwork for the redistricting process to proceed efficiently and openly. Alderman Burke's most important act in connection with the redistricting process was his assignment of Judge Ruble–Murphy as the coordinator of the redistricting effort. Judge Ruble–Murphy proved to be tireless and fair in the administration of her duties.

442. The 1991 redistricting process permitted for more public involvement and ensured aldermanic input to a greater extent than any previous Chicago aldermanic redistricting. Many of the participants in the process left the negotiating table feeling that their interests had not been adequately considered, but it is inevitable that a process requiring so many difficult political decisions, particularly when the process did not end in the 41 vote consensus needed to avoid a referendum, would leave some of the participants disappointed.

443. Similarly, the final ward map resulting from the redistricting process is not perfect and certainly has room for improvement. Nonetheless, the present ward map does more than any previous ward map, that was not the result of trial or settlement, to facilitate minority participation in the political process. The redistricting process in Chicago is extremely complex and requires the balancing of many competing interests. The present ward map, for all the dispute it engendered, nonetheless does a creditable job of balancing the competing political, neighborhood, racial and ethnic interests in Chicago while providing a means for the substantially proportional representation of the chief racial and ethnic groups in the City.

444. The Voting Rights Act was intended to serve as a "means of eradicating voting practices that 'minimize or cancel out the

voting strength and political effectiveness of minority groups.'" *Reno v. Bossier Parish School Board,* —— U.S. ——, ——, 117 S.Ct. 1491, 1498, 137 L.Ed.2d 730 (1997), *quoting,* S.Rep. 97–416, 1982 U.S.C.C.A.N. at 205. The present ward map accomplishes this purpose by containing a proportional number of wards in which minority members constitute an effective majority enabling them to elect a proportional number of the members of the Chicago City Council.

445. The present ward map also furthers the deeper salutary purpose of hastening the end of polarized voting by including a number of wards, including the 10th, 18th, 46th, 48th, and 49th wards, in which minority members, while not constituting an effective majority, are nonetheless present in such sizeable numbers that a candidate must receive support from minority voters in order to be successful. These multi-racial or multiethnic wards serve the salutary purpose of enabling and encouraging involvement in the give and take of political coalition building and compromise at the grass roots level. Locking minorities and whites into separate wards in which they constitute supermajorities might ensure proportionality of representation, but it will never serve the deeper purposes of the Voting Rights Act. By residing in racially and ethnically diverse wards, in which no racial or ethnic group wields absolute electoral control, the members of the community might be educated about the diversity of opinions and aspirations of other members of the community. By running for election in racially and ethnically diverse wards, in which no racial or ethnic group wields absolute electoral control, candidates might learn to be responsive to the broader community.

## V. INTENTIONAL DISCRIMINATION

446. Plaintiffs' intentional discrimination claims revolve around their contention that ward lines were manipulated in order to protect a handful of senior white incumbents. The desire to protect incumbents, as such, is not a form of racial discrimination. If, however, in order to protect incumbents, the redistricting scheme deliberately adopted devices for limiting minority representation, defendants have engaged in deliberate racial discrimination. *Barnett v. Daley,* 32 F.3d at 1196; *Ketchum v. Byrne,* 740 F.2d at 1408.

447. In Section I.D., ¶¶ 176–184, of this Memorandum Opinion, this Court discussed, at length, plaintiffs' factual allegations that defendants adopted devices for limiting minority representation and manipulated ward boundaries in order to protect incumbencies. This Court found that concerns about the effectiveness of the new Latino wards and the concomitant attempt to draw Latino areas with high population concentrations into the new Latino majority wards motivated the shifts in ward boundaries. Changes in the ward boundaries were also necessary to correct the significant underpopulation of some of the south side wards. (¶¶ 178–182).

448. This Court also concluded that the manner in which the 11th, 14th, and 33rd wards, in particular, were drawn exhibited a significant level of political prudence insofar as the drawing of these wards avoided pitting a Latino aldermanic candidate against several of the incumbent white aldermen with the most formidable ward organizations. (¶ 183).

449. Based upon the foregoing facts, upon the relevant legal standards, and upon this Court's previous determination that in the totality of the circumstances Latinos and African–Americans in the City of Chicago have an opportunity equal to other members of the electorate to participate in the political process, this Court concludes that the present ward map of the City of Chicago was not the product of an intent to discriminate against Chicago's African–American and Latino voters.

## CONCLUSION

For the reasons set forth above, this Court concludes that the plaintiffs have failed to prove than the present ward map for the City of Chicago violates § 2 of the Voting Rights Act, 42 U.S.C. § 1973. This Court also concludes that the plaintiffs have failed to establish that the present ward map was the product of an intent to discriminate against Chicago's African–American and Latino voters. Accordingly, the Clerk of the

Court is directed to enter judgment in favor of defendants.